## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE

_____

CONSERVATION LAW FOUNDATION, INC.

Plaintiff,

v.

NEW HAMPSHIRE FISH AND GAME DEPARTMENT; GLENN NORMANDEAU, in his official capacity as EXECUTIVE DIRECTOR of the NEW HAMPSHIRE FISH AND GAME DEPARTMENT; NEW HAMPSHIRE FISH AND GAME COMMISSION; ROBERT PHILLIPSON, in his official capacity as CHAIR and CHESHIRE COUNTY COMMISSIONER of the NEW HAMPSHIRE FISH AND GAME COMMISSION; DAVID PATCH, in his official capacity as VICE CHAIR and CARROLL COUNTY COMMISSIONER of the NEW HAMPSHIRE FISH AND GAME COMMISSION; BARRY CARR, in his official capacity as SECRETARY/TREASURER and STRAFFORD COUNTY COMMISSIONER of the NEW HAMPSHIRE FISH AND GAME COMMISSION; PAUL G. MCINNIS, in his official capacity as COASTAL COMMISSIONER of the NEW HAMPSHIRE FISH AND GAME COMMISSION; CHRISTOPHER HODGDON, in his official capacity as MERRIMACK COUNTY COMMISSIONER of the NEW HAMPSHIRE FISH AND GAME COMMISSION; TODD BALDWIN, in his official capacity as GRAFTON COUNTY COMMISSIONER of the NEW HAMPSHIRE FISH AND GAME COMMISSION; ERIC G. STOHL, in his official capacity as COOS COUNTY COMMISSIONER of the NEW HAMPSHIRE FISH AND GAME

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:18-cv-00996

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

1

COMMISSION; RAY GREEN, in his official )
capacity as HILLSBOROUGH COUNTY )
COMMISSIONER of the NEW )
HAMPSHIRE FISH AND GAME )
COMMISSION; ERNEST MILLETTE, in his )
official capacity as BELKNAP COUNTY )
COMMISSIONER of the NEW )
HAMPSHIRE FISH AND GAME )
COMMISSION;CHRISTINA LUPPI, in her )
official capacity as ROCKINGHAM )
COUNTY COMMISSIONER of the NEW )
HAMPSHIRE FISH AND GAME )
COMMISSION; and BRUCE TEMPLE, in )
his official capacity as SULLIVAN )
COUNTY COMMISSIONER of the NEW )
HAMPSHIRE FISH AND GAME )
COMMISSION, )
                                                                )
Defendants

## **INTRODUCTION**

1.   This action is a citizen suit brought under Section 505 of the Federal Water Pollution

Control Act ("Clean Water Act" or "CWA,"), 33 U.S.C. § 1365(a), to address significant Clean

Water Act violations by the Powder Mill State Fish Hatchery, a facility located in New Durham,

New Hampshire that discharges pollutants into the Merrymeeting River subject to National

Pollutant Discharge Elimination System ("NPDES") Permit NH0000710 (the "Permit") (the

"Facility").  The Facility is discharging significant loads of pollutants into the Merrymeeting

River, substantially degrading the health of the river and its impoundments, creating conditions

that have precluded the recreational use of portions of the Merrymeeting River, and threatening

the health of Lake Winnipesaukee's Alton Bay downstream.  More particularly, the Facility has

discharged and continues to discharge wastewater associated with its fish production operations

into waters of the United States in violation of the Permit's (1) effluent limitations prohibiting

2

discharges that violate state water quality standards; (2) effluent limitations requiring that the receiving waters remain free of pollutants and non-natural effects that interfere with designated uses; (3) effluent limitations relative to formaldehyde; (4) effluent limitations and State Certification requirements relative to pH; (5) effluent limitations prohibiting the direct discharge of cleaning water; and (6) effluent limitations requiring implementation and maintenance of a Best Management Practices ("BMP") plan.

2.  The Facility is owned and operated by the New Hampshire Fish and Game Department ("Department"), under the purview of the New Hampshire Fish and Game Commission ("Commission") and the above-named director and commissioners in their official capacities with the Department and/or the Commission.  Conservation Law Foundation ("CLF") seeks declaratory judgment, injunctive relief, and other relief with respect to the Facility's violations of its Permit, Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and applicable regulations, as well as the State's Certification requirement pertaining to pH discharges.

## JURISDICTION AND VENUE

3.  Plaintiff brings this civil suit under the citizen suit provision of Section 505 of the Clean Water Act, 33 U.S.C. § 1365.

4.  This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1); 28 U.S.C. § 1331 (an action arising under the Constitution and laws of the United States); and 28 U.S.C. §§ 2201 and 2202 (declaratory judgment).

5.  On August 2, 2018, Plaintiff notified the Department, the Department's Director, and

3

members of the Commission of its intention to file suit for violations of the Clean Water Act, in compliance with the statutory notice requirements of Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations located at 40 C.F.R. § 135.2.[1] A true and accurate copy of Plaintiff's Notice Letter ("Notice Letter") is appended as Exhibit 1. Plaintiff also sent copies of the Notice Letter to the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region 1, the Citizen Suit Coordinator, and the New Hampshire Department of Environmental Services.

6.   More than sixty days have elapsed since Plaintiff mailed its Notice Letter, during which time neither EPA nor the State of New Hampshire has commenced an action to redress the violations alleged in this Complaint. 33 U.S.C. § 1365(b)(1)(B).

7.   The Clean Water Act violations alleged in the Notice Letter are of a continuing nature, ongoing, or reasonably likely to re-occur.  Defendants remain in violation of the Clean Water Act.

8.   Venue is proper in the United States District Court for the District of New Hampshire pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

**Plaintiff**

9.   Plaintiff, Conservation Law Foundation ("CLF"), is a nonprofit, member-supported, regional environmental advocacy organization dedicated to protecting New England's environment.

---

[1] Christina Luppi, named here as a Defendant in her official capacity as a member of the Commission, was not a Commissioner at the time Plaintiff sent its Notice Letter.

10.   CLF has a long history of working to protect the health of New England's and New Hampshire's water resources, including addressing significant sources of nutrient pollution.

11.   CLF has over 5,000 members, including over 600 members in New Hampshire.  CLF members use and enjoy New Hampshire's waterways, including the Merrymeeting River and Lake Winnipesaukee, for recreational and aesthetic purposes, including but not limited to boating, swimming, fishing, and sightseeing.

12.   CLF's members include individuals who own property contiguous to, or near, the Merrymeeting River; who have used and enjoyed the Merrymeeting River for recreational purposes such as fishing, swimming and boating; who have used and enjoyed the Merrymeeting River for aesthetic purposes; and/or who have engaged in ongoing monitoring and study of the Merrymeeting River.

13.   CLF's members include individuals who have been and continue to be directly and adversely affected by the degradation of water quality in the Merrymeeting River.  Such adverse effects include interference with recreational and aesthetic use and enjoyment of the Merrymeeting River, and the loss of property value, as a result of cyanobacteria blooms, the proliferation of green algae and other plants, and the loss of water clarity, associated with eutrophic conditions caused by the Facility's discharges of phosphorus, nitrogen, total suspended solids and other pollutants, and as a result of the Facility's violations of its Permit.

**Defendants**

14.   Defendant New Hampshire Fish and Game Department is an agency of the State of New Hampshire under the purview of the New Hampshire Fish and Game Commission.

15.   The Department is the owner and operator of the Powder Mill State Fish Hatchery located at 288 Merrymeeting Road, New Durham, New Hampshire.

16.   Defendant Glenn Normandeau is the Executive Director of the Department and, in this official capacity, is responsible for ensuring that the Department and the Facility operate in compliance with the Clean Water Act.

17.   Defendant Robert Phillipson is the Chair and Cheshire County Commissioner of the Commission and, in this official capacity, is responsible for ensuring that the Department and the Facility operate in compliance with the Clean Water Act.

18.   Defendant David Patch is the Vice Chair and Carroll County Commissioner of the Commission and, in this official capacity, is responsible for ensuring that the Department and the Facility operate in compliance with the Clean Water Act.

19.   Defendant Barry Carr is the Secretary/Treasurer and Strafford County Commissioner of the Commission and, in this official capacity, is responsible for ensuring that the Department and the Facility operate in compliance with the Clean Water Act.

20.   Defendants Paul G. McInnis, Christopher Hodgdon, Todd Baldwin, Eric G. Stohl, Ray Green, Ernest Millette, Christina Luppi, and Bruce Temple are members of the Commission and, in this official capacity, are responsible for ensuring that the Department and the Facility operate in compliance with the Clean Water Act.

21.   Defendants are all persons as defined by Section 502(5) of the Clean Water Act, 33 U.S.C. 1362(5).

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act and Its Associated Regulations

22.   The objective of the Clean Water Act is "to restore and maintain the chemical, physical and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

23.   The Clean Water Act prohibits the addition of any pollutant to navigable waters

from any point source except as authorized by a National Pollutant Discharge Elimination System ("NPDES") permit applicable to that point source. 33 U.S.C. §§ 1311(a) and 1342.

24.   Under the Clean Water Act's implementing regulations, the "discharge of a pollutant" is defined as "[a]ny addition of any 'pollutant' or combination of pollutants to 'waters of the United States' from any 'point source.'"  40 C.F.R. § 122.2.  *See also* 33 U.S.C. § 1362(12).

25.   A "pollutant" is any "solid waste," "sewage," "chemical wastes, biological materials," and "agricultural waste discharged into water."  33 U.S.C. § 1362(6).

26.   The Clean Water Act defines navigable waters as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). "Waters of the United States" are defined by EPA regulations to include, *inter alia*, all tributaries to interstate waters. See 40 C.F.R. § 122.2.

27.   Under the regulations that implement the Clean Water Act, "waters of the United States" include, among other things: "(i) all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce . . . ; (v) all other waters the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce."  40 C.F.R. § 122.2.

28.   "Point source" is defined broadly to include, "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

29.   A concentrated aquatic animal production facility is "a hatchery, fish farm, or other facility . . . [which] contains, grows, or holds. . . cold water fish species. . . in ponds, raceways, or other similar structures which discharge at least 30 days per year," and which produces more than 20,000 pounds of aquatic animals per year and feeds more than 5,000 pounds of food during

the calendar month of maximum feeding, and is a point source subject to the NPDES permit program.  40 C.F.R. § 122.24; 40 C.F.R. Pt. 122, App. C.

30.    Concentrated aquatic animal production facilities that "produce 100,000 pounds or more per year of aquatic animals in a flow-through or recirculating system" that is "designed to provide a continuous water flow to waters of the United States through chambers used to produce aquatic animals" are required to develop and maintain a BMP plan.  *See* 40 C.F.R. §§ 451.2, 451.3(d), 451.10.

31.    Among other things, the BMP plan must "identify and implement procedures for routine cleaning of rearing units and off-line settling basins, and procedures to minimize any discharge of accumulated solids during the inventorying, grading and harvesting [*sic.*] aquatic animals in the production system."  *Id.* § 451.11(a)(2).  The BMP plan must implement these procedures "in order to minimize the discharge of accumulated solids from settling ponds and basins and production systems." *Id*.

32.    Each NPDES permit must meet State requirements and include the additional requirements necessary to achieve the "water quality standards established under section 303 of the [Clean Water Act], including State narrative criteria for water quality."  *See id.* § 122.44(d)(1).

33.    Effluent limitations established in NPDES permits must control all pollutants that cause or contribute to the violation of water quality standards.  *See id.*

**New Hampshire's Surface Water Quality Regulations**

34.    New Hampshire's State surface water quality standards require that:

> [a]ll surface waters shall be restored to meet the water quality criteria for their designated classification including existing and designated uses, and to maintain the chemical, physical, and biological integrity of surface waters, [and that] all surface waters shall provide, wherever attainable, for the protection and

> propagation of fish, shellfish and wildlife, and for recreation in and on the surface waters.

N.H. Code Admin. R. Env-Wq § 1703.01(b), (c).

35.   New Hampshire's State surface water quality standards require that, unless otherwise specifically allowed:

> [a]ll surface waters shall be free from substances in kind or quantity that:
> i.   Settle to form harmful benthic deposits;
> ii.  Float as foam, debris, scum or other visible substances;
> iii. Produce odor, color, taste or turbidity that is not naturally occurring and would render the surface water unsuitable for its designated uses;
> iv.  Result in the dominance of nuisance species; or
> v.   Interfere with recreational activities.

*Id.* § 1703.03(c)(1).

36.   New Hampshire State water quality standards contain specific provisions pertaining to dissolved oxygen, including but not limited to the requirements, with limited exception, that Class B waters have a dissolved oxygen content of at least 75 percent of saturation, based on a daily average, and an instantaneous minimum dissolved oxygen concentration of at least 5 milligrams per liter.  *Id.* § 1703.07.

37.   New Hampshire State water quality standards require that Class B waters "shall contain no benthic deposits that have a detrimental impact on the benthic community, unless naturally occurring."  *Id.* § 1703.08(b).

38.   New Hampshire State water quality standards do not allow Class B waters to contain color in such concentrations that would impair any existing or designated uses, unless naturally occurring.  *See id.* § 1703.10(b).

39.   New Hampshire State water quality standards include the following regulatory provisions specifically pertaining to nutrients:

a. Class A waters shall contain no phosphorous or nitrogen unless naturally occurring.

b. Class B waters shall contain no phosphorus or nitrogen in such concentrations that would impair any existing or designated uses, unless naturally occurring.

c. Existing discharges containing phosphorus or nitrogen, or both, which encourage cultural eutrophication shall be treated to remove the nutrient(s) to ensure attainment and maintenance of water quality standards.

d. There shall be no new or increased discharge of phosphorus into lakes or ponds.

e. There shall be no new or increased discharge containing phosphorus or nitrogen to tributaries of lakes or ponds that would contribute to cultural eutrophication or growth of weeds or algae in such lakes or ponds.

*See id.* § 1703.14.

40.   New Hampshire's State water quality standards, relating to the integrity of the biological and aquatic community of surface waters, require that:

> [a]ll surface waters shall support and maintain a balanced, integrated, and adaptive community of organisms having a species composition, diversity, and functional organization comparable to that of similar natural habitats of a region . . . [and that] [d]ifferences from naturally-occurring conditions shall be limited to non-detrimental differences in community structure and function.

*Id.* § 1703.19.

41.   New Hampshire's State water quality standards regarding antidegradation require, *inter alia*, the maintenance and protection of existing uses and the level of water quality necessary to protect them.  *See id.* § 1708.01.

**The Facility and Its NPDES Permit**

42.   The Facility is a concentrated aquatic animal production facility within the meaning of 40 C.F.R. § 122.24, 40 C.F.R. Part 122 Appendix C, and 40 C.F.R. Part 451.

43.   The Facility's Permit, appended as Exhibit 2, became effective on December 22, 2011.

44.   The Permit expired in December 2016 and has been administratively continued since its expiration.

45.   The Permit states in Part I.A.3 that the Facility is specifically required, *inter alia*, to "not cause a violation of the [state] water quality standards of the receiving water," which include but are not limited to N.H. Code Admin. R. Env-Wq Rules 1703.01 (Water Use Classifications; Designated Uses), 1703.03 (General Water Quality Criteria), 1703.07 (Dissolved Oxygen), 1703.08 (Benthic Deposits); 1703.10 (Color), 1703.14 (Nutrients),1703.19 (Biological and Aquatic Community Integrity), and 1708.01 (Antidegradation).

46.   The Permit requires in Part I.A.4 that the Facility ensure that the Merrymeeting River "remains free from pollutants in concentrations or combinations that settle to form deposits, float as foam, debris, scum or other visible pollutants" and that discharges from the Facility "shall be adequately treated to ensure that [the Merrymeeting River] remain[s] free from pollutants which produce odor, color, taste or turbidity which is not naturally occurring and would render it unsuitable for its designated uses."

47.   The Permit states in Part I.A.5(a) and (b) that "[n]o components of the effluent shall result in any demonstrable harm to aquatic life or violate any water quality standard which has been or may be promulgated . . ." and that the Facility "shall not discharge into the receiving water any pollutant or combination of pollutants in toxic amounts."

48.   The Permit requires in Part I.A.1-2 that the Facility not discharge effluent with concentrations of formaldehyde exceeding 4.6 mg/L as a daily maximum or 1.6 mg/L as a monthly average.

49.   The Permit requires in Part I.A.1-2 that the pH level of the Facility's effluent be within a specified range of 6.5 to 8.0 standard units (S.U.), except that if the effluent's pH is lower than 6.5 S.U., compliance may be demonstrated by showing that the discharge pH is either higher than, or not more than 0.5 S.U. lower than, the ambient upstream river water pH.

50.  The Permit, in Part I.D.1(a), includes pH range limitations as a State Certification requirement.

51.  The Permit, in Part I.A.9, prohibits the Facility from directly discharging cleaning water, which is defined by the Permit as "any water from the facility's hatchery house, raceways, ponds, canals, circular tanks, etc. which contains settled solids that have accumulated on the bottom of such structures that is discharged, absent some form of solids removal, directly to the receiving water during periodic cleaning operations."

52.  The Permit requires in Part I.B.4 that the Facility "implement and maintain" a BMP plan that, *inter alia*, addresses "solids control."

53.  The Permit requires in Part I.B.4 that the Department amend its BMP plan "within thirty (30) days following any change in facility design, construction, operation, or maintenance which affects the potential for the discharge of pollutants into surface waters. . .".

54.  The New Hampshire Fish and Game Department's BMP plan for the Facility states with respect to solids management, *inter alia*: "The preferred option for [solids] disposal is land application of our agricultural manure on [sic] local farmer's hay fields, or crops, as part of the farmer's nutrient management plan. (Estimated at 3 times per year . . .)."

**Citizen Enforcement Suits under the Clean Water Act**

55.  The Clean Water Act authorizes citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation."  33 U.S.C. § 1365(a)(1).

56.  An "effluent limitation" is "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other

constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." *See id.* 1362(11).

57.  Such enforcement action under Section 505(a)(1) of the Clean Water Act includes an action seeking remedies for unauthorized discharge under Section 301 of the Clean Water Act, 33 U.S.C § 1311, as well as for violation of a permit condition under Section505(f), 33 U.S.C. § 1365(f).

58.  Each separate violation of the Clean Water Act subjects the violator to a penalty of up to the maximum amount allowed pursuant to Sections 309(d) and 505(a) of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365(a).  *See also* 40 C.F.R. §§ 19.1–19.4.

## FACTUAL BACKGROUND

### The Facility and Its Operations

59.  The Facility is a concentrated aquatic animal production facility engaged in the production of fish to be stocked primarily for recreational fishing purposes in water bodies throughout New Hampshire.

60.  The Facility's fish-production operations include annual targets of raising 130,000 pounds of eastern brook trout, 97,000 pounds of rainbow trout, 32,000 pounds of brown trout, and 6,000 pounds of landlocked salmon, with a maximum annual harvestable weight of 265,000 pounds of fish.

61.  The Facility uses 17,000 pounds of food during the calendar month of maximum feeding.

62.  To control parasites on fish eggs, the Facility uses formalin.

63.  Formalin is also known as the aqueous solution of formaldehyde.

64.  The Facility's cleaning and maintenance operations are subject to a BMP plan, and

include vacuuming fish waste from fish containment facilities.

65.   The Facility's BMP plan includes, inter alia, practices related to the removal of solids from the Facility and identifies the preferred disposal option as land application of solids on agricultural fields three times per year.

66.   The Facility's operations cause the discharge of pollutants – including but not limited to phosphorus, nitrogen, suspended solids, and formaldehyde – through two outfalls into the Merrymeeting River.

**The Waterbodies Affected by the Facility's Discharges**

67.   The Facility discharges pollutants into the Merrymeeting River at waterbody segment NHRIV700020102-04 near the river's source, Merrymeeting Lake.

68.   The Merrymeeting River is a navigable water within the meaning of the Clean Water Act.

69.   The Merrymeeting River is a Class B waterbody pursuant to RSA 485-A:8, which provides that waters of such class shall be of the second highest quality (as compared to Class A waters), shall have no objectionable physical characteristics, shall not receive disposal of sewage or waste absent adequate treatment, and shall be considered as being acceptable for fishing, swimming and other recreational purposes, and for use as a water supply after adequate treatment.

70.   The Merrymeeting River flows downstream from the Facility into, and is comprised of, the following waterbody segments: Marsh Pond (Waterbody NHIMP700020102-01-02), Jones Dam Pond (Waterbody NHIMP700020102-01-01), Downing Pond (Waterbody NHLAK700020102-02), and Merrymeeting River (Waterbody Segment NHRIV700020102-08), each of which are habitats for wildlife and aquatic life, and provide for primary and secondary

contact recreational uses.

71.   Segments of the Merrymeeting River (Downing Pond and Jones Dam Pond) are listed on New Hampshire's 2016 Section 303(d) list as violating state water quality standards – as a result of cyanobacteria hepatoxic microsystins – for not supporting primary contact recreation uses.

72.   Merrymeeting River flows into Lake Winnipesaukee (Waterbody NHLAK700020110-02-19) at Alton Bay approximately nine miles downstream from the Facility.

73.   Lake Winnipesaukee is a Class B waterbody pursuant to RSA 485-A:8, and its Alton Bay is a popular resource for residents, homeowners, and visitors who enjoy swimming, boating, kayaking, canoeing, fishing, paddle boarding, and a variety of primary contact recreation uses.

74.   Lake Winnipesaukee is subject to the New Hampshire 158 Acid Ponds TMDL.

75.   Lake Winnipesaukee in Alton is listed on New Hampshire's 2016 Section 303(d) list as violating state water quality standards – as a result of cyanobacteria hepatotoxic microsystins – for not supporting primary contact recreation uses.

**Impacts of the Facility's Discharges on the Affected Waterbodies**

76.   The Facility has discharged, and continues to discharge, significant loads of pollutants that have caused and contributed to, and will continue to cause and contribute to, significant degradation of the Merrymeeting River, including the violation of State water quality standards.

77.   The discharge of pollutants from the Facility (including but not limited to discharges of phosphorus, nitrogen, ammonia, total suspended solids, and organic materials) have resulted in unnatural odor, color, taste and turbidity in the waterbody segments that comprise

Merrymeeting River, including Marsh Pond, Jones Dam Pond, and Downing Pond.

78.   The Merrymeeting River carries pollutants and organisms present in the river – including but not limited to nutrients, cyanobacteria, algae, and low pH levels—downstream into Alton Bay.

79.   Water quality issues in the Merrymeeting River cause degradation of downstream waters, such as Lake Winnipesaukee's Alton Bay.

Pollutant: Phosphorus

80.   The Facility's discharges of phosphorus cause or contribute to the degradation of the Merrymeeting River, and to the violation of State water quality standards.

81.   The Facility's quarterly discharge monitoring reports show that it has discharged phosphorus from its two outfalls nearly every quarter since the third quarter of 2013.

82.   The Facility has discharged phosphorus loads as high as 1.5012 pounds per day from Outfall 001 and 3.13 pounds per day from Outfall 002, and at concentrations as high as .09 milligrams per liter (mg/L) from Outfall 001 and .11 mg/L from Outfall 002.

83.   Between May 2017 and February 2018, ambient phosphorus levels in the Merrymeeting River were within a range of 6 micrograms per liter ("µg/L") or lower upstream of the Facility, and extremely elevated (as high as 62.5 µg/L) immediately downstream from the Facility.

84.   Between May 2017 and February 2018, high phosphorus concentrations were measured in Marsh Pond (as high as 49.0 µg/L), Jones Dam Pond (as high as 30.7 µg/L), and Downing Pond (as high as 26.4 µg/L).

85.   High ambient levels of phosphorus also were found in Marsh Pond, Jones Dam Pond, and Downing Pond during the summers of 2015 and 2016.

Pollutants: Nitrogen and Ammonia

86.   The Facility's discharges of nitrogen and ammonia cause or contribute to the degradation of the Merrymeeting River, and to the violation of State water quality standards.

87.   The Facility's quarterly discharge monitoring reports show that it has discharged nitrogen and ammonia from both outfalls for most reporting periods since 2014.

88.   The Facility has discharged loads as high as 16.483 pounds per day of nitrogen and 3.336 pounds per day of ammonia from Outfall 001, and 88.16 pounds per day of nitrogen and 14.933 pounds per day of ammonia from Outfall 002.

Pollutant: Total Suspended Solids ("TSS")

89.   The Facility's discharges of TSS cause or contribute to the degradation of the Merrymeeting River, and to the violation of State water quality standards.

90.   The Facility has been discharging TSS more frequently and in increasing amounts over the past four years.

91.   In the third quarter of 2017, 183.48 pounds per day of TSS were discharged from Outfall 001; in the second quarter of 2017, 91.82 pounds per day were discharged from Outfall 002.

92.   The Facility's discharges of TSS have resulted in non-naturally occurring benthic deposits that have had detrimental impacts to the Merrymeeting River's benthic community.

Pollutant: Biological Oxygen Demand ("BOD")

93.   The Facility's discharges of biological oxygen-demanding material ("BOD") cause or contribute to the degradation of the Merrymeeting River, and to the violation of State water quality standards.

94.   The Facility has been discharging organic material as measured by high levels of

biological oxygen demand ("BOD") (a measure of the amount of oxygen needed to break down the organic material present in water).

95.   Discharges from the Facility have contained BOD levels as high as 168.13 pounds per day from Outfall 001 and 84.06 pounds per day from Outfall 002.

Pollutant Impact: Cyanobacteria

96.   The Facility's discharges of phosphorus, nitrogen, ammonia, TSS, and/or BOD have caused and contributed to, and continue to cause and contribute to, the degradation of water resources as evidenced by the proliferation of cyanobacteria blooms in the Merrymeeting River.

97.   The Merrymeeting River is experiencing significant problems with cyanobacteria, an algae-like bacteria that proliferates and produces a bloom when there are unnaturally high concentrations of phosphorus or other nutrients in the water, and which can be harmful to human health and prevent people from enjoying water-based activities.

98.   Cyanobacteria in Jones Dam Pond and Downing Pond has occurred in such high concentrations that both segments are on New Hampshire's 2016 Section 303(d) list of impaired waters as violating State water quality standards for failing to support primary contact recreation uses.

99.   In August 2015 and July 2016, the presence of cyanobacteria caused the New Hampshire Department of Environmental Services ("NHDES") to issue advisories for cyanobacteria (*Anabaena*) blooms exceeding 70,000 cells/mL at Downing Pond, warning users for a period of time to avoid contact with the affected water and to keep pets out of the water.

100.   In 2017, water quality monitoring revealed cyanobacteria (*Oscillatoria*) in both Marsh Pond and Downing Pond, as well as additional species of cyanobacteria – Aphanocapsa and long linear colonies of *Anabaena* – in Downing Pond.

101.  On July 20, 2018, NHDES issued a cyanobacteria advisory for Jones Pond, citing an estimate of over 3 million cells/ml of *Oscillatoria* and warning users to avoid contact with the water in areas experiencing elevated cyanobacteria cell conditions.

102.  On July 27, 2018, NHDES issued a cyanobacteria advisory for Marsh Pond as a result of blooms of *Oscillatoria* with 140,000 cells/mL, warning users to avoid contact with the water in areas experiencing elevated cyanobacteria cell conditions.

103.  Cyanobacteria is a public health concern not only because of the acute health problems it can cause as a result of direct contact, as in the case of primary contact recreation, but also because of a growing correlation between toxins associated with cyanobacteria and neurodegenerative conditions such as Alzheimer's disease and ALS (Lou Gehrig's disease).

104.  Cyanobacteria can produce so-called "taste-and-odor" compounds that add unnatural tastes and odors to water and fish.

105.  The toxic compounds produced by cyanobacteria can kill fish, shellfish, mammals, and birds.

106.  The presence and proliferation of cyanobacteria interferes with and impairs the Merrymeeting River's uses for aquatic life and recreation.

Pollutant Impact: Green Algae and Loss of Water Clarity

107.  The Facility's discharges of phosphorus, nitrogen, ammonia, TSS, and/or BOD have caused and contributed to, and continue to cause and contribute to, the degradation of water resources as evidenced by eutrophication in the Merrymeeting River, including the growth of green algae and other vegetation, and decreased water clarity.

108.  Marsh Pond, Jones Dam Pond, and Downing Pond have all exhibited and continue to exhibit eutrophic conditions when measured in terms of phosphorus and chlorophyll a

concentrations.

109.  Downing Pond has exhibited and continues to exhibit eutrophic conditions when measured using water clarity alone.

110.  Jones Dam Pond and Marsh Pond experienced significant green algae growth in the summer and early fall of 2016.

111.  Eutrophic conditions such as the proliferation of green algae and reduced water clarity interfere with recreational uses and enjoyment of the Merrymeeting River.

**The Facility's Harm to CLF Members**

112.  CLF members use the Merrymeeting River, including its various segments (Marsh Pond, Jones Dam Pond, and Downing Pond) for swimming, boating, fishing, and aesthetic enjoyment.

113.  CLF members used to regard the Merrymeeting River as a place of great natural beauty and enjoyed the experience of sharing the recreational and aesthetic values of the river with family and friends.

114.  The Facility's discharges of pollutants into the Merrymeeting River have degraded the health of the river and caused the proliferation of cyanobacteria blooms and other eutrophic conditions in a way that greatly diminishes the use and enjoyment of the river by CLF members.

115.  CLF members are concerned with the health impacts of cyanobacteria from direct contact with water where cyanobacteria is present, as well as from exposure to cyanobacterial toxins in the air that may cause neurodegenerative diseases.

116.  CLF members worry about the potential health effects of living close to toxins suspected to be associated with neurodegenerative diseases.

117.  As a result of cyanobacteria warnings issued by NHDES, CLF members have been

deprived of the opportunity to recreate on portions of the Merrymeeting River.

118.  CLF members worry about harm to their pets from exposure to or ingestion of water in the Merrymeeting River where cyanobacteria are present.

119.  The enjoyment CLF members experience from swimming and boating in the Merrymeeting River is negatively affected by the presence of green algae and diminished water clarity.

120.  The presence of cyanobacteria, green algae, and duckweed, and diminished water clarity adversely affect the aesthetic enjoyment of the Merrymeeting River by CLF members.

121.  CLF members are concerned about the adverse impacts of the Merrymeeting River's degraded condition on the value of their property.

## CLAIMS FOR RELIEF

### Count I – Violation of the Clean Water Act
### *Unlawful Discharges Causing Violation of Water Quality Standards*

122.  Paragraphs 1 through 121 are incorporated by reference as if fully set forth herein.

123.  Defendants' Permit specifically requires that the Facility "not cause a violation of the [state] water quality standards of the receiving water."

124.  The Facility has caused or contributed to cyanobacteria problems that have resulted in the State including portions of the Merrymeeting River on the New Hampshire 2016 Section 303(d) List for their failure to support primary contact recreation uses.

125.  The Facility has caused or contributed to violations of State water quality standards contained in N.H. Code Admin. R. Env-Wq 1703.01(b) and (c), pertaining to water use classifications and designated uses.

126.  The Facility has caused or contributed to violations of State water quality standards

contained in N.H. Code Admin. R. Env-Wq 1703.03, setting forth general water quality criteria.

127.  The Facility has caused or contributed to violations of State water quality standards contained in N.H. Code Admin. R. Env-Wq 1703.07, pertaining to dissolved oxygen.

128.  The Facility has caused or contributed to violations of State water quality standards contained in N.H. Code Admin. R. Env-Wq 1703.08(b), pertaining to benthic deposits.

129.  The Facility has caused or contributed to violations of State water quality standards contained in N.H. Code Admin. R. Env-Wq 1703.10, pertaining to color.

130.  The Facility has caused or contributed to violations of State water quality standards contained in N.H. Code Admin. R. Env-Wq 1703.14, pertaining to nutrients (phosphorus and nitrogen).

131.  The Facility has caused or contributed to violations of State water quality standards contained in N.H. Code Admin. R. Env-Wq 1703.19, pertaining to biological and aquatic community integrity.

132.  The Facility has caused or contributed to violations of State water quality standards contained in N.H. Code Admin. R. Env-Wq 1708, pertaining to antidegradation, including 1708.01(a).

133.  Every State surface water quality standard violation constitutes a separate and distinct violation of the Permit and the Clean Water Act.

134.  In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate the Permit's prohibition against causing the State water quality standards violations, including violations of each of the above-enumerated State water quality standards, unless and until enjoined from doing so.

135.  Each day, and for each pollutant parameter and each State water quality standard

that Defendants have violated or continue to violate, constitutes a separate and distinct violation of the Permit and of Section 301(a) of the Clean Water Act, 33 U.S.C. §§ 1311(a).

### Count II – Violation of the Clean Water Act
*Unlawful Discharges that Interfere with the Designated Uses*
*of Receiving Waters and Harm Aquatic Life*

136. Paragraphs 1 through 121 are incorporated by reference as if fully set forth herein.

137. The Permit requires that the Facility adequately treat its discharges to ensure that the Merrymeeting River remains free from "pollutants which produce odor, color, taste or turbidity which is not naturally occurring and would render it unsuitable for its designated uses." Permit Part I.A.4

138. The Permit also requires that the Facility's effluent not harm aquatic life.  *See id.* Part I.A.5(a), (b).

139. Defendants have not adequately treated the Facility's discharges, causing eutrophication and cyanobacterial blooms in the Merrymeeting River, including non-naturally occurring odor, color, taste and turbidity rendering the river unsuitable for its designated uses.

140. The Facility's effluent discharges have created conditions that are harmful to aquatic life.

141. In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this prohibition in the future unless and until enjoined from doing so.

142. Each day, and for each pollutant parameter, that Defendants have violated or continue to violate the Permit's prohibition against interfering with the designated uses of receiving waters or harming aquatic life is a separate and distinct violation of the Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

**Count III – Violation of the Clean Water Act**
*Unlawful Discharges of Formaldehyde*

143.  Paragraphs 1 through 121 are incorporated by reference as if fully set forth herein.

144.  Defendants' Permit prohibits the discharge of effluent with concentrations of formaldehyde exceeding 4.6 mg/L as a daily maximum or 1.6 mg/L as a monthly average. Permit Part I.A.1-2.

145.  The Facility's Discharge Monitoring Report (DMR) data submitted to EPA show that Defendants have discharged formaldehyde in violation of their Permit.

146.  Since 2016, the Facility's DMR data show at least three separate violations of the Permit's effluent limitations for formaldehyde.

147.  In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this prohibition in the future unless and until enjoined from doing so.

148.  Each day that Defendants have violated or continue to violate the effluent limitation on formaldehyde discharge is a separate and distinct violation of the Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

**Count IV – Violation of the Clean Water Act**
*Unlawful Discharges in Violation of Effluent pH Limits*

149.  Paragraphs 1 through 121 are incorporated by reference as if fully set forth herein.

150.  Defendants' Permit specifically prohibits the discharge of effluent with pH levels outside of the range of 6.5 to 9.0 standard units (S.U.) unless the pH level is no more than 0.5 S.U. lower than upstream river pH.

151.  In the last five years, the Facility's DMR data shows at least 24 separate violations of the Permit's minimum pH level requirement of 6.5 S.U.

152.  Upon information and belief, the Department also may not have satisfied all reporting requirements pertaining to pH.

153.  In light of the Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this prohibition in the future unless and until enjoined from doing so.

154.  Each day that Defendants have violated or continue to violate their effluent pH limitation is a separate and distinct violation of the Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

## Count V – Violation of State Certification Requirement
### *Unlawful Discharges in Violation of Effluent pH Limits*

155.  Paragraphs 1 through 121 are incorporated by reference as if fully set forth herein.

156.  The Permit includes a State Certification requirement prohibiting the discharge of effluent with pH levels outside the range of 6.5 to 9.0 S.U., unless the pH level is no more than 0.5 S.U. lower than upstream river pH.

157.  Discharge Monitoring Report data submitted to EPA by Defendants show that the Facility has discharged effluent with pH levels below 6.5 S.U. in violation of its Permit.

158.  Considering the Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate the State Certification Requirement pertaining to effluent pH limits in the future unless and until enjoined from doing so.

## Count VI – Violation of the Clean Water Act
### *Unlawful Discharge of Cleaning Water*

159.  Paragraphs 1 through 121 are incorporated by reference as if fully set forth herein.

160.  Defendants' Permit specifically prohibits any discharge of cleaning water.  Permit Part I.A.9.

161.  Upon information and belief, the Facility has been operated, and continues to be operated, in a manner that violates the prohibition against discharges of "cleaning water."

162.  Upon information and belief, Defendants have directly discharged cleaning water from the Facility without the required treatment.

163.  Upon information and belief, Defendants have not taken necessary action to prevent such discharges of cleaning water from the Facility.

164.   In light of Defendants' history of violations, and their failure to take corrective action, Defendants will continue to violate this prohibition in the future unless and until enjoined from doing so.

165.  Each day that Defendants have violated or continue to violate the prohibition against discharging cleaning water is a separate and distinct violation of the Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

### Count VII – Violation of the Clean Water Act
#### *Failure to Implement and Maintain a Best Management Practices Plan*

166.  Paragraphs 1 through 121 are incorporated by reference as if fully set forth herein.

167.  The Permit requires the implementation and maintenance of a BMP plan that, *inter alia*, addresses "solids control."

168.  Defendants' BMP plan specifies that solids will be disposed of through land application on agricultural fields as part of a nutrient management plan approximately three times per year.  Permit Part I.B.4.

169.  Upon information and belief, Defendants have not been complying with the solids management and control processes outlined in the Facility's BMP plan since October 2016.

170.  Defendants' Permit requires, *inter alia*, that the BMP plan be amended within thirty days following any changes in the Facility's operation which affects the potential for the

discharge of pollutants into surface waters.  Permit Part I.B.4.

171.  Upon information and belief Defendants have not been complying with the Permit requirements for maintaining and amending their BMP plan.

172.  Each day that Defendants have violated or continue to violate the Permit requirement that they implement and maintain a BMP Plan, is a separate and distinct violation of the Permit, Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and 40 C.F.R. Part 451.

**RELIEF REQUESTED**

Plaintiff respectfully requests that this Court grant the following relief:

a.   Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Defendants have violated and remain in violation of the Permit, Section 301(a) of the Clean Water Act, 33 U.S.C § 1311(a), and applicable regulations, as alleged in Counts I, II, III, IV, V, VI and VII of this Complaint;

b.   Enjoin Defendants from violating the requirements of the Permit, Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), applicable Clean Water Act regulations, and the State Certification requirement;

c.   Impose civil penalties on Defendants as provided under Sections 505(a) and 309(d) of the Clean Water Act, 33 U.S.C. §§ 1365(a) and 1319(d), and its implementing regulations of 40 C.F.R. § 19.4;

d.   Award Plaintiff's costs of litigation, including reasonable attorney and expert witness fees, as provided under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(d); and

e.   Grant such other relief as this Court may deem appropriate.


Dated: October 31, 2018

/s/ Thomas F. Irwin
Thomas F. Irwin
New Hampshire Bar No. 11302
Conservation Law Foundation, Inc.
27 North Main Street
Concord, NH 03301
(603) 225-3060
tirwim@clf.org

Heather A. Govern, Esq.
*Pro hac vice motion to be filed*
Conservation Law Foundation, Inc.
62 Summer St.
Boston, MA 02110
(617) 850-1765
hgovern@clf.org

Rohemir Ramírez-Ballagas, Esq.
*Pro hac vice motion to be filed*
Conservation Law Foundation, Inc.
62 Summer St.
Boston, MA 02110
(617) 850-1761
rramírez@clf.org

ATTORNEYS FOR PLAINTIFF