**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., Plaintiff, v. GLENN NORMANDEAU, in his official capacity as Executive Director of the New Hampshire Fish and Game Department, *et al.* Defendants. | Civil Action No. 1:18-cv-00996-PB |

**MEMORANDUM OF LAW IN SUPPORT OF**
**CONSERVATION LAW FOUNDATION'S**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ 4

INTRODUCTION ........ 5

STATEMENT OF UNDISPUTED FACTS ........ 5

I. DEFENDANTS DISCHARGE EFFLUENT CONTAINING FISH FOOD, FECAL MATTER, AND HATCHERY WASTE CHEMICALS INTO THE MERRYMEETING RIVER. ........ 5

II. TO PROTECT THE MERRYMEETING RIVER, THE PERMIT ESTABLISHES LIMITS AND CONDITIONS FOR THE FACILITY'S DISCHARGES OF EFFLUENT. ........ 8

III. DEFENDANTS' DISCHARGES OF PHOSPHORUS, SOLIDS, AND OTHER POLLUTANTS HARM THE MERRYMEETING RIVER AND ITS DESIGNATED USES FOR RECREATION AND AQUATIC LIFE. ........ 9

A. Defendants' Discharges of Phosphorus Degrade its Ecological Health and Foreclose Much of the River's Recreational Use. ........ 9

B. Defendants' Discharges of Phosphorus, Solids, and Other Pollutants Must Be Reduced Dramatically in Order to Prevent Further Harm to the Merrymeeting River. ........ 12

C. Defendants' Discharges Are Causing Acidity Pollution. ........ 14

D. Defendants' Discharges Are Causing Formaldehyde Pollution. ........ 14

ARGUMENT ........ 15

I. THE COURT HAS JURISDICTION OVER THIS ACTION. ........ 15

II. DEFENDANTS ARE VIOLATING THE CLEAN WATER ACT. ........ 16

A. Defendants Are Violating the Permit's Prohibition Against Violating New Hampshire State Water Quality Standards (Count 1). ........ 16

1. Defendants violate the Permit's incorporated state water quality standards by impairing the Merrymeeting River's designated use for recreation. ........ 18

2. Defendants violate the Permit's incorporated state water quality standards by violating state water quality criteria related to phosphorus, eutrophication, and habitat health. ........ 19

3. Defendants violate the Permit's incorporated state water quality standards by creating harmful benthic deposits. ........ 22

B. Defendants Are Violating the Permit's Conditions by Interfering with the Designated Uses of the Merrymeeting River, Harming its Aquatic Life, and Creating Harmful Benthic Deposits (Count 2). ........ 23

C. Defendants Have Failed, and Will Continue to Fail, to Comply with the Best Management Practices Plans (Count 7). ........ 23

D. Defendants Are Violating the Permit's Low pH Effluent Condition and State Certification Requirement (Counts 4 & 5). ........ 24

E. Defendants Are Violating the Permit's Formaldehyde Condition (Count 3). ........ 25

F. Defendants Have Discharged, and Will Continue to Discharge, Cleaning Water in Violation of the Permit (Count 6)........ 26

III. THE COURT SHOULD DECLARE THAT DEFENDANTS ARE VIOLATING THE PERMIT AND ENJOIN THEIR CONTINUED DISCHARGES UNTIL THEY HAVE CONSTRUCTED A TREATMENT SYSTEM AND ELIMINATED PHOSPHORUS RE-RELEASE IN THE RIVER. ........ 26

CONCLUSION........ 27

# TABLE OF AUTHORITIES

**Cases**

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........ 15
*PUD No. 1 of Jefferson Cty. v. Washington Dep't of Ecology*,
511 U.S. 700 (1994) ........ 16, 20

**Statutes**

28 U.S.C. § 1331 ........ 14
28 U.S.C. § 2201–02 ........ 14
33 U.S.C. § 1311 ........ 15
33 U.S.C. § 1313 ........ 16
33 U.S.C. § 1342 ........ 16
33 U.S.C. § 1362 ........ 15
33 U.S.C. § 1365 ........ 14
N.H. Rev. Stat. § 485-A:8 ........ 16, 17, 19

**Regulations**

40 C.F.R. § 122, App. C ........ 15
40 C.F.R. § 122.24 ........ 15
40 C.F.R. § 260.10 ........ 15
N.H. Code Admin. R. Env-Wq § 1702.17 ........ 16
N.H. Code Admin R. Env-Wq § 1703.01 ........ 16
N.H. Code Admin. R. Env-Wq § 1703.03 ........ 17, 21
N.H. Code Admin. R. Env-Wq § 1703.07 ........ 19
N.H. Code Admin. R. Env-Wq § 1703.10 ........ 21
N.H. Code Admin. R. Env-Wq § 1703.14 ........ 19
N.H. Code Admin. R. Env-Wq § 1703.19 ........ 20

## INTRODUCTION

Harmful amounts of phosphorus, contained in fish food and fish waste, are pumped from outfall pipes at Defendants' fish hatchery directly into one of New Hampshire's cherished waters, the Merrymeeting River ("River"). There is no dispute that the pollution creates toxic, cyanobacteria blooms, which cause dangerous conditions for people, their pets, and other animals. Nor can it be disputed that Defendants' waste discharge violates numerous conditions of the Facility's Clean Water Act permit. Therefore, Plaintiff is entitled to summary judgment and asks this Court to order Plaintiff's requested relief, as stated in section III below.

## STATEMENT OF UNDISPUTED FACTS

### I. DEFENDANTS DISCHARGE EFFLUENT CONTAINING FISH FOOD, FECAL MATTER, AND HATCHERY WASTE CHEMICALS INTO THE MERRYMEETING RIVER.

The Powder Mill State Fish Hatchery (the "Facility") in New Durham, New Hampshire operated by the New Hampshire Fish and Game Department ("Fish and Game") and the New Hampshire Fish and Game Commission (the "Commission"), is located on the Merrymeeting River just downstream from its headwaters in Merrymeeting Lake, "one of the clearest lakes in New Hampshire." Answer at ¶ 13 (ECF No. 26); Ex. 1 at 4 of 97; Ex. 2.[1] After flowing through the Facility, the River travels south through a series of small ponds, including Marsh Pond, Jones Pond, and Downing Pond. *Id.;* Ex. 1 at 18 of 97. The River eventually flows into Lake Winnipesaukee at Alton Bay. *Id.* The Merrymeeting River watershed is "treasured as a recreational haven" by residents and visitors who fish, hike, boat, canoe, kayak, and swim there. *Id.* at 19 of 97. The watershed is predominantly forested land inhabited by land mammals (among others, moose, bears, otters, and beavers), amphibians, reptiles, and birds (e.g. herons,

[1] Citations to "Ex. _" refer to the exhibits to the Declaration of Heather A. Govern filed herewith.

loons, ducks, turkeys, grouse, and cormorants). *Id.* at 26 of 97.

Defendants are officials who operate or control the Facility. Answer at ¶ 13-18. The purpose of the Facility is to hatch and rear brook, rainbow, and brown trout to stock waterbodies in New Hampshire for recreation and restoration. Answer at ¶ 32; Ex. 3 at 18 of 46. The Facility's 2019 production target is 323,467 fish. Ex. 4 at 3. The Facility receives waters from Merrymeeting Lake through intake pipes, then funnels the water to "raceways" (long, narrow, cement channels), circular tanks, and ponds in which Defendants raise fish. Ex. 3 at 19 of 46; 26 of 46. As new water flows in from the Lake, Defendants release Facility effluent directly into the Merrymeeting River through two metal outfall pipes one to two feet in diameter (Outfalls 001 and 002). Ex. 3 at 26 of 46; Ex. 5 at 1, 2.

The effluent that Defendants release contains wastes generated by the Facility's operations. Ex. 6 at 2, 5. Total suspended solids in the effluent includes fish feces and uneaten fish food. *Id.* These solids accumulate and partially dissolve in the raceways, tanks, and ponds, releasing dissolved nitrogen and phosphorus into the water. *Id.* at 5. The Facility has been discharging total suspended solids (TSS) in large amounts over the past four years. Ex. 7 at 5, 8, 11, 14. In the second quarter of 2016, 100 pounds per day of TSS were discharged from Outfall 002; in the third quarter of 2017, 183.48 pounds per day of TSS were discharged from Outfall 001; in the second quarter of 2018, 120 pounds per day were discharged from Outfall 002. *Id.*

Water within the Facility also becomes acidic in the course of its use: as fish respirate, they generate carbon dioxide, making the waters acidic (i.e. lowering its pH). Ex. 8 at 34:3-10. Defendants periodically remove by vacuum a small portion of the effluent (around 10,000 gallons out of the 6,500,000 gallons flowing through the Facility on a day that vacuuming occurs, *see infra* at 7). Ex. 6 at 6; Ex. 9 at 56:19-57:3. Defendants discharge all of the Facility's

unvacuumed effluent (comprising 99.98 percent of the flow)—untreated, together with its dissolved content and remaining solids—into the Merrymeeting River. Ex. 6 at 2, 6; Ex. 9 at 56:17-57:16. On average, the Facility discharges around 6.5 million gallons of effluent daily. Ex. 6 at 2.

Formaldehyde is a chemical commonly used as an industrial fungicide, germicide, and disinfectant. Ex. 10. In response to parasites, such as Gyrodactylus worms, Defendants treat fish at the Hatchery with formalin, a liquid form of formaldehyde. Answer at ¶ 33-34; Ex. 9 at 17:10-13; 19:2-6; 19:14; 20:13-16; 55:18-20; Ex. 11 at 21:1. When Defendants add formalin to the Facility's waters, it is discharged to the Merrymeeting River as formaldehyde in effluent. Ex. 11 at 26:16-17.

Defendants also release Facility effluent to the River during their cleaning operations. Ex. 12 at 64:7-18; Ex. 13 at 4, 25-6. Defendants periodically vacuum 10,000 gallons of used water from the Facility's raceways and ponds, attempting to capture undissolved solid wastes, namely feces and uneaten food. Ex. 6 at 2, 6. Until recently, Defendants transferred this vacuumed water into two settling ponds at the south end of the Facility. Ex. 9 at 57:1-12. Defendants placed stacked boards or paddles in the settling ponds with the intent of holding back the flow of water until the solids settled. Ex. 11 at 48:4-52:9. Once the solids settled, Defendants' were required to lower dam boards to allow water at the top of the tanks to "decant" and ultimately flow through an outfall into the Merrymeeting River. *Id.* and Ex. 3 at 39 of 46. But before solids can settle, Defendants routinely lower dam boards and flush the "settling" ponds with additional water, allowing the concentrated effluent—with unsettled, solid wastes whirled up by the inrushing water—to wash out to the Merrymeeting River. Ex. 12 at 64:7-18; Ex. 13 at 4. During 2017, 2018, and 2019, this flushing occurred as often as "most Fridays" during the summer. Ex. 13 at

25-26. For example, Facility superintendent Edward Malone sent a letter to EPA and the New Hampshire Department of Environmental Services following one incident on July 11, 2018, admitting that up to "approximately 600 gallons of raceway waste water" were transferred to the River from the settling pond before a lowered dam board was replaced. Ex. 14.

## II. TO PROTECT THE MERRYMEETING RIVER, THE PERMIT ESTABLISHES LIMITS AND CONDITIONS FOR THE FACILITY'S DISCHARGES OF EFFLUENT.

In December 2011, pursuant to its authority under the Clean Water Act, the Environmental Protection Agency ("EPA") issued an NPDES permit to Fish and Game. Ex. 3 at 1 of 46. The Permit authorizes Defendants "to discharge from a facility located at Powder Mill State Fish Hatchery . . . to receiving water named Merrymeeting River . . . in accordance with effluent limitations, monitoring requirements and other conditions set forth [t]herein." *Id*.

The Permit includes narrative standards limiting the Facility's discharges to maintain the health and natural integrity of the Merrymeeting River. *Id.* at 7 of 46. These narrative standards include that Defendants must ensure the Merrymeeting River "remains free from pollutants in concentrations or combinations that settle to form harmful deposits, float as foam, debris, scum or other visible pollutants." *Id*. The Permit also requires Defendants to "adequately treat[]" effluent "to ensure that [the Merrymeeting River] remain[s] free from pollutants which produce odor, color, taste or turbidity which is not naturally occurring and would render it unsuitable for its designated uses." *Id*. The Permit requires that "[n]o components of the effluent shall result in any demonstrable harm to aquatic life or violate any water quality standard which has been or may be promulgated." *Id.* The Permit requires that Defendants discharge without "caus[ing] a violation of the water quality standards of the receiving water." *Id.*

The Permit also sets numeric limits for certain pollutants. *See id.* at 2-3, 27, 30–31 of 46. Defendants are authorized to discharge formaldehyde at a daily maximum concentration of 4.6

milligrams per liter (mg/L) and a maximum monthly average concentration of 1.6 mg/L. *Id.* at 3, 30 of 46. With respect to acidity, Defendants may not discharge effluent with a pH lower than 6.5 standard units, unless the effluent's pH is within half a standard unit of the ambient upstream river water (i.e. unless the low pH is attributable to conditions upstream of the Facility). *Id.* at 2, 27 of 46.

The Permit also requires Defendants to follow specified practices when discharging Facility effluent. *See id.* at 8, 10–14 of 46. Defendants are prohibited from discharging cleaning water, that is, "any water from the facility's hatchery house, raceway, ponds, canals, circular tanks, etc. which contains settled solids that have accumulated on the bottom of such structures that is discharged, absent some form of solids removal, directly to the receiving water during periodic cleaning operations." *Id.* at 8. Defendants must also adhere to a Best Management Practices Plan ("BMP Plan"), which they must develop in accordance with the requirements in their Permit and make available to EPA upon request. *Id.* at 10. Defendants' BMP Plans are not approved by EPA. Ex. 9 at 76:5-7. The BMP plan mandates that they vacuum raceways "approximately once per week, or once every two weeks in winter" and vacuum the 24 round tanks on the south end of the Facility "about once every two weeks." Ex. 4 at 4.

The Permit expired in December 2016 and has been administratively continued since its expiration. Ex. 3 at 1 of 46.

## III. DEFENDANTS' DISCHARGES OF PHOSPHORUS, SOLIDS, AND OTHER POLLUTANTS HARM THE MERRYMEETING RIVER AND ITS DESIGNATED USES FOR RECREATION AND AQUATIC LIFE.

### A. Defendants' Discharges of Phosphorus Degrade its Ecological Health and Foreclose Much of the River's Recreational Use.

As Lake water passes through the Facility into the River, Defendants increase the water's phosphorus concentration by 1200 percent. Ex. 1 at 45 of 97 (discharge from the Facility into

Merrymeeting River contains levels of phosphorus that are "approximately 12 times higher than the outflow concentrations from Merrymeeting Lake."). The Facility adds dissolved phosphorus to the water, as well as undissolved solid wastes, including fish feces, that release phosphorus as they break down after release into the River. Ex. 3 at 19 of 46. Defendants annually discharge an estimated 342 kg of phosphorus into the first segment of the Merrymeeting River, which travels downstream to Marsh Pond. Ex. 1 at 4, 40 of 97. Their discharges increase the daily mass of total phosphorus in the Merrymeeting River by between 362 percent and 541 percent. Ex. 6 at 3. Discharge from the Facility contributes 67 percent of all phosphorus added to this part of the River each year. Ex.1 at 40-41 of 97.

Facility effluent contributes to "internal phosphorus loading" within the River. Ex. 1 at 40 of 97. Internal loading occurs when phosphorus binds to sediment and accumulates in deposits on the riverbed. Ex. 15 at 11-12, 19. Phosphorus is re-released into the water column when this sediment is disturbed (e.g. by passing boats) or is exposed to low-oxygen conditions. *Id.* at 3, 11-12, 19; Ex. 1 at 12 of 97. Marsh Pond and Jones Pond, the ponds immediately downstream of the Facility, experience "significant internal loading" of phosphorus. Ex. 1 at 33 of 97.

Phosphorus is environmentally damaging when present in high concentrations. *Id.* at 45 of 97. In freshwater bodies, phosphorus feeds aquatic plants, algae, and cyanobacteria (a blue-green algae-like bacteria). *Id.* at 37 of 97; Ex. 16. Excessive phosphorus can cause populations of these organisms to grow rapidly and in overabundance. Ex. 1 at 45 of 97. Such growth causes serious harms to the aquatic ecosystem. Ex. 15 at 11. This process is called eutrophication. *Id.* In a eutrophic waterbody, overgrown algae and plants clog the waterways and make the water murky, blocking sunlight from the bottom of the River, eliminating native aquatic plants. *Id.* at 8,

13. As these populations die off, bacteria decompose their remains, consuming the waterbody's limited supply of dissolved oxygen, relied upon by fish and other aquatic life. *Id.* at 4. Depletion of oxygen can kill fish and create rotten-smelling low-oxygen zones. *Id.* at 11-14; Ex. 17.[2] Low levels of dissolved oxygen also create advantages for weed species and pathogens that thrive in low-oxygen conditions. Ex. 15 at 12. Through aquatic shading and oxygen depletion, elevated phosphorus can cause a loss of species diversity, ultimately resulting in an "aquatic system[s] with little more than dense blooms of algae and bacteria." *Id.* at 14.

The outbreaks of harmful algae, including cyanobacteria, that result from elevated phosphorus can also be harmful to human health. Ex. 17. Cyanobacteria release compounds known as cyanotoxins, among the "most powerful natural poisons known." *Id* at 9-11; Ex. 17. Harms from cyanotoxins can range from mild skin rash to serious illness (e.g. pneumonia, fever, vomiting, diarrhea) and, in rare circumstances, respiratory paralysis leading to death. Ex. 18; Ex. 1 at 34 of 97; Ex. 15 at 4-5. Humans and animals can become exposed to cyanotoxins from swimming in waters in which cyanobacteria bloom. Ex. 17. There are no known remedies to mitigate the harmful effects of cyanotoxins. *Id.* The Centers for Disease Control recommends that humans entirely avoid swimming or boating in areas where the water is discolored potentially by cyanobacteria or where they see foam, scum, or mats of algae on the water's surface. *Id.*

Defendants' discharges of Facility effluent are causing harmful cyanobacteria blooms and eutrophic conditions in the Merrymeeting River. Ex. 15 at 5. These conditions have led the New Hampshire Department of Environmental Services, acting under Section 303(d) of the Clean

[2] When dissolved oxygen levels fall below 5 parts per million, cold-water fish and other sensitive aquatic organisms experience stress and reduced habitat. Ex. 1 at 32 of 98.

Water Act, to designate Marsh Pond, Jones Pond, and Downing Pond as failing to support recreational uses (swimming or diving) due to the presence of cyanobacteria hepatoxic microcystins. Ex. 19 at 15, 23; Ex. 20 at 21. The presence of these cyanotoxins also caused the same agency, in the summers of 2018 and 2019, to issue months-long advisories warning the public "to avoid contact with the water" in Marsh Pond and Jones Pond. Ex. 21 at 4-7.

In addition to their cyanobacteria outbreaks, Marsh Pond, Jones Pond, and Downing Pond are eutrophic and choked with overgrowths of filamentous green algae and invasive variable milfoil (an aquatic plant). Ex. 15 at 4. Algae and dissolved particles significantly reduce water clarity, blocking sunlight from reaching native aquatic plants and photosynthesizing organisms in the water. Ex. 1 at 30 of 97; Ex. 15 at 8. Excess algae and plant growth have created conditions of hypoxia (low oxygen levels, under 5 parts per million) and anoxia (the complete absence of oxygen) in parts of Marsh Pond and Jones Pond. *Id.* at 4; Ex. 1 at 32 of 97. In the Merrymeeting River, these conditions cause a dominance of nuisance species like variable milfoil and filamentous green algae at the expense of biological diversity. Ex. 15 at 5. And like cyanobacteria, these eutrophic conditions impair the Merrymeeting River's recreational uses. Ex. 21; Ex. 13 at 6-7; Ex. 23 at 4-6; Ex. 22 at 2-4. For example, dense thickets of variable milfoil with strands as long as 15 feet ensnare motorboat propellers and swimmers' limbs; while filamentous green algae cover swimmers and coat docks with an unpleasant slime. Ex. 23 at 5, 6.

### B. Defendants' Discharges of Phosphorus, Solids, and Other Pollutants Must Be Reduced Dramatically in Order to Prevent Further Harm to the Merrymeeting River.

As a result of these significant water quality problems, in 2018, a group of concerned citizens from New Durham and Alton (including Glenn Normandeau and Jason Smith, Ex. 1 at 5 of 97) raised funds from sources, including the Town of New Durham and Fish and Game, for a "Merrymeeting River & Lake Watershed Management Plan" (the "Watershed Management

Plan”). *Id.* at 15 of 97. The Plan was commissioned to “provide a roadmap . . . [for] improving water quality.” *Id.* at 13 of 97. It was released in final form in September 2019. *Id.* at 1 of 97.[3] The Watershed Management Plan provides an overview of the Merrymeeting River’s phosphorus problem, analyzing sources of pollution and necessary remedial measures. *Id.* According to this document, the Merrymeeting River should have an annual average total phosphorus concentration of no more than 10 parts per billion. *Id.* at 14 of 97. But current total phosphorus levels rise well above this level—from 34 and 36 parts per billion at times in the middle depths of Jones and Downing Ponds, to at times 65 parts per billion in Marsh Pond. *Id.* at 30 of 97. In the lower depths of Marsh Pond—closer to the phosphorus-bearing deposits—the concentration at times rises to nearly 200 parts per billion. *Id.* at 33 of 97, fig. 3-3. The Watershed Management Plan determines that nearly all of the necessary reduction in phosphorus—95 percent—must be made by the Facility. *Id.* Defendants must reduce their phosphorus discharges by 293 kilograms per year in order for the Merrymeeting River to meet the environmentally sustainable total phosphorus level. *Id.* at 14, 44 of 97.

In August 2019, nine months after the complaint had been filed int his action, Defendants built a wastewater settling system, in an attempt to reduce phosphorus discharges from the Facility. Ex. 9 at 65:9; Ex. 2 at 27:4-6. Vacuumed solids are now added, not to the converted Bass Ponds (the settling ponds), but to two converted circular tanks containing duckweed. Ex. 9 at 62:15; 64:20; Ex. 11 at 73:17-21. Concentrated wastewater flows from the two outer tanks into a third circular tank containing green-haired algae. *Id.* at 74:1-11. Ultimately, the wastewater is discharged through dirt bags and woodchips into groundwater. *Id.* at 75:6-15; Ex. 4 at 7-8. The system’s components—duckweed, algae, dirt bags, and woodchips—are not providing biological

[3] The Watershed Management Plan was prepared by a third-party environmental consulting firm FB Environmental Associates. Ex. 1 at 3 of 98.

treatment as intended. Ex. 24 at 2-3. Environmental engineering expert, Dr. Wane Schneiter, estimates that the new interim circular tank system will "result in about the same reduction in phosphorus discharge as was occurring with the bass ponds"—meaning that it is not an improvement over the settling ponds. *Id.* at 4.

**C. Defendants' Discharges Are Causing Acidity Pollution.**

Defendants continue to discharge Facility effluent more acidic than the Permit's allowance of 6.5 standard units pH. Ex. 25. Defendants have discharged water more acidic than 6.5 standard units at least 24 times since 2013[4]—including six times in 2019 to date.[5] *Id.*; Ex. 26. Defendants have taken no measures to mitigate or treat the acidity generated by their operations. Ex. 8 at 34:1-2, 14-15.

The level of pH affects many chemical and biological processes in a waterbody. Ex. 27. "It [the pH level] is one of the most important environmental factors limiting species distributions in aquatic habitats." *Id*. The optimal range for most aquatic organisms is between 6.5 and 8 standard units. *Id*. A change of pH outside of the optimal range "physiologically stresses many species and can result in decreased reproduction, decreased growth, disease or death. This can ultimately lead to reduced biological diversity in streams." *Id.*

**D. Defendants' Discharges Are Causing Formaldehyde Pollution.**

Defendants continue to discharge Facility effluent with formaldehyde concentrations exceeding the Permit's numeric limits. In September 2016, Defendants discharged wastewater with an average daily formaldehyde concentration of 75 mg/L—that is, a concentration 1500 percent of the Permit numeric limitation (4.6 mg/L daily average). Ex. 7 at 1. In November 2017,

---

[4] These 18 discharges from 2013-2014 cannot fall within the Permit's safe harbor for discharges within half a standard unit of the ambient upstream water, as Defendants did not submit the ambient upstream pH measurements with their DMRs until 2016.

[5] *See* Ex. 25.

Defendants' discharges of effluent had a monthly average formaldehyde concentration of 3.26 mg/L—double the Permit limit (1.6 mg/L monthly average). *Id.* at 2. The parasitic infestations for which Defendants use formalin (the liquid form of formaldehyde) are seasonally recurring, and Defendants have supplies of formalin on site at the Facility. Ex. 9 at 19:14; Ex. 8 at 24:18-22. Defendants will continue to use formalin at the Facility "on an as needed basis" to protect fish yields, understanding they run the risk of violating the Permit's formaldehyde limit. Ex. 9 at 55:18-20, 19:2-6; Ex. 7 at 5.

Formaldehyde can be harmful to aquatic life because it chemically removes dissolved oxygen from water and kills algal organisms that produce oxygen. The National Toxicology Program, an interagency program of the Department of Health and Human Services, classifies formaldehyde as a known human carcinogen. Ex. 10.

## ARGUMENT

### I. THE COURT HAS JURISDICTION OVER THIS ACTION.

Conservation Law Foundaiton (CLF) brings this suit to address Defendants' violations of a federal permit, raising federal questions and seeking redress under the citizen-suit provision of the Clean Water Act. 28 U.S.C. §§ 1331, 2201–02; 33 U.S.C. § 1365(a).

CLF has standing to bring these claims. Plaintiff's members (1) "ha[ve] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant[s]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). CLF members have enjoyed, used, and recreated on and in the Merrymeeting River, Marsh Pond, Jones Pond, and Downing Pond, and plan to continue to do so. Ex. 13 at 2, 6; Ex. 23 at 1-3, 5-6; Ex. 22 at 2-3. Defendants' violations of the Clean Water Act have harmed and

continue to harm these CLF members' abilities to enjoy, use, and recreate in these waterbodies. Ex. 13 at 6-7; Ex. 23 at 4-6; Ex. 22 at 2-4. For example, CLF members have curtailed and will continue to curtail their uses of the River in light of fears for the health of themselves and their families as a result of exposure to harmful cyanobacteria outbreaks caused by Defendants' unlawful discharges. Ex. 13 at 6-7; Ex. 23 at 4-5; Ex. 22 at 2, 4. The Court's grant of the relief described below, *infra* at 26–27, will redress Defendants' ongoing violations.

## II. DEFENDANTS ARE VIOLATING THE CLEAN WATER ACT.

Section 301 of the Clean Water Act prohibits the addition of any pollutant to navigable waters from any point source except as authorized by an NPDES permit. 33 U.S.C. § 1311(a); *id.* § 1362(12). The Facility is a "concentrated aquatic animal production facility" and a point source. 40 C.F.R. §§ 122.24, 260.10; *id.* pt. 122, app. C.[6] The Facility's discharges of pollutants[7] to the Merrymeeting River are permitted only pursuant to the terms of its Permit. "Compliance with a permit . . . shall be deemed compliance" with Section 301 of the Act. 33 U.S.C. § 1342(k).

### A. Defendants Are Violating the Permit's Prohibition Against Violating New Hampshire State Water Quality Standards (Count 1).

Section 303 of the Clean Water Act "requires each State, subject to federal approval, to institute comprehensive water quality standards establishing water quality goals" for navigable waters. *PUD No. 1 of Jefferson Cty. v. Washington Dep't of Ecology*, 511 U.S. 700, 700 (1994) (citing 33 U.S.C. § 1313). These standards may be numeric, meaning quantitative limits on particular chemicals within a waterbody, or narrative, meaning limits defined qualitatively. A

[6] A hatchery, fish farm, or other facility is a "concentrated aquatic animal production facility" and thus a point source where it grows or holds cold water fish species (like trout) in ponds, raceways, or other similar structures which discharge at least 30 days per year, and produces at least 20,000 pounds harvest weight of aquatic animals per year; and feeds at least, 5,000 pounds of food during the calendar month of maximum feeding. 40 C.F.R. § Pt. 122, App. C. The Powder Mill State Fish Hatchery qualifies as a concentrated aquatic feeding operation under this definition. *See* Ex. 14 at 12 (providing harvest weight and annual feed weight from 2014 to 2018).
[7] A "pollutant" includes any "solid waste," "sewage," "chemical wastes, biological materials," and "agricultural waste discharged into water." 33 U.S.C. § 1362(6).

NPDES permit must require that the discharger achieve these "water quality standards established under section 303 of the [Clean Water Act], including State narrative criteria for water quality." 40 C.F.R. § 122.44(d)(1). New Hampshire's state water quality standards include both standards defined by "designated uses" and those defined as "water quality criteria." *See* N.H. Code Admin. R. Env-Wq § 1702.17, 1703.03; N.H.D.E.S., *2018 Section 305(b) and 303(d) Consolidated Assessment and Listing Methodology* (Aug. 8, 2019) at 5-6.

As a Class B water, the Merrymeeting River must support designated uses that include: recreational uses, use as a water supply (after adequate treatment), and uses for aquatic life, fish consumption, and wildlife. N.H. Rev. Stat. § 485-A:8,II; N.H. Code Admin. R. Env-Wq § 1702.17; *see also* MMRL at 16 (Table 3-1). In addition, the State statute and rules define specific water quality criteria to protect these designated uses. N.H. Rev. Stat. § 485-A:8; N.H. Code Admin. R. Env-Wq § 1700.[8] As mentioned, many of the state's water quality criteria are both *numeric* and *narrative*. For example, relevant here, there are narrative criteria for phosphorus and nitrogen,[9] and narrative criteria stating that Class B waters "shall have no objectionable physical characteristics" and that the discharge of waste shall not be "inimical to aquatic life or to the maintenance of aquatic life." N.H. Rev. Stat. § 485-A:8,II. A water body that fails to support a

---

[8] For example, N.H. Code Admin R. Env-Wq § 1703.01(b) states: "[a]ll surface waters shall be restored to meet the water quality criteria for their designated classification including existing and designated uses, and to maintain the chemical, physical, and biological integrity of surface waters, [and that] all surface waters shall provide, wherever attainable, for the protection and propagation of fish, shellfish and wildlife, and for recreation in and on the surface waters."

[9] N.H. Code Admin R. Env-Wq § 1703.14 provides :

> (a) Class A waters shall contain no phosphorus or nitrogen unless naturally occurring.
> (b) Class B waters shall contain no phosphorus or nitrogen in such concentrations that would impair any existing or designated uses, unless naturally occurring.
> (c) Existing discharges containing phosphorus or nitrogen, or both, which encourage cultural eutrophication shall be treated to remove the nutrient(s) to ensure attainment and maintenance of water quality standards.
> (d) There shall be no new or increased discharge of phosphorus into lakes or ponds. (e) There shall be no new or increased discharge containing phosphorus or nitrogen to tributaries of lakes or ponds that would contribute to cultural eutrophication or growth of weeds or algae in such lakes and ponds.

designated use or fails to satisfy one or more water quality criteria is violating state water quality standards.

The Facility's Permit mandates that its discharges "shall not cause a violation of the water quality standards of the receiving water." Ex. 3 at 7 of 46. Contrary to this mandate, the Facility's discharges are causing the violation of water quality standards—namely, the River's designated use for recreation, and several water quality criteria.

**1. Defendants violate the Permit's incorporated state water quality standards by impairing the Merrymeeting River's designated use for recreation.**

New Hampshire's water quality standards applicable to the Merrymeeting River include: (1) supporting its designated use for recreation as a Class B surface water, and (2) "General Water Quality Criteria" requiring that "[a]ll surface waters shall be free from substances in kind or quantity that . . . [i]nterfere with recreational activities." N.H. Code Admin. R. Env-Wq § 1703.03(c)(1)(e).

Defendants are violating these standards. As discussed above, the Facility is discharging significant phosphorus loads into the Merrymeeting River (*see supra* at 9–12) causing eutrophic conditions and associated cyanobacteria outbreaks. Ex. 15 at 5. Pursuant to its obligation under Section 303(d) of the Clean Water Act to identify water bodies that fail to meet state water quality standards, the state has already designated Marsh, Jones, and Downing Ponds as "impaired" for primary recreation uses (e.g., swimming and diving) as a result of cyanobacteria hepatoxic microsystins that endanger human health. Ex. 19 at 15, 23; Ex. 20 at 21. In other words, the state has determined that these segments of the Merrymeeting River do not support their designated recreational uses. The state issued advisories for Marsh Pond (in 2018 and 2019) and Jones Pond (in 2018 and 2019) instructing citizens to "avoid contact with the water in areas experiencing elevated cyanobacteria cell conditions." Ex. 21 at 1, 4-7.

Defendants' discharges are causing this violation of state water quality standards. In addition to cyanobacteria outbreaks, the Facility's significant discharges of phosphorus are causing other eutrophic conditions: thick mats of vegetal blooms and milfoil that impede access to boaters; filamentous green algae that cover the bodies of swimmers and docks with an unpleasant slime, Ex. 23 at 34, 36; and uninviting greenish-clouded water, and malodors from decaying matter. Ex. 15 at 5, 10. Each of these adverse impacts, further undermines the Merrymeeting River's designated use for recreation. Accordingly, Defendants are violating the Permit's prohibition against violating state water quality standards related to recreation.

**2. Defendants violate the Permit's incorporated state water quality standards by violating state water quality criteria related to phosphorus, eutrophication, and habitat health.**

The Facility's significant discharges of phosphorus, including phosphorus-containing solids, are causing violations of numerous state water quality criteria, as follows.

*Nutrients and Eutrophication Criteria*

New Hampshire's state water quality standards include water quality criteria with respect to nutrients:

> Class B waters shall contain no phosphorus or nitrogen in such concentrations that would impair any existing or designated uses, unless naturally occurring.
>
> Existing discharges containing phosphorus or nitrogen, or both, which encourage cultural eutrophication shall be treated to remove the nutrients(s) to ensure attainment and maintenance of water quality standards.

N.H. Code Admin. R. Env-Wq § 1703.14(b), (c). As discussed above, the Facility is discharging a significant load of phosphorus that is 1200 percent more concentrated than the Facility's source water; increases the daily mass of total phosphorus in the River by at least 362 percent; and contributes 67 percent of all phosphorus to Marsh Pond each year. *See supra* 9–10. These major phosphorus pollution contributions are causing eutrophic conditions that: impair the River's

designated use for recreation as a result of toxic cyanobacteria blooms; cause the proliferation of green filamentous algae and invasive milfoil; and cause unnatural color. Such discharges must "be treated to remove the [phosphorus] to ensure attainment and maintenance of water quality standards." N.H. Code Admin. R. Env-Wq § 1703.14(c). Unless and until the Facility's discharges are subject to such phosphorus treatment, Defendants are violating state water quality standards and, thus, the Permit.

*Dissolved Oxygen Criteria*

New Hampshire's state water quality standards include water quality criteria that provide, with limited exception, that Class B waters "shall have a dissolved oxygen content of: (1) [a]t least 75% of saturation, as specified in N.H. Rev. Stat. § 485-A:8,II, based on a daily average; and (2) [a]n instantaneous minimum dissolved oxygen concentration of at least 5 mg/l." N.H. Code Admin. R. Env-Wq § 1703.07(b).

As described above, one of the consequences of phosphorus pollution and its resulting eutrophic blooms is that after a bloom ends and its component organisms decay, dissolved oxygen in the water column continues to deplete. Ex. 15 at 11. As a result of Defendants' phosphorus-laden discharges, this process regularly occurs in the River, lowering oxygen levels below 5 mg/l in Marsh, Jones, and Downing Ponds. *Id.* at 4, Ex. 1 at 32 of 97. At times, Marsh and Jones Ponds experience "[e]xtremely low dissolved oxygen" or "anoxia" at levels below 1 part per million, which triggers internal loading from phosphorus-bearing sediments and perpetuates phosphorus loading, eutrophication, and oxygen depletion. *Id*. Defendants' discharges initiate and continue this vicious cycle of phosphorus loading, causing violations of the dissolved oxygen water quality standard, and thus, the Permit.

*Aquatic Community Integrity and Nuisance Species Criteria*

New Hampshire water quality standards include criteria designed to protect biological integrity and prevent aquatic habitats from being dominated by nuisance species:

> [a]ll surface waters shall support and maintain a balanced, integrated, and adaptive community of organisms having a species composition, diversity, and functional organization comparable to that of similar natural habitats of a region . . . [and that] [d]ifferences from naturally-occurring conditions shall be limited to non-detrimental differences in community structure and function.

N.H. Code Admin. R. Env-Wq § 1703.19. In addition, New Hampshire's General Water Quality Criteria include the requirement that all surface waters "be free from substances in kind or quantity that . . . [r]esult in the dominance of nuisance species." *Id.* § 1703.03(c)(1)(d).

As described above, the Facility's substantial phosphorus discharges have caused cultural eutrophication in the Merrymeeting River. *Supra* at 9-12, Due to that eutrophication, filamentous green algae and variable milfoil, an invasive, nuisance aquatic plant species, dominate segments of the River. Ex. at 15 at 5. The green algae and invasive milfoil create a detrimental and unnatural composition, diversity, and functional organization of plant species at the expense of biological diversity in the Merrymeeting River. Ex. 15 at 5; Ex. 22. In addition, the algal blooms described above exhaust supplies of dissolved oxygen needed by native species of plants and fish. Ex. 15 at 6; Ex. 1 at 32 of 97. The blooms also produce turbidity, preventing sunlight from reaching photosynthesizing organisms in the River. *Id.* at 30 of 97; Ex. 15 at 8. Defendants' discharges of phosphorus trigger a radical—and environmentally detrimental—change in the River's species composition, thus violating the aquatic community integrity and nuisance species water quality criteria and the Permit.

*Color Criteria*

New Hampshire's state water quality standards include water quality criteria pertaining to

color: "Class B waters shall contain no color in such concentrations that would impair any existing or designated uses, unless naturally occurring." N.H. Code Admin. R. Env-Wq § 1703.10(b). *See also id.* § 1703.03(c)(1)(c) (requiring that all surface water be free from substances that "[p]roduce . . . color . . . that is not naturally occurring and would render the surface water unsuitable for its designated uses."). As discussed above, algae and dissolved particles significantly reduce water clarity, Ex. 1 at 30 of 97; Ex. 15 at 8, and eutrophic conditions cause green filamentous algae to produce greenish-clouded water. *Id.* at 5, 10. Defendants' discharges are causing or contributing to these changes in color, violating these water quality standards, and thus, the Permit.

**3. Defendants violate the Permit's incorporated state water quality standards by creating harmful benthic deposits.**

New Hampshire's state water quality standards include water quality criteria related to benthic deposits. These require that all surface waters be free from substances in kind or quantity that "[s]ettle to form harmful benthic deposits." N.H. Code Admin. R. Env-Wq § 1703.03(c)(1)(a). In addition, "Class B waters shall contain no benthic deposits that have a detrimental impact on the benthic community, unless naturally occurring." *Id.* § 1703.08(b).

The Facility's discharges of phosphorus and phosphorus-bearing, total suspended solids settle on the bottom of the River, where they form non-naturally occurring benthic deposits of phosphorus-bearing sediments. Ex. 1 at 4, 25 of 97. These sediments store phosphorus until physically disturbed or exposed to low-oxygen conditions, at which point the phosphorus is re-released, entering the water column in dissolved form. Ex. 15 at 11-12, 19; Ex. 1 at 33 of 97. Mobilization of sediment-bound phosphorus contributes to further eutrophication and associated oxygen depletion, which leads to mobilization of more sediment-bound phosphorus on the riverbed. Ex. 15 at 11-12; Ex. 28; Ex. 29. It is a never-ending cycle that imposes significant harms on the riverine ecosystem. By creating preconditions for toxic cyanobacteria blooms, the

cycle also imposes harms for those who would otherwise enjoy the River. Ex. 15 at 11-12. Defendants' discharges create harmful benthic deposits in violation of water quality standards and, thus, the Permit.

**B. Defendants Are Violating the Permit's Conditions by Interfering with the Designated Uses of the Merrymeeting River, Harming its Aquatic Life, and Creating Harmful Benthic Deposits (Count 2).**

Specific conditions in the Facility's discharge permit also directly protect against interference of the River's designated uses, harm to its aquatic life, and the creation of benthic deposits. The Permit requires that: (1) discharges from the Facility "shall be adequately treated to ensure that [the Merrymeeting River] remain[s] free from pollutants which . . . would render it unsuitable for its designated uses, " (2) "[n]o components of the effluent shall result in any demonstrable harm to aquatic life," and (3) the Merrymeeting River "remain[s] free from pollutants in concentrations or combinations that settle to form harmful deposits." Ex. 3 at 7 of 46.

As described above, Defendants' discharges from the Facility impair the Merrymeeting River's designated uses, harm its aquatic life, and create harmful benthic deposits, in violation of the Permit. *Supra* at 18-23.

**C. Defendants Have Failed, and Will Continue to Fail, to Comply with the Best Management Practices Plans (Count 7).**

The Permit requires Defendants to "implement and maintain a BMP Plan."[10] Ex. 3 at 10 of 46. Defendants have failed to implement provisions of their recently updated, September 2019 BMP Plan as well as their earlier, October 2016 BMP Plan.

First, the Permit requires Defendants to "identify and implement procedures for routine

[10] Defendants' Permit states that the "permittee must continue to implement and maintain a BMP Plan (PLAN) upon the permit's effective date that describes how the following requirements will be achieved." Ex. 3 at 11 of 46.

cleaning of rearing units and settling tanks" in their BMP Plan. Defendants have not adequately identified a routine cleaning procedure for all of their rearing units and settling tanks. Ex. 3 at 11 of 46. Nor have Defendants included in their BMP Plan a cleaning schedule for all of the rearing units (i.e., there is no cleaning schedule for the Show Ponds and the Woods Ponds, the larger ponds in which fish are raised) or the settling tanks (also referred to as the "interim tanks" or the "wastewater storage circular ponds"). Ex. 4 at 4.

Second, the BMP Plan requires Defendants to clean the raceways "approximately once per week, or once every two weeks in winter, when in use by vacuum pumping" and to clean the round tanks "about once every two weeks." *Id.* Defendants have failed to comply with these cleaning procedures. The Facility keeps a "Loads Hauled Log" documenting when the loads of vacuumed solids from the raceways and fish ponds are hauled to the settling ponds. Ex. 30; Ex. 11 at 92:19-21, 93:1-22. According to the 2019 Log, at least 26 times in the spring, summer, and fall, Defendants failed to clean weekly, and during the winter, biweekly cleanings were missed at least 8 times. *See* Ex. 32; Ex. 31. At times, raceways are cleaned as infrequently as once a month. *Id.*, Ex. 30. Charts produced by Defendants confirm that the uncleaned raceways were in use, accumulating fish wastes during the periods when Defendants skipped cleanings. Ex. 33.

According to Jason Smith, the chief of inland fisheries for Fish and Game, the Facility does not have a set cleaning schedule. Ex. 9 at 63:5-11. Without a set cleaning schedule that meets the BMP plan requirements, nor an intention to implement one, Defendants will continue to violate their BMP Plan.

### D. Defendants Are Violating the Permit's Low pH Effluent Condition and State Certification Requirement (Counts 4 & 5).

Defendants frequently discharge and will continue to discharge acidic wastewater more acidic than the Permit limit of 6.5 standard units pH and more than 0.5 standard units lower than

the ambient upstream river water. Defendants have violated this Permit limit at least 24 times since 2013[11]—including 6 violations in 2019. *See* Ex. 25; see also Ex. 9 at 45:20-22, 46:8-13, 47:11-13. Despite these repeated violations, Defendants "don't do anything to manipulate the pH" at the Facility prior to discharging the wastewater into the Merrymeeting River. Ex. 8 at 34:1-2. As Defendants have made no attempts to treat their effluent for low pH despite years of repeated low pH violations, these violations will continue into the future.

### E. Defendants Are Violating the Permit's Formaldehyde Condition (Count 3).

Defendants discharge formaldehyde when they use formalin (formaldehyde gas dissolved in water and methanol) to treat fish for parasites. Ex. 3 at 20 of 46. Defendants use formalin on an "as needed basis" and formalin is kept on-site at the Facility. Ex. 9 at 55:18-20; Ex. 8 at 24:18-22. Defendants discharged formaldehyde in excess of the Permit's formaldehyde limits in 2016 and 2017.[12] Answer at ¶ 80; Ex. 7 at 1, 2. Defendants also discharged formaldehyde in February 2019. *Id.* at 5. There is no plan to stop the use of formalin at the Facility. Ex. 8 at 31:13-15. The Facility's fish technician, Matthew Pehrson, responsible in part for determining whether to use formalin, foresees needing to use formalin in the future, including applications larger than ones that caused Permit exceedances in the past. Ex. 8 at 16:11-20; Ex. 8 at 22:8-9; 30:10-18. Pehrson does not remember any discussions regarding reducing the amount of formalin used at the Facility to avoid violating the permitted formaldehyde limit. Ex. 11 at 26:3-31:1. With no change in their practices, Defendants will continue to violate the Permit's formaldehyde limit in the future.

---

[11] Defendants discharged wastewater with a pH below 6.5 24 times between 2013 and 2014 (see Pl.'s Complaint at 18). For these violations, Defendants did not qualify for the Permit exception allowing wastewater to be discharged with a pH below 6.5 standard units when ambient upstream pH is within 0.5 standard units of the wastewater, as they did not begin submitting the ambient upstream pH measurements with their DMRs until 2016.

[12] In September 2016, Defendants discharged wastewater with a formaldehyde concentration of 75 mg/L—more than 15 times the Permit allowance of 4.6 mg/L. Ex. 7 at 1. In November 2017, Defendants' monthly average formaldehyde concentration was 3.26—double the Permit allowance of 1.6 mg/L. *Id.* at 2.

### F. Defendants Have Discharged, and Will Continue to Discharge, Cleaning Water in Violation of the Permit (Count 6).

Defendants' Permit prohibits the direct discharge of cleaning water, that is, wastewater containing settled solids. Ex. 3 at 8 of 46. Defendants are permitted to discharge cleaning water to a settling pond "for the purpose of settling solids"—however, the only water that may be discharged from the settling ponds directly to the Merrymeeting River is the relatively clear so-called "decant water," which remains after solids have settled out, or "water that flows slowly over those solids." *Id*.

In practice, Defendants repeatedly discharge solids-laden cleaning water directly from their settling ponds either before the solids had settled out to form decant water or while turbulent fast-moving water was flowing through the ponds, stirring up sediment. As discussed above, Defendants reported to EPA and the New Hampshire Department of Environmental Services that they potentially discharged up to 3,000 gallons of cleaning water from their settling ponds on July 11, 2018. Ex. 14. Defendants also routinely discharged cleaning water during the summers of 2017, 2018, and 2019. Ex. 13 at 4. Given Defendants' practices, Defendants will continue to discharge cleaning water from the Facility's settling ponds in violation of the Permit.

## III. THE COURT SHOULD DECLARE THAT DEFENDANTS ARE VIOLATING THE PERMIT AND ENJOIN THEIR CONTINUED DISCHARGES UNTIL THEY HAVE CONSTRUCTED A TREATMENT SYSTEM AND ELIMINATED PHOSPHORUS RE-RELEASE IN THE RIVER.

CLF seeks a declaration that Defendants are violating the Facility's Permit and the Clean Water Act, as well as an order enjoining Defendants' operation of the Facility until Defendants have constructed a wastewater treatment system, Ex. 6 at 7-8, Ex. 24 at 4-5, and have eliminated

the re-release of phosphorus from benthic deposits in Marsh and Jones Ponds.[13] The Court should order that Defendants propose for its approval a plan and schedule for Defendants to achieve compliance with the conditions of the Permit and the Clean Water Act. If necessary, Plaintiffs request additional proceedings to define the particular terms of the remedial order.

## CONCLUSION

For the foregoing reasons, there is no genuine dispute of material fact as to Counts I-VII, nor as to the proper remedy for these Counts. CLF is entitled to judgment as a matter of law.

Dated: November 27, 2019

Respectfully submitted,

CONSERVATION LAW FOUNDATION, INC.,

*/s/ Thomas F. Irwin*
Thomas F. Irwin, Esq.
N.H. Bar No. 11302
Conservation Law Foundation
27 North Main Street
Concord, NH 03301
(603) 225-3060
tirwin@clf.org

*/s/ Heather A. Govern*
Heather A. Govern, *Admitted Pro Hac Vice*
Chelsea E. Kendall, *Pro Hac Vice Pending*
Kenta Tsuda, *Pro Hac Vice Pending*
Conservation Law Foundation
62 Summer St.
Boston, MA 02110
(617) 850-1765
hgovern@clf.org
ckendall@clf.org
ktsuda@clf.org

[13] The elimination of the phosphorus re-release could be remedied through the removal of the phosphorus-bearing sediment, as stated in Plaintiff's complaint, or by chemical inactivation of the phosphorus in the sediment. The "inactivation" option, which may be a more viable means of eliminating the phosphorus re-release, was identified through expert discovery.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 27, 2019, the foregoing document was filed through the ECF system, by which means a copy of the filing will be sent electronically to all parties registered with the ECF system.

*/s/ Heather A. Govern*
Heather A. Govern