**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


**Conservation Law Found.**

    v.

**N.H. Fish and Game Dep't, et al.**

Case No. 18-cv-996-PB
Opinion No. 2020 DNH 054


**MEMORANDUM AND ORDER**

    The Conservation Law Foundation ("CLF"), a non-profit environmental advocacy organization, brought this citizen suit for injunctive relief under Section 505 of the Clean Water Act ("CWA") against the Executive Director of the New Hampshire Fish and Game Department and the eleven individual officers who serve as commissioners of the New Hampshire Fish and Game Commission (collectively "defendants"). CLF alleges that the Powder Mill State Fish Hatchery (the "Facility"), a hatchery owned and operated by the defendants, has for several years been discharging pollutants into the Merrymeeting River in violation of the Facility's National Pollutant Discharge Elimination System ("NPDES") permit. CLF bases its claims on two types of what it alleges are ongoing CWA violations. The first — "Direct Discharge" claims — are based on current and anticipated future releases of pollutants directly from the Facility itself. The remaining claims — "Indirect Discharge" claims — stem from past releases of phosphorus by the Facility that have settled into

sediments at the bottom of the river and continue to leach phosphorus into the river.

The parties have filed cross-motions for summary judgment addressing both types of claims. For the reasons that follow, I deny the motions without prejudice with respect to the Direct Discharge claims and instruct the parties to file supplemental briefing with respect to the Indirect Discharge claims.

## I. BACKGROUND

### A. The Claims

CLF's suit against defendants consists of seven counts, which I summarize here. Each count describes an alleged violation of the Facility's NPDES permit and, by extension, the CWA and its implementing regulations. The Facility's NPDES permit was initially issued in December 2011. Am. Compl., Doc. No. 20 at 10. The permit expired in 2016 and has since been administratively continued. Doc. No. 20 at 10.

In Count I, CLF alleges that phosphorus discharged by the Facility directly or indirectly causes violations of state water use classifications, water quality criteria, dissolved oxygen standards, benthic deposit standards, water color standards, phosphorus standards, biological and aquatic community integrity standards, and antidegradation standards. Doc. No. 20 at 22-23. CLF alleges that the Defendants directly discharge phosphorus

2

into the river from the outflows of the Facility. See, e.g., Mem. of Law in Support of Pl.'s Mot. for Sum. J., Doc. No. 47-1 at 9-10. CLF further alleges that this phosphorus, once it has been discharged, settles into the sediment at the bottom of the river and is then re-discharged into the river. Doc. No. 47-1 at 23. Of particular relevance to this Order, CLF argues that these discharges violate the NPDES permit, even though the permit contains no numerical limit for phosphorus discharges. Doc. No. 47-1 at 16-23.

In Count II, CLF alleges that the Facility's ongoing discharges, both direct and indirect, render the receiving waters unsuitable for their designated uses, harm aquatic life, and settle to form harmful deposits. Doc. No. 20 at 23-24.

In Count III, CLF alleges that the Facility is discharging formaldehyde into the Merrymeeting River in concentrations that violate the NPDES permit. Doc. No. 20 at 24-25.

In Count IV, CLF alleges that the Facility's discharges violate the NPDES permit's limitations on effluent pH. Doc. No. 20 at 25-26. Count V alleges effluent pH violations of State Certification requirements. Doc. No. 20 at 26.

In Count VI, CLF alleges that the Facility improperly discharges cleaning water into the Merrymeeting River. Doc. No. 20 at 26-27. Finally, in Count VII, CLF alleges that defendants have failed to implement and maintain a Best Management

Practices Plan ("BMP Plan") in violation of NPDES permit requirements. Doc. No. 20 at 27–28.

Currently before me are Defendants' Partial Motion for Summary Judgment (Doc. No. 44) and CLF's Motion for Summary Judgment (Doc. No. 47).

B.  **Interceding Events**

While this case has been pending, two events have occurred that bear on my analysis. First, on December 31, 2019, the Environmental Protection Agency ("EPA") released a new draft NPDES permit for the Facility. Joint Public Re-Notice of Comment Period, Defs.' Obj. to Pl.'s Mot. for Sum. J., Ex. A-1, Doc. No. 53-3 at 1. The comment period closed on February 14, 2020. Doc. No. 53-3 at 1. According to the notice, "[f]ollowing the close of the comment period, and after the public hearing, the [EPA] will issue a final permit decision . . . ." Doc. No. 53-3 at 3. Unlike the 2011 permit, the draft permit contains numerical limits for phosphorus discharge. E.g., Draft Permit, Defs.' Obj. to Pl.'s Mot. for Sum. J., Ex. A-2, Doc. No. 53-4 at 2, 4, 6. The draft permit also includes a compliance schedule, pursuant to which the Facility must — after meeting a variety of benchmarks — come into compliance with the permit's requirements within five years. Doc. No. 53-4 at 18. Of course, it remains to be seen which aspects of this draft permit will ultimately be adopted in the final permit.

Second, the U.S. Supreme Court granted certiorari and heard oral arguments in the case of County of Maui v. Haw. Wildlife Fund, ___ U.S. ___, 139 S. Ct. 1164, 1164, 203 L. Ed. 2d 196 (2019). Specifically, the Court granted certiorari with respect to the question "[w]hether the CWA requires a permit when pollutants originate from a point source but are conveyed to navigable waters by a nonpoint source, such as groundwater." Pet. For Writ of Cert., No. 18-260, 2018 WL 4205010, at *i (Aug. 27, 2018).

On March 25, 2020, I held a telephone status conference with the parties.

## II. **ANALYSIS**

As I explained to the parties during our telephone status conference, I understand CLF's Direct Discharge and Indirect Discharge claims to be analytically distinct. The Direct Discharge claims consist of claims arising out of the Facility's present and anticipated future discharges into the Merrymeeting River directly from the Facility. The Indirect Discharge claims consist of claims arising out of pollutants previously discharged by the Facility that have settled into the sediment and, CLF alleges, continue to leach phosphorus into the river. I address these categories of claims in turn.

5

## A. Direct Discharge Claims

This category of claims contains all alleged NPDES permit violations stemming from the Facility's present and ongoing point source discharges directly from its outflow. It includes those aspects of Counts I and II that pertain to present discharges, as well as Counts III–VII.[1]

The CWA forbids all point source discharges of pollutants into the waters of the United States, unless a discharge complies with an NPDES permit or is otherwise allowed by the CWA. See 33 U.S.C. §§ 1311, 1342. The Citizen Suit provision of the CWA permits "any citizen [to] commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of [an NPDES permit]" 33 U.S.C. § 1365 (emphasis added); accord Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 53, 108 S. Ct. 376, 98 L. Ed. 2d 306 (1987). CWA citizen suits may be brought only to abate ongoing, as opposed to "wholly past," violations. Gwaltney, 484 U.S. at 56–63.[2] Further, injunctive relief claims against state officials

---

[1] While the failure to implement and maintain a BMP Plan alleged in Count VII does not allege an unpermitted discharge per se, it does allege a failure by defendants to maintain "solids management and control processes," resulting in present discharges and violations of its NPDES permit. Doc. No. 20 at 27–28. As such, I analytically include Count VII in this category.

[2] CWA citizen suits for civil penalties have, in some cases been permitted to redress past violations where the violation was

6

for retrospective relief are also subject to constitutional limitations. See Town of Barnstable v. O'Connor, 786 F. 3d 130, 138 (1st Cir. 2015) ("The Constitution does not permit [injunctive] relief that 'would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment.'") (quoting Mills v. Maine, 118 F. 3d 37, 55 (1st Cir. 1997)).

CLF's Direct Discharge claims allege violations of the December 2011 NPDES permit. That permit, however, will imminently be replaced by a new permit. If, as expected, the new permit contains a numeric limit for phosphorus discharge, I will no longer need to decide whether defendants' phosphorus discharges violate its NPDES permit notwithstanding the lack of a numeric phosphorus limit. Additionally, if the new permit contains a compliance schedule, and defendants can demonstrate compliance with that schedule, they may be able to avail themselves of the CWA's shield provision. Under the shield provision, a party may demonstrate compliance with the CWA by

---

ongoing at the time the suit was commenced. See, e.g., Atl. States Legal Found., Inc. v. Stroh Die Casting Co., 116 F. 3d 814, 820 (7th Cir. 1997), cert. denied, 522 U.S. 981, 118 S. Ct. 442, 139 L. Ed. 2d 379 (1997); Atl. States Legal Found, Inc. v. Pan Am. Tanning Corp., 993 F. 2d 1017, 1021 (2d Cir. 1993). Here, however, CLF abandoned its claim to civil penalties as barred under the Eleventh Amendment, so this exception does not apply.

demonstrating compliance with the permit. See U.S. Pub. Interest Research Grp. v. Atlantic Salmon of Me., LLC, 339 F.3d 23, 29 (1st Cir. 2003) (citing 33 U.S.C. § 1342(k)).

The forthcoming NPDES permit may moot many, if not all, of the Direct Discharge claims. In any event, I would require new briefing to determine if defendants were in compliance with the 2020 permit. I, therefore, deny the parties' motions for summary judgment as they pertain to the Direct Discharge claims, without prejudice to their right to re-file once the new NPDES permit issues.

**B.      Indirect Discharge Claims**

This category of claims includes all allegations in Counts I and II that the defendants are violating the CWA due to past phosphorus discharges that settled in sediment and are re-discharged into the receiving water. During our telephone conference, the parties agreed that a new permit would not moot this category of claims.

CLF advances two interconnected but distinct theories for why these indirect discharges violate the CWA. First, CLF alleges that the re-discharges of phosphorus from the sediments are "themselves point sources." Mem. of Law in Support of Pl.'s Obj. to Defs.' Mot. for Sum. J., Doc. No. 56-1 at 25. If these re-discharges are, in fact, point sources, they are not permitted by the 2011 NPDES permit and are not expected to be

permitted by the 2020 NPDES permit. Under this theory, these such discharges would, therefore, continue to be CWA violations regardless of the new permit.

Second, CLF argues that, even if the phosphorus re-discharges are not, themselves, point source discharges, they still constitute an ongoing violation of the CWA because "[t]he lingering presence of a discharge of pollutants that 'continue[s] to have roughly the same net polluting effect over years or decades thereafter' is a continuing violation under the [CWA]." Doc. No. 56-1 at 24 (quoting Sierra Club Inc. v. Granite Shore Power LLC, No. 19-cv-216-JL, at 27 (D.N.H. Sept. 13, 2019) (Doc. No. 33)) (second alteration in original). Under this theory (adopted by some courts and not others) if a pollutant was discharged from a point source in the past in violation of an NPDES permit, the discharge will be treated as ongoing if the pollutant remains in the receiving water and continues to cause harm. See City of Mountain Park, Ga. v. Lakeside at Ansley, LLC, 560 F. Supp. 2d 1288, 1296–97 (N.D. Ga. 2008) (analyzing split and concluding that "the continuing presence of illegally discharged fill material can constitute an 'ongoing violation'"). But see, e.g., Conn. Coastal Fishermen's Ass'n v. Remington Arms Co., 989 F.2d 1305, 1313 (2d Cir. 1993) ("The present violation requirement of the [CWA] would be completely undermined if a violation included the mere decomposition of

9

pollutants."). Under this theory, the phosphorus in the sediment need not be a point source discharge to constitute an ongoing violation, provided that (1) defendants initially discharged it from a point source in violation of their NPDES permit, (2) it remains in the receiving water, and (3) it continues to cause harm.

I agree with the parties that the new NPDES permit is unlikely to affect my analysis of these claims. I consider it plausible, however, that the U.S. Supreme Court's forthcoming opinion in County of Maui will provide me with some guidance as to how I should analyze one or both of CLF's theories of liability. It would be an unfortunate waste of the court's limited resources if I were to issue an opinion on these claims that had to be re-briefed and re-heard in a few short months. I, therefore, decline to rule on these claims at this time, unless the parties convince me that the County of Maui opinion will have no bearing on my analysis of CLF's theories. Accordingly, further briefing on the issue is required.

CLF shall file a supplemental memorandum of law limited to five pages within fourteen days, explaining what, if any impact the County of Maui opinion is likely to have on my analysis of these Indirect Discharge claims. Defendants will have fourteen days to respond with their own memorandum of law, also limited to five or fewer pages. Following this briefing, I will hold a

telephone conference with the parties to explain how I plan to proceed.

### III. CONCLUSION

For the reasons explained above, the parties' motions for summary judgment (Doc. Nos. 44, 47) as they pertain to the Direct Discharge claims are denied without prejudice. Within fourteen (14) days of this order, CLF shall file a supplemental memorandum, not to exceed five pages, on the impact, if any, that the U.S. Supreme Court's forthcoming decision in County of Maui may have on my analysis of the Indirect Discharge claims. Defendants shall then have fourteen (14) days to respond with their own memorandum, not to exceed five pages.

The clerk shall schedule a telephone status conference to occur within one week of defendants' memorandum being filed.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

April 6, 2020

cc: Chelsea Elizabeth Kendall, Esq.
    Heather A. Govern, Esq.
    Kenta Tsuda, Esq.
    Thomas F. Irwin, Esq.
    Christopher G. Aslin, Esq.

11