**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:18-cv-00996-PB |
| GLENN NORMANDEAU, *et al.*, | ) | |
| Defendants. | ) | |

**PLAINTIFF CONSERVATION LAW FOUNDATION'S CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND ITS OBJECTION TO DEFENDANTS' PARTIAL CROSS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION .......... 1

STATEMENT OF UNDISPUTED FACTS .......... 2

I. THE POWDER MILL FACILITY AND THE MERRYMEETING RIVER .......... 2

II. THE PERMIT .......... 3

III. THE FACILITY'S DISCHARGE OF DISSOLVED AND SOLID-BOUND PHOSPHORUS AND CLEANING WATER .......... 5

A. The Facility's Discharge of Dissolved and Solid-Bound Phosphorus to the River via Facility Outfalls (the "Direct Discharge") .......... 5

B. The Facility's Discharge of Dissolved Phosphorus to the River via Benthic Deposits (the "Indirect Discharge") .......... 6

C. The Facility's Discharge of Dissolved and Solid-Bound Phosphorus to the River in Cleaning Water .......... 8

D. The Harmful Impacts of the Facility's Phosphorus Discharges .......... 10

IV. THE FACILITY'S DISCHARGE OF FORMALDEHYDE TO THE RIVER .......... 14

V. THE FACILITY'S DISCHARGE OF ACIDIC (LOW PH) WASTEWATER TO THE RIVER .......... 15

VI. THE FACILITY'S BEST MANAGEMENT PRACTICES PLAN AND RELATED ACTIVITIES .......... 16

ARGUMENT .......... 17

I. THE COURT HAS JURISDICTION OVER THIS ACTION. .......... 17

II. DEFENDANTS' DISCHARGES CAUSE VIOLATIONS OF NEW HAMPSHIRE WATER QUALITY STANDARDS (COUNT I). .......... 18

A. Defendants' Direct and Indirect Discharges of Dissolved and Solid-Bound Phosphorus Are Point Source Discharges Within the Meaning of the Clean Water Act. .......... 19

B. Defendants' Point Source Discharges of Dissolved and Solid-Bound Phosphorus Cause Violations of State Water Quality Standards. .......... 21

C. There Is No Genuine Dispute Regarding the Causal Nexus Between Defendants' Conduct and Violations of Water Quality Standards. .......... 27

D. A New Permit Is Immaterial to Defendants' Current Liability for Violating State Water Quality Standards. .......... 29

III. DEFENDANTS VIOLATE THE PERMIT'S DESIGNATED USE, AQUATIC LIFE, AND BENTHIC DEPOSIT PROHIBITIONS (COUNT II). .......... 31

A. Defendants' Discharges Cause Non-Naturally Occurring Color, Odor, and Turbidity That Impair Designated Uses. .......... 31

B. Defendants' Discharges Cause "Demonstrable Harm to Aquatic Life." .............. 33

C. Defendants' Discharges Settle as Harmful Deposits and Float as Scum. ............. 34

IV. DEFENDANTS VIOLATE THE PERMIT'S FORMALDEHYDE LIMITS (COUNT III). ........................................................................................................ 35

V. DEFENDANTS VIOLATE THE PERMIT'S PH LIMITS (COUNTS IV & V). ............ 36

VI. DEFENDANTS DISCHARGE CLEANING WATER TO THE RIVER IN VIOLATION OF THE PERMIT (COUNT VI). ........................................................................ 37

VII. DEFENDANTS FAIL TO IMPLEMENT A BEST MANAGEMENT PRACTICES PLAN (COUNT VII). .............................................................................................. 40

CONCLUSION ........................................................................................................................ 42

**TABLE OF AUTHORITIES**

Page(s)

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ........ 38

*Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*,
305 F.3d 943 (9th Cir. 2002) ........ 21

*Dague v. City of Burlington*,
935 F.2d 1343 (2d Cir. 1991) ........ 20

*Dubois v. U.S. Dep't of Agric.*,
20 F. Supp. 2d 263 (D.N.H. 1998) ........ 38

*Fishel v. Westinghouse Elec. Corp.*,
640 F. Supp. 442 (M.D. Pa. 1986) ........ 21

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........ Passim

*Nat. Res. Def. Council, Inc. v. Gould, Inc.*,
733 F. Supp. 8 (D. Mass. 1990) ........ 35, 36, 40

*NRDC v. County of Los Angeles*,
840 F.3d 1098 (9th Cir. 2016) ........ 30

*Ohio Valley Envtl. Coal., Inc. v. Hernshaw Partners, LLC*,
984 F. Supp. 2d 589 (S.D.W. Va. 2013) ........ 21

*O'Leary v. Moyer's Landfill, Inc.*,
523 F. Supp. 642 (E.D. Pa. 1981) ........ 21

*Pub. Interest Research Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*,
913 F.2d 64 (3d Cir. 1990) ........ 27

*PUD No. 1 of Jefferson Cty. v. Washington Dep't of Ecology*,
511 U.S. 700 (1994) ........ 21

*Sierra Club v. Abston Const. Co.*,
620 F.2d 41 (5th Cir. 1980) ........ 21

*Sierra Club v. C.G. Mfg., Inc.*,
638 F. Supp. 492 (D. Mass. 1985) ........ 37

*Umatilla Waterquality Protective Ass'n v. Smith Frozen Foods, Inc.*,
962 F.Supp. 1312 (D. Or. 1997) ........ 20

*United States v. Concentrated Phosphate Export Assn.*,
393 U.S. 199 (1968) ........ 39

*United States v. Cumberland Farms of Connecticut, Inc.*,
647 F. Supp. 1166 (D. Mass. 1986) ........ 19

*United States v. Earth Scis., Inc.*,
599 F.2d 368 (10th Cir. 1979) ........ 21

*United States v. Sanchez-Gomez*,
138 S. Ct. 1532 (2018) ........ 38

*United States Pub. Interest Research Grp. v. Atlantic Salmon of Maine, LLC*,
339 F.3d 23 (1st Cir. 2003) ........ 30

*Velazquez-Perez v. Developers Diversified Realty Corp.*,
753 F.3d 265 (1st Cir. 2014) ........ 36

*Werlein v. United States*,
746 F. Supp. 887 (D. Minn. 1990) ........ 20

Statutes

28 U.S.C. § 1331 .......... 18
28 U.S.C. § 2201–02 .......... 18
33 U.S.C. § 1311 .......... 18
33 U.S.C. § 1313 .......... 21
33 U.S.C. § 1362 .......... 18, 20, 32
33 U.S.C. § 1365 .......... 18
N.H. Rev. Stat. § 485-A:8 .......... 22, 24

Regulations

40 C.F.R. § 122.2 .......... 32
40 C.F.R. § 122.24 .......... 19
40 C.F.R. § 122.44 .......... 22
40 C.F.R. § 260.10 .......... 19
N.H. Code Admin. R. Env-Wq § 1702.17 .......... 22
N.H. Code Admin. R. Env-Wq § 1703.03 .......... 22, 26
N.H. Code Admin. R. Env-Wq § 1703.07 .......... 24
N.H. Code Admin. R. Env-Wq § 1703.10 .......... 26
N.H. Code Admin. R. Env-Wq § 1703.14 .......... 23, 24
N.H. Code Admin. R. Env-Wq § 1703.19 .......... 25

## INTRODUCTION

At the Powder Mill Facility, Defendants rear hundreds of thousands of fish and generate large volumes of waste, including feces and decomposing fish food. The Facility, one of New Hampshire's six fish hatcheries, was built on the Merrymeeting River just south of the pristine waters of Merrymeeting Lake. Defendants dispose of almost all the Facility's wastes and contaminated wastewater by discharging it into the Merrymeeting River.

The Merrymeeting River is one of New Hampshire's cherished waters, treasured for recreational and aesthetic uses by residents and visitors. To protect the waters of the Merrymeeting River, EPA has set conditions on Defendants' operation of the Facility in a federally enforceable National Pollution Discharge Elimination System permit ("the Permit"). This Permit establishes effluent limitations to protect the receiving waters and ensure that pollution discharges from the Facility do not violate state water quality standards.

Defendants are violating and will continue to violate the Permit. Contravening Permit conditions, Defendants discharge substantial quantities of dissolved and solid-bound phosphorus from (1) pipes (or outfalls) directly into the River, and (2) via "indirect discharge"[1] from deposits of sediments Defendants have created on the River floor. Both of Defendants' means of discharging phosphorus are forcing the River into a state of "eutrophication," characterized by cloudy, green water, overgrowths of algae, invasive plant species, depleted oxygen, and outbreaks of toxic cyanobacteria. Defendants also discharge formaldehyde and acidic water from

[1] As the Court clarified during its April 26, 2020 conference with the parties, notwithstanding the Court's and the parties' reference to CLF's internal-loading claims as "indirect discharge claims," relative to the deposits and the Merrymeeting River, discharges from point sources are direct to navigable waters. The discharges could not be any more direct as nothing lies between the sediment (the point source) and the Ponds (the navigable water).

the Facility to the River, dump their cleaning water to the River, and fail to implement "best management practices"—all in violation of the Permit.

Defendants' violations of the Permit endanger the Merrymeeting River and the people who enjoy it; cause toxic cyanobacteria blooms, which imperil people, their pets, and other organisms in the River ecosystem; and greatly undermine the River's biological and aquatic community. CLF moves for summary judgment and respectfully requests that the Court remedy Defendants' ongoing violations by, *inter alia*, entering a declaratory judgment articulating Defendants' liability and an order enjoining Defendants' ongoing and future violations of the Permit and the Clean Water Act.

## STATEMENT OF UNDISPUTED FACTS

### I. THE POWDER MILL FACILITY AND THE MERRYMEETING RIVER

The Powder Mill State Fish Hatchery (the "Facility") is operated by officials and staff of the New Hampshire Fish and Game Department ("Fish and Game") and the New Hampshire Fish and Game Commission (the "Commission"). Defendants are officials who operate or control the Facility. ECF No. 26 (Answer) at ¶¶ 13–18. The Facility is located in New Durham, New Hampshire on the Merrymeeting River, just downstream from its headwaters in Merrymeeting Lake, "one of the clearest lakes in New Hampshire." ECF No. 26 (Answer) at ¶ 13; ECF No. 47-3 (Watershed Management Plan) at 4 of 97; ECF No. 47-4 (Map of Ponds). After flowing through the Facility, the River travels south through a series of small ponds, including Marsh Pond, Jones Pond, and Downing Pond. ECF No. 47-4 (Map of Ponds); ECF No. 47-3 (Watershed Management Plan) at 18 of 97. The River eventually flows into Lake Winnipesaukee at Alton Bay. ECF No. 47-3 (Watershed Management Plan) at 18 of 97. The Merrymeeting River watershed is "treasured as a recreational haven" by residents and visitors who fish, hike, boat, canoe, kayak, and swim there. *Id.* at 19 of 97. The watershed is

predominantly forested land inhabited by land mammals (among others, moose, bears, otters, and beavers), amphibians, reptiles, and birds (e.g. herons, loons, ducks, turkeys, grouse, and cormorants). *Id*. at 26 of 97.

The Facility is operated to hatch and rear hundreds of thousands of brook, rainbow, and brown trout each year to stock waterbodies in New Hampshire. ECF No. 26 (Answer) at ¶ 32; ECF No. 47-5 (Permit) at 18 of 46.[2] Its fish production and rearing operations generate waste byproducts, including fish feces and unconsumed fish food, which contaminate the water passing through the Facility.

Defendants dispose of the Facility's wastes and wastewater by releasing it to the River via two "outfalls," or pipes. The Facility receives water from Merrymeeting Lake through intake channels, then funnels the water to "raceways" (long, narrow, cement channels), circular tanks, and ponds in which Defendants raise fish. ECF No. 47-5 (Permit) at 19, 26 of 46; ECF No. 47-8 (Schneiter Report) at 2. As clean water flows in from the Lake, Defendants release wastewater directly into the River through two metal outfall pipes (Outfalls 001 and 002). ECF No. 47-5 (Permit) at 26 of 46; ECF No. 47-7 (Site Visit Photos) at 1, 2; ECF No. 47-8 (Schneiter Report) at 2, 5. Defendants discharge 99.98 percent of the wastewater flowing through the Facility—approximately 6.5 million gallons per day—into the Merrymeeting River through these pipes. ECF No. 47-8 (Schneiter Report) at 2, 6; ECF No. 47-11 (Smith Dep.) at 56:17-57:16.

## II. THE PERMIT

In December 2011, pursuant to its authority under the Clean Water Act, the Environmental Protection Agency ("EPA") issued a NPDES permit to Fish and Game. ECF No. 47-5 (Permit) at 1 of 46. The Permit authorizes Defendants "to discharge from a facility located

[2] The Facility's 2019 production target was 323,467 fish. ECF No. 47-6 (Sept. 2019 BMP Plan) at 3.

at Powder Mill State Fish Hatchery . . . to receiving water named Merrymeeting River . . . in accordance with effluent limitations, monitoring requirements and other conditions set forth [t]herein." *Id*.

The Permit includes narrative standards requiring that Defendants discharge without "caus[ing] a violation of the water quality standards of the receiving water." *Id*. at 7 of 46. The Permit also requires that Defendants ensure the Merrymeeting River "remains free from pollutants in concentrations or combinations that settle to form harmful deposits, float as foam, debris, scum or other visible pollutants." *Id*. The Permit requires Defendants to "adequately treat[]" effluent "to ensure that [the Merrymeeting River] remain[s] free from pollutants which produce odor, color, taste or turbidity which is not naturally occurring and would render it unsuitable for its designated uses." *Id*. The Permit requires that "[n]o components of the effluent shall result in any demonstrable harm to aquatic life." *Id*.

The Permit sets numeric limits for certain pollutants, including formaldehyde and acidity. *See id*. at 2-3, 27, 30–31 of 46. Defendants are authorized to discharge formaldehyde at a daily maximum concentration of 4.6 milligrams per liter (mg/L) and a maximum monthly average concentration of 1.6 mg/L. *Id*. at 3, 30 of 46. With respect to acidity, two Permit conditions prohibit Defendants from discharging effluent with a pH lower than 6.5 standard units, unless the effluent's pH is within half a standard unit of ambient upstream river water. *Id*. at 2, 16, 27 of 46.

The Permit requires Defendants to follow specified procedures when discharging Facility effluent. *See id.* at 8, 10–14 of 46. Defendants are prohibited from discharging cleaning water, that is, "any water from the facility's hatchery house, raceway, ponds, canals, circular tanks, etc. which contains settled solids that have accumulated on the bottom of such structures that is discharged, absent some form of solids removal, directly to the receiving water during periodic

cleaning operations." *Id*. at 8. Defendants must also adhere to a Best Management Practices Plan ("BMP Plan"), which they must develop in accordance with the requirements in the Permit and make available to EPA upon request. *Id*. at 10. Under Defendants' BMP Plan, they must vacuum raceways "approximately once per week, or once every two weeks in winter" and vacuum the 24 round tanks on the south end of the Facility "about once every two weeks." ECF No. 47-6 (Sept. 2019 BMP Plan) at 4.

The Permit expired in December 2016 and has been administratively continued since its expiration. ECF No. 47-5 (Permit) at 1 of 46. On December 31, 2019, EPA issued a new, draft NPDES permit for the Facility. ECF No. 53-3 (Public Notice) at 1. The comment period on the draft permit closed on February 14, 2020. *Id.* EPA has not yet issued a final permit.

## III. THE FACILITY'S DISCHARGE OF DISSOLVED AND SOLID-BOUND PHOSPHORUS AND CLEANING WATER

Defendants are causing harmful cyanobacteria blooms and eutrophic conditions in the Merrymeeting River by discharging dissolved and solid-bound phosphorus from Facility outfalls ("direct discharge"), from benthic deposits ("indirect discharge"), and from cleaning water. ECF No. 47-17 (Rensel Report) at 4-5.

### A. The Facility's Discharge of Dissolved and Solid-Bound Phosphorus to the River via Facility Outfalls (the "Direct Discharge")

As water passes through the Facility, Defendants' fish-rearing operations add undissolved solid wastes containing phosphorus to the water. As these solids break down, they release dissolved phosphorus to the Facility's water. ECF No. 47-8 (Schneiter Report) at 2, 5, 6. The phosphorus concentration of Facility wastewater increases by 1200 percent as it passes through the Facility (as compared to influent water from Merrymeeting Lake). ECF No. 47-3 (Watershed Management Plan) at 45 of 97. The wastewater is also loaded with undissolved suspended solids

(fish feces and unconsumed fish food, as well as algae[3]). ECF No. 47-8 (Schneiter Report) at 2, 5; ECF No. 47-9 (DMRs) at 5, 8, 11, 14. As described above, Defendants discharge 99.98 percent of this untreated polluted water to the River through two outfalls, what this Court refers to as the "direct discharge" of dissolved and solid-bound phosphorus (i.e. "total suspended solids"). *Supra* at 3; ECF No. 65 (Mem. & Order) at 1. For example:

- In the second quarter of 2016, Defendants reported a discharge of 100 pounds per day of phosphorus-containing total suspended solids from Outfall 002;
- In the third quarter of 2017, Defendants reported a discharge of 183.48 pounds per day of total suspended solids from Outfall 001;
- In the second quarter of 2018, Defendants reported a discharge of 120 pounds per day of total suspended solids from Outfall 002.

*Id.* In total, Defendants annually discharge an estimated 884 pounds of both dissolved and solid-bound phosphorus through their outfalls into the first segment of the River. ECF No. 47-17 (Rensel Report) at 18. Their discharges increase the daily mass of total phosphorus in the River by between 362 percent and 541 percent. ECF No. 47-8 (Schneiter Report) at 3.

### B. The Facility's Discharge of Dissolved Phosphorus to the River via Benthic Deposits (the "Indirect Discharge")

Defendants also release dissolved phosphorus to the River via benthic deposits of phosphorus-loaded sediments they have created on the River floor (what the Court terms "indirect discharges"). The phosphorus-bearing solids Defendants release from Facility outfalls settle in Marsh and Jones Ponds, where they form non-naturally occurring benthic deposits of

[3] Photographs taken by CLF show algae growing in the Facility's raceways and in the settling ponds. ECF No. 56-6 (Algae Photos). While Defendants attempt to vacuum feces and unconsumed food that settles in raceways, they do not vacuum the algae floating on the water's surface. ECF No. 47-13 (Pehrson 1st Dep.) at 68:19-69:16. Algae is likely discharged through the Facility's outfalls. Discharged algae in the Merrymeeting River turn the River greenish and clouded, and impair the River's designated uses, including swimming and other forms of recreation and use by wildlife. ECF No. 47-17 (Rensel Report) at 4; ECF No. 47-3 (Watershed Management Plan) at 30 of 97; ECF No. 47-15 (Gelinas Decl.) at 4-5; ECF No. 47-25 (Quimby Decl.) at 4-6; ECF No. 47-24 (Hoover Decl.) at 2-4.

phosphorus-bearing sediments. ECF No. 47-17 (Rensel Report) at 11-12, 19; ECF No. 47-3 (Watershed Management Plan) at 4, 25 of 97. These sediments store phosphorus until physically disturbed or exposed to low-oxygen conditions, at which point, in a process known as "internal loading," phosphorus is re-released in dissolved form. ECF No. 47-17 (Rensel Report) at 3, 11-12, 19; ECF No. 47-3 (Watershed Management Plan) at 12, 33, 40 of 97. The following diagram, reproduced from the summary judgment record, illustrates the process of internal loading:




ECF No. 47-30 (National Environmental Research Institute Internal Loading Diagram). Marsh Pond and Jones Pond, the ponds immediately downstream of the Facility, experience "significant internal loading" of phosphorus. ECF No. 47-3 (Watershed Management Plan) at 33 of 97.

The indirect discharge of sediment-bound phosphorus in turn contributes to further eutrophication and associated oxygen depletion, which leads to mobilization of more sediment-bound phosphorus on the riverbed. ECF No. 47-17 (Rensel Report) at 11-12; ECF No. 47-30

(National Environmental Research Institute Internal Loading Diagram); ECF No. 47-31 (Lakes of Missouri Volunteer Program Internal Loading Diagram). The re-release of phosphorus from these deposits thwarts rehabilitation of the River. ECF No. 47-17 (Rensel Report) at 6, 12; ECF No. 47-3 (Watershed Management Plan) at 40 of 97. Phosphorus-bearing sediments discharged from the Facility will continue to add phosphorus to the water until the deposits are removed or the phosphorus is inactivated. *Id.*

### C. The Facility's Discharge of Dissolved and Solid-Bound Phosphorus to the River in Cleaning Water

Defendants also release Facility effluent to the River during their cleaning operations. ECF No. 47-14 (Gelinas Dep.) at 64:7-18; ECF No. 47-15 (Gelinas Decl.) at 4. Defendants periodically remove by vacuum a small portion of the effluent from the Facility's raceways and ponds, attempting to capture undissolved solid wastes (around 10,000 gallons out of the 6,500,000 gallons flowing through the Facility on a day that vacuuming occurs). ECF No. 47-8 (Schneiter Report) at 2, 6; ECF No. 47-11 (Smith Dep.) at 56:19-57:3.

Until recently, Defendants transferred cleaning water—actually a slurry of solid wastes and wastewater— into two settling ponds at the southern end of the Facility. ECF No. 47-11 (Smith Dep.) at 57:1-12; ECF 47-13 (Pehrson 1st Dep.) at 70:14-17. Defendants placed stacked boards or paddles in the settling ponds with the intent of holding back the flow of water into the River until the solids settled. ECF No. 47-13 (Pehrson 1st Dep.) at 48:4-52:9. Once the solids settled, Defendants were required to lower dam boards to allow only clarified water to "decant" from the top of the tanks through an outfall into the River. *Id.*; ECF No. 47-5 (Permit) at 39. However, Defendants routinely flouted the required practice, lowering dam boards before solids settled and flushing the "settling" ponds with additional water. ECF No. 47-14 (Gelinas Dep.) at 64:7-18; ECF No. 47-15 (Gelinas Decl.) at 4. Defendants thereby allowed the concentrated

cleaning water—with unsettled, solid wastes whirled up by the inrushing water—to wash out to the River. *Id.* During 2017, 2018, and 2019, this flushing occurred as often as "most Fridays" during the summer. ECF No. 47-15 (Gelinas Decl.) at 4. For example, Facility superintendent Edward Malone sent a letter to EPA and the New Hampshire Department of Environmental Services ("NHDES") following one incident on July 11, 2018, admitting that up to "approximately 600 gallons of raceway waste water" were transferred to the River from the settling pond before a lowered dam board was replaced. ECF No. 47-16 (Malone–EPA Correspondence).

In August 2019, nine months after the complaint had been filed in this action, Defendants voluntarily built an interim algae microculture-based wastewater system (the "Interim Project") in an attempt to reduce phosphorus discharges from the Facility. ECF No. 47-13 (Pehrson 1st Dep.) at 75:20-23; ECF No. 47-11 (Smith Dep.) at 65:9, 66:21-67:2. Matthew Pehrson, the Fish and Game technician who designed and built the Interim Project, is not an engineer and has had no background or training in designing or building wastewater treatment systems. ECF No. 47-10 (Pehrson 2nd Dep.) at 10:10-12; ECF No. 47-13 (Pehrson 1st Dep.) at 75:16-19; 9:3-10:18. According to Mr. Pehrson, a treatment system "ha[d] never been done before like this." ECF No. 47-13 (Pehrson 2nd Dep.) at 77:23-79:3; 79:10. Vacuumed solids are now added not to the settling ponds, but to two converted circular tanks containing duckweed. ECF No. 47-11 (Smith Dep.) at 62:15; 64:20; ECF No. 47-13 (Pehrson 1st Dep.) at 73:17-21. Concentrated wastewater flows from those tanks into a third circular tank containing green hair algae. ECF No. 47-13 (Pehrson 1st Dep.) at 74:1-11. Ultimately, the wastewater is discharged through dirt "biobags" and woodchips into the ground and leaches into groundwater. *Id.* at 75:6-15; *see also* ECF No. 47-5 (Permit) at 13, 18; ECF No. 47-6 (Sept. 2019 BMP Plan) at 7-8.

The cleaning water that Defendants add to the Interim Project has a high phosphorus concentration, and the effluent coming out of the Project's drainage bed remains highly concentrated. ECF No. 47-26 (Schneiter Decl.) at 2; ECF No. 44-05 (Neils Sampling Data) at 4-5. The Project's duckweed, algae, dirt "biobags," and woodchips are intended to reduce phosphorus and nitrogen concentrations in cleaning water before it is released to the ground from the drainage bed. *Id.*; ECF No. 47-06 (BMPs) at 7-8; ECF No. 47-13 (Pehrson 1st Dep.) at 73:10-75:15. The Interim Project, however, is not providing treatment as intended: "the intended biological treatment is not occurring in the circular tanks due to poor design" and "[t]he algae and plants in the tank, the wood chips, and the algae-covered biobags are removing very little nitrogen or phosphorus from the effluent." ECF No. 47-26 (Schneiter Decl.) at 2-3. According to environmental engineer Dr. Wane Schneiter, the Interim Project will "result in about the same reduction in phosphorus discharge as was occurring"—meaning that it is not an improvement over the settling ponds. *Id*. at 4.

Defendants currently deposit cleaning water into the Interim Project, however, the settling ponds remain intact at the Facility. ECF No. 47-11 (Smith Dep.) at 57:1-12; ECF No. 56-7 (Photographs of the settling ponds). No physical changes have been made to the settling ponds that would prevent Defendants from using them to "settle" cleaning water as before. *Id.*

### D. The Harmful Impacts of the Facility's Phosphorus Discharges

Phosphorus is environmentally damaging to freshwater bodies like the Merrymeeting River when present in high concentrations. ECF No. 47-3 (Watershed Management Plan) at 45 of 97. In the River, Defendants' discharges of dissolved and solid-bound phosphorus have triggered the growth of invasive aquatic plants, algae, and cyanobacteria (a blue-green, algae-like bacteria). *Id*. at 37 of 97; ECF No. 47-18 (Cyanobacteria Photos). Phosphorus has caused populations of these organisms to grow rapidly and in overabundance. ECF No. 47-3 (Watershed

Management Plan) at 45 of 97. Such growth causes serious harms to the aquatic ecosystem in a process called eutrophication. ECF No. 47-17 (Rensel Report) at 11. In a eutrophic waterbody, algae and plants clog the waterways, rendering the water green and murky, blocking sunlight from the bottom of the River, and eliminating native aquatic plants. *Id.* at 8, 13; ECF No. 47-3 (Watershed Management Plan) at 11 of 97. Marsh Pond, Jones Pond, and Downing Pond are eutrophic and choked with overgrowths of filamentous green algae and invasive variable milfoil (an aquatic plant), which now dominate the ecosystem at the expense of a once diverse array of plant species. ECF No. 47-17 (Rensel Report) at 4-5; ECF No. 47-24 (Hoover Decl.). As algal blooms die off in the River, bacteria decompose their remains, consuming the waterbody's limited supply of dissolved oxygen, generating foul odors in the process. *Id.*

Excess algae and plant growth have created conditions of hypoxia (low oxygen levels, under 5 mg/L) and anoxia (the complete absence of oxygen) in parts of Marsh Pond and Jones Pond. ECF No. 47-17 (Rensel Report) at 4; ECF No. 47-3 (Watershed Management Plan) at 32 of 97. Anaerobic organisms that thrive in the absence of oxygen produce sulfides and methane, which are toxic to aquatic animals. ECF No. 47-17 (Rensel Report) at 5. Depletion of oxygen can kill fish and create advantages for weed species and pathogens that thrive in low-oxygen conditions. *Id.* at 11-14; ECF No. 47-19 (CDC, Cyanobacteria Blooms FAQ).[4] Through aquatic shading and oxygen depletion, elevated phosphorus is causing a loss of species diversity, ultimately yielding an "aquatic system[s] with little more than dense blooms of algae and bacteria," and a dominance of nuisance species like variable milfoil and filamentous green algae at the expense of biological diversity. ECF No. 47-17 (Rensel Report) at 5, 14.

---

[4] When dissolved oxygen levels fall below 5 parts per million, cold-water fish and other sensitive aquatic organisms experience stress and reduced habitat. ECF No. 47-3 (Watershed Management Plan) at 32 of 98.

The State of New Hampshire acknowledges that the Merrymeeting River is experiencing an ecological crisis due to eutrophication. Phosphorus pollution and the possibility of algal blooms in the Merrymeeting River have been matters of concern since at least 1985, when the State of New Hampshire found "severe impact[s] from the Powder Mill Fish Hatchery, with high bacteria and phosphorus levels." ECF No. 58-3 (Letter Attaching Merrymeeting River Study). The last ten years have seen a general upward trend in the biomass of fish raised at the Facility and correspondingly large quantities of phosphorus discharged. ECF No. 58-4 (Phosphorus and Biomass Summary Table). Eutrophic conditions impair the Merrymeeting River's recreational uses. ECF No. 47-23 (Advisories) at 6-7; ECF No. 47-25 (Quimby Decl.) at 4-6; ECF No. 47-24 (Hoover Decl.) at 2-4. For example, dense thickets of variable milfoil with strands as long as 15 feet ensnare motorboat propellers and swimmers' limbs; while filamentous green algae cover swimmers and coat docks with an unpleasant slime. ECF No. 47-25 (Quimby Decl.) at 5, 6.

Cyanobacterial outbreaks have plagued the River. Cyanobacteria release cyanotoxins that are among the "most powerful natural poisons known." ECF No. 47-17 (Rensel Report) at 9-11; ECF No. 47-19 (CDC, Cyanobacteria Blooms FAQ). Harms from cyanotoxins can range from mild skin rash to serious illness (e.g. pneumonia, fever, vomiting, diarrhea) and, in rare circumstances, respiratory paralysis leading to death. ECF No. 47-20 (EPA, Health Effects from Cyanotoxins); ECF No. 47-17 (Rensel Report) at 4-5. Humans and animals can become exposed to cyanotoxins from swimming in waters in which cyanobacteria bloom. ECF No. 47-19 (CDC, Cyanobacteria Blooms FAQ). There are no known remedies to mitigate the harmful effects of cyanotoxins. *Id*. The Centers for Disease Control recommends that humans entirely avoid swimming or boating in areas where the water is discolored potentially by cyanobacteria or where they see foam, scum, or mats of algae on the water's surface. *Id*.

In 2015, prompted by local resident Fred Quimby's observation of cyanobacterial mats on the surface of the River,[5] NHDES issued the first cyanobacteria advisory for the River. ECF No. 47-25 at 3 (Quimby Decl.); ECF No. 47-23 (Advisories). The State continued to issue advisories for Marsh Pond and Jones Pond (in 2018 and 2019) instructing citizens to "avoid contact with the water in areas experiencing elevated cyanobacteria cell conditions." ECF No. 47-23 (Advisories) at 4-7.

Acting under Section 303(d) of the Clean Water Act, NHDES designated the Marsh Pond, Jones Pond, and Downing Pond segments of the River as failing to support recreational uses (swimming or diving) on account of cyanobacterial outbreaks. ECF No. 47-21 (2016 303(d) List) at 15, 23; ECF No. 47-22 (2018 303(d) List) at 21.

Responding to this water quality crisis, a group of concerned citizens from New Durham and Alton (as well as Glenn Normandeau and Jason Smith, ECF No. 47-3 (Watershed Management Plan) at 5 of 97) raised funds for a study and report entitled the "Merrymeeting River & Lake Watershed Management Plan" (the "Watershed Management Plan"). *Id*. at 15 of 97.[6] The Plan was commissioned to "provide a roadmap . . . [for] improving water quality." *Id*. at 4, 13 of 97. It was released in final form in September 2019. *Id*. at 1 of 97. The Watershed Management Plan provides an overview of the Merrymeeting River's phosphorus problem, analyzing sources of pollution and necessary remedial measures. *Id*.

According to the Watershed Management Plan, the Merrymeeting River should have an annual and monthly average total phosphorus concentration of no more than 10 parts per billion.

---

[5] Outbreaks of deep-water cyanobacteria may be unobservable by the naked eye and detectable only by deep-water sampling (which commenced in the River in 2017). ECF No. 58-2 (Perkins Thesis) at 21.
[6] The group raised funds from Fish and Game and the Town of New Durham. ECF No. 47-3 (Watershed Management Plan) at 15 of 97.

*Id*. at 14 of 97. Current total phosphorus levels rise well above this level—from 34 and 36 parts per billion at times in the middle depths of Jones and Downing Ponds, to at times 65 parts per billion in Marsh Pond. *Id.* at 30 of 97. In the lower depths of Marsh Pond—closer to the phosphorus-bearing deposits—the concentration at times rises to nearly 200 parts per billion. *Id.* at 30, 33 of 97, figs. 3-5, 3-3.

The Watershed Management Plan found that Defendants' discharges account for 67 percent of the total phosphorus in the River. *Id.* at 40–41 of 97. Defendants annually discharge at least an estimated 754 pounds of phosphorus into the first segment of the Merrymeeting River, just above Marsh Pond. *Id.* at 4, 40 of 97. The Watershed Management Plan determined that nearly all of the necessary reduction in phosphorus—95 percent—must be made by the Facility. *Id*. Defendants would have to reduce their phosphorus discharges by at least 646 pounds per year—an 85 percent reduction relative to their current discharges—to meet the environmentally sustainable phosphorus level. *Id.* at 14, 44 of 97.

## IV. THE FACILITY'S DISCHARGE OF FORMALDEHYDE TO THE RIVER

Formaldehyde is a chemical commonly used as an industrial fungicide, germicide, and disinfectant. ECF No. 47-12 (NIH Formaldehyde Info). The National Toxicology Program, an interagency program of the Department of Health and Human Services, classifies formaldehyde as a known human carcinogen. *Id.*

In response to parasites, such as Gyrodactylus worms, Defendants treat fish at the Facility with formalin, a liquid form of formaldehyde. ECF No. 26 (Answer) at ¶ 33-34; ECF No. 47-11 (Smith Dep.) at 17:10-13; 19:2-6; 19:14; 20:13-16; 55:18-20; ECF No. 47-13 (Pehrson 1st Dep.) at 21:1. When Defendants add formalin to the Facility's waters, it is discharged to the Merrymeeting River as formaldehyde in effluent. ECF No. 47-13 (Pehrson 1st Dep.) at 26:16-17. The parasitic infestations for which Defendants use formalin are seasonally recurring. ECF No.

47-11 (Smith Dep.) at 19:14 (“These parasites show up seasonally.”); ECF No. 47-10 (Pehrson 2nd Dep.) at 24:5-14. Defendants maintain supplies of formalin on site at the Facility for ongoing and future use. ECF No. 47-11 (Smith Dep.) at 19:14; ECF No. 47-10 (Pehrson 2nd Dep.) at 24:18-22.

In September 2016, Defendants discharged wastewater with an average daily formaldehyde concentration of 75 mg/L—that is, a concentration 1500 percent of the Permit numeric limitation (4.6 mg/L daily average). ECF No. 47-9 (DMRs) at 1. In November 2017, Defendants’ discharges of effluent had a monthly average formaldehyde concentration of 3.26 mg/L—double the Permit limit (1.6 mg/L monthly average). *Id.* at 2. Defendants will continue to use formalin at the Facility “on an as needed basis,” in whatever amounts are necessary to eliminate a parasitic infestation. ECF No. 47-11 (Smith Dep.) at 55:18-20; ECF No. 47-10 (Pehrson 2nd Dep.) at 22:8-11.

## V. THE FACILITY’S DISCHARGE OF ACIDIC (LOW PH) WASTEWATER TO THE RIVER

The level of pH affects many chemical and biological processes in a waterbody. ECF No. 47-29 (EPA, pH CADDIS). “It [the pH level] is one of the most important environmental factors limiting species distributions in aquatic habitats.” *Id.* The optimal pH range for most aquatic organisms is between 6.5 and 8 standard units. *Id.* A change of pH outside of the optimal range “physiologically stresses many species and can result in decreased reproduction, decreased growth, disease or death. This can ultimately lead to reduced biological diversity in streams.” *Id.*

Water within the Facility becomes acidic in the course of its use: as fish respirate, they generate carbon dioxide, making the waters acidic (i.e. lowering its pH). ECF No. 47-10 (Pehrson 2nd Dep.) at 34:4-10. Defendants have discharged water more acidic than 6.5 standard

units at least 24 times since 2013[7]—including six times in 2019. *Id.*; ECF No. 47-28 (pH DMRs). Defendants have continued to discharge Facility effluent more acidic than the Permit's allowance of 6.5 standard units pH. ECF No. 47-27 (pH Noncompliance Letters). Defendants have taken no measures to mitigate or treat the acidity generated by their operations. ECF No. 47-10 (Pehrson 2nd Dep.) at 34:1-2, 14-15.

## VI. THE FACILITY'S BEST MANAGEMENT PRACTICES PLAN AND RELATED ACTIVITIES

In October 2016, Defendants developed a best management practices plan ("BMP Plan"). ECF No. 56-8 (Oct. 2016 BMP Plan). As described above, in August 2019 Defendants began to use the Interim Project to accommodate Facility cleaning water in lieu of the settling ponds. *Supra* at 9. In September 2019, Defendants correspondingly revised their BMP Plan. The revised Plan requires solids disposal "on an as needed basis." ECF No. 47-6 (Sept. 2019 BMP Plan) at 8. Defendants have previously conceded that the revised September 2019 BMP Plan "does not contain a specified frequency of disposal of concentrated solids . . ." ECF No. 44-1 (Defs. MSJ Mem.) at 14.

Both before and after the September 2019 revisions, Defendants' BMP Plan required Defendants to clean Facility raceways "approximately once per week, or once every two weeks in winter, when in use by vacuum pumping" and to clean the round tanks "about once every two weeks." ECF No. 47-6 (Sept. 2019 BMP Plan) at 4; ECF No. 56-8 (Oct. 2016 BMP Plan) at 4. The Facility staff maintain a "Loads Hauled Log," documenting when the loads of vacuumed solids from the raceways and fish ponds are hauled to the settling ponds. ECF No. 47-32 (Loads

[7] These 18 discharges from 2013-14 cannot fall within the Permit's safe harbor for discharges within half a standard unit of the ambient upstream water, as Defendants did not submit the ambient upstream pH measurements with their DMRs until 2016.

Hauled Log); ECF No. 47-13 (Pehrson 1st Dep.) at 92:19-21, 93:1-22. According to the 2019 Loads Hauled Log, Defendants have failed to clean at these mandated intervals.[8] ECF No. 47-32 (Loads Hauled Log); ECF No. 47-34 (Summary Chart). In 2019, Defendants failed to clean the raceways approximately weekly at least 26 times in the spring, summer, and fall, and failed to clean about biweekly at least 8 times in the winter. *Id.* At times, raceways are cleaned as infrequently as once per month. *Id*.; ECF No. 47-32 (Loads Hauled Log). Charts produced by Defendants confirm that the uncleaned raceways were in use, accumulating fish wastes during the periods when Defendants skipped cleanings. ECF No. 47-35 (Fish Tracking Charts). Defendants have no set cleaning schedule, nor have they stated an intent to implement one. ECF No. 47-11 (Smith Dep.) at 63:5-11.

## ARGUMENT

### I. THE COURT HAS JURISDICTION OVER THIS ACTION.

Conservation Law Foundation (CLF) brings this suit to address Defendants' violations of a federal permit, raising federal questions and seeking prospective declaratory and injunctive relief under the citizen-suit provision of the Clean Water Act. 28 U.S.C. §§ 1331, 2201–02; 33 U.S.C. § 1365(a).

CLF has standing to bring these claims. Plaintiff's members have suffered a concrete and particularized injury in fact that is actual or imminent, not conjectural or hypothetical; the injury is fairly traceable to Defendants' actions; and it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). CLF members have enjoyed, used, and

[8] For this calculation, CLF understood Defendants to have cleaned "approximately weekly" when they recorded cleanings no more than 11 days apart.

recreated on and in the Merrymeeting River, including Marsh, Jones, and Downing Ponds, and plan to continue to do so. ECF No. 47-15 (Gelinas Decl.) at 2, 6; ECF No. 47-25 (Quimby Decl.) at 1-3, 5-6; ECF No. 47-24 (Hoover Decl.) at 2-3. Defendants' violations of the Clean Water Act continue to harm these members' abilities to enjoy, use, and recreate in these waterbodies. ECF No. 47-15 (Gelinas Decl.) at 6-7; ECF No. 47-25 (Quimby Decl.) at 4-6; ECF No. 47-24 (Hoover Decl.) at 2-4. For example, CLF members have curtailed and will continue to curtail their uses of the River due to fears for their health and that of their families from exposure to harmful cyanobacteria outbreaks caused by Defendants' unlawful discharges. ECF No. 47-15 (Gelinas Decl.) at 6-7; ECF No. 47-25 (Quimby Decl.) at 4-5; ECF No. 47-24 (Hoover Decl.) at 2, 4. The Court's grant of the requested relief, ECF No. 20 (Amended Complaint) at 28-29, will redress Defendants' ongoing violations.

## II. DEFENDANTS' DISCHARGES CAUSE VIOLATIONS OF NEW HAMPSHIRE WATER QUALITY STANDARDS (COUNT I).

Section 301 of the Clean Water Act prohibits the addition of any pollutant to navigable waters from any point source except as authorized by a NPDES permit. 33 U.S.C. §§ 1311(a), 1362(12). A "pollutant" includes any "solid waste," "sewage," "chemical wastes, biological materials," and "agricultural waste discharged into water." *Id.* § 1362(6). Defendants' discharges of pollutants to the Merrymeeting River—including phosphorus and phosphorus-containing suspended solids—are permitted only pursuant to the terms of the Facility's Permit. "Compliance with a permit . . . shall be deemed compliance" with Section 301 of the Act. *Id.* § 1342(k). The Permit includes narrative standards requiring that Defendants discharge without "caus[ing] a violation of the water quality standards of the receiving water." *Id*. at 7 of 46. There

is no genuine dispute that Defendants' direct and indirect discharges of dissolved and solid-bound phosphorus cause violations of these standards.[9]

### A. Defendants' Direct and Indirect Discharges of Dissolved and Solid-Bound Phosphorus Are Point Source Discharges Within the Meaning of the Clean Water Act.

Defendants' "direct discharges" of dissolved and solid-bound phosphorus from Facility outfalls are point source discharges. The Facility is a "concentrated aquatic animal production facility" where Defendants grow and/or hold cold water fish species in ponds, raceways, or other similar structures. Defendants discharge continuously, producing more than 20,000 pounds harvest weight of aquatic animals per year; and use more than 5,000 pounds of food during the calendar month of maximum feeding. S*ee* ECF No. 47-16 (Malone–EPA Correspondence) at 12 (providing harvest weight and annual feed weight from 2014 to 2018). Therefore, under applicable regulatory definitions of the term, the Facility is a point source, and discharges from its outfalls are point source discharges. 40 C.F.R. §§ 122.24, 260.10; *id*. pt. 122, app. C.

Defendants' ongoing "indirect discharges" of dissolved phosphorus via benthic sediment deposits are also point source discharges for two reasons. First, pollutants that have been unlawfully discharged by Defendants from the Facility's outfalls—point sources—remain as benthic deposits on the River floor and continue discharging dissolved phosphorus into the River. In such circumstances, courts impose Clean Water Act liability under the "continuing violation" doctrine: a defendant's liability under the Act persists as long as it allows pollutants it has unlawfully discharged to remain in the relevant surface water. *See, e.g., United States v. Cumberland Farms of Connecticut, Inc.*, 647 F. Supp. 1166, 1183 (D. Mass. 1986), *aff'd*, 826

---

[9] To the extent there is a genuine dispute of material fact relevant to this claim, the Court should deny Defendants' cross motion for summary judgment on this claim and advance the dispute to trial. CLF reserves the right to dispute characterizations of the summary judgment record Defendants make in their forthcoming consolidated memorandum due on June 30, 2020.

F.2d 1151 (1st Cir. 1987). The lingering presence of a discharge of pollutants that "continue[s] to have roughly the same net polluting effect over years or decades thereafter" is a continuing violation under the Clean Water Act. Memorandum Order, *Sierra Club Inc. v. Granite Shore Power LLC*, No. 19-cv-216-JL (D.N.H. Sept. 13, 2019) at 27 (ECF No. 33) (internal quotation mark and citation omitted); *see also, e.g., Umatilla Waterquality Protective Ass'n v. Smith Frozen Foods, Inc*., 962 F.Supp. 1312, 1322 (D. Or. 1997) ("[A] discharge of pollutants is ongoing if the pollutants continue to reach navigable waters, even if the discharger is no longer adding pollutants to the point source itself"); *Werlein v. United States*, 746 F.Supp. 887, 896-97 (D. Minn. 1990) (holding that pollutants from defendant's past release is "ongoing pollution" where "toxic waste . . . has not yet reached a waterway, but is being introduced into the waterway over time" as rainwater infiltrates contaminated soil in which the pollutants were deposited) *class cert. vacated by* 793 F.Supp. 898 (D. Minn. 1992).

Additionally and alternatively, Defendants' indirect discharges of dissolved phosphorus via benthic deposits are point source discharges because the benthic sediment deposits in Marsh and Jones Ponds are themselves point sources. Under the Clean Water Act, a "discharge" includes "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container . . . from which pollutants are or may be discharged." *Id.* § 1362(14). "The concept of a point source was designed to . . . embrac[e] the broadest possible definition of any identifiable conveyance from which pollutants might enter waters of the United States." *Dague v. City of Burlington*, 935 F.2d 1343, 1354-55 (2d Cir. 1991), *rev'd in part on other grounds,* 505 U.S. 557 (1992) (quoting *United States v. Earth Scis., Inc*., 599 F.2d 368, 373 (10th Cir. 1979)). Courts have held a broad

range of means of depositing pollutants to navigable waters to constitute point sources.[10] Discharge from a point source may be mediated by "natural phenomena as rainfall and gravity." *O'Leary v. Moyer's Landfill*, *Inc*., 523 F. Supp. 642, 655 (E.D. Pa. 1981); *see also Sierra Club v. Abston Const. Co.*, 620 F.2d 41, 45 (5th Cir. 1980).

Defendants have created discrete and confined phosphorus-bearing deposits in Marsh and Jones Ponds. ECF 43-17 (Rensel Report) at 18. These deposits are conveyances: Defendants add dissolved phosphorus from these deposits into the River. ECF 43-17 (Rensel Report) at 18. It is of no moment that this addition is mediated by the natural chemical properties of the phosphorus as it unbinds from its host sediments in the deposit. *O'Leary*, 523 F. Supp. at 655; *Abston Const. Co*., 620 F.2d at 45.

Both Defendants' direct and indirect discharges of phosphorus and phosphorus-bearing solids are point source discharges.

### B. Defendants' Point Source Discharges of Dissolved and Solid-Bound Phosphorus Cause Violations of State Water Quality Standards.

Under Section 303 of the Clean Water Act, "each State, subject to federal approval, [must] institute comprehensive water quality standards establishing water quality goals" for navigable waters. *PUD No. 1 of Jefferson Cty. v. Washington Dep't of Ecology*, 511 U.S. 700, 700 (1994) (citing 33 U.S.C. § 1313). These standards may be numeric (quantitative) limits on particular chemicals within a waterbody, or narrative, meaning that the limits are defined qualitatively. New Hampshire's water quality standards include standards defined by "designated

---

[10] These include including sources from which previously discharged pollutants are re-released, as well as entire farms, ponds, lagoons, and valley-fill deposits. *See, e.g., Ohio Valley Envtl. Coal., Inc. v. Hernshaw Partners, LLC*, 984 F. Supp. 2d 589, 599 (S.D.W. Va. 2013) (holding that a "percolate[d]" release of pollutants from the "toe" of a valley-fill deposit into navigable waters is a point source discharge); *United States v. Earth Scis., Inc.*, 599 F.2d 368, 374 (10th Cir. 1979) (mining operation's sump pit); *Fishel v. Westinghouse Elec. Corp.*, 640 F. Supp. 442, 446 (M.D. Pa. 1986) (waste lagoon); *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 955 (9th Cir. 2002) (dairy farms); *Sierra Club v. Abston Const. Co.*, 620 F.2d 41, 45 (5th Cir. 1980) (mine spoil piles).

uses" and those defined as "water quality criteria," as outlined below. *See* N.H. Code Admin. R. Env-Wq §§ 1702.17, 1703.03; N.H.D.E.S., 2018 Section 305(b) and 303(d) Consolidated Assessment and Listing Methodology (Aug. 8, 2019) at 5-6. As required under federal law,[11] the Permit mandates that discharges "shall not cause a violation of the water quality standards of the receiving water." ECF No. 47-5 (Permit) at 7 of 46. The Permit thereby incorporates New Hampshire state water quality standards.

Defendants have violated and will continue to violate the Permit because the Facility's discharges are causing the violation of water quality standards, as follows.

***i. Defendants' Discharges Cause Violations of New Hampshire's Designated Use Standards.***

New Hampshire's water quality standards applicable to the Merrymeeting River require that, as a Class B surface water, the River must support its designated use for recreation, and that "[a]ll surface waters shall be free from substances in kind or quantity that . . . [i]nterfere with recreational activities." N.H. Rev. Stat. § 485-A:8,II; N.H. Code Admin. R. Env-Wq § 1702.17; *see also* ECF No. 47-3 (Watershed Management Plan) at 16 (Table 3-1); N.H. Code Admin. R. Env-Wq § 1703.03(c)(1)(e). Defendants' discharges cause violations of these standards.

Adding significant phosphorus loads to the Merrymeeting River, Defendants cause eutrophic conditions and associated cyanobacteria outbreaks. *Supra* at 10–11. Indeed, the State of New Hampshire has officially determined that these cyanobacterial outbreaks impair the River's designated use for recreation: the State designated Marsh, Jones, and Downing Ponds as "impaired" (i.e., not meeting water quality standards) for primary recreation uses (e.g., swimming and diving) as a result of cyanobacteria hepatoxic microsystins that endanger human

[11] A NPDES permit must require that the discharger achieve "water quality standards established under section 303 of the [Clean Water Act], including State narrative criteria for water quality." 40 C.F.R. § 122.44(d)(1).

health. ECF No. 47-21 (2016 303(d) List) at 15, 23; ECF No. 47-22 (2018 303(d) List) at 21. The State also issued advisories for Marsh Pond (in 2018 and 2019) and Jones Pond (in 2018 and 2019) instructing citizens to "avoid contact with the water in areas experiencing elevated cyanobacteria cell conditions." ECF No. 47-23 (Advisories) at 1, 4-7.

In addition to cyanobacteria outbreaks, the Facility's significant discharges of phosphorus are otherwise impairing recreational uses: thick mats of vegetal blooms and milfoil that impede access to boaters; filamentous green algae that cover the bodies of swimmers and docks with an unpleasant slime, ECF No. 47-25 (Quimby Decl.) at 34, 36; and uninviting greenish-clouded water, and malodors from decaying matter, ECF No. 47-17 (Rensel Report) at 5, 10. Each of these adverse impacts, further undermines the Merrymeeting River's designated use for recreation.

***ii. Defendants' Discharges Cause Violations of New Hampshire's Nutrients and Eutrophication Standards.***

New Hampshire's state water quality standards include narrative water quality criteria with respect to nutrients and eutrophication:

> Class B waters shall contain no phosphorus or nitrogen in such concentrations that would impair any existing or designated uses, unless naturally occurring.
>
> Existing discharges containing phosphorus or nitrogen, or both, which encourage cultural eutrophication shall be treated to remove the nutrients(s) to ensure attainment and maintenance of water quality standards.

N.H. Code Admin. R. Env-Wq § 1703.14(b), (c). Defendants are violating these standards.

Defendants' phosphorus discharges to the River cause eutrophic conditions that: impair the River's designated use for recreation as a result of toxic cyanobacteria blooms; cause the proliferation of green filamentous algae and invasive milfoil; and cause unnatural color. *See supra* at 10–11. Such discharges must "be treated to remove the [phosphorus] to ensure

attainment and maintenance of water quality standards." N.H. Code Admin. R. Env-Wq § 1703.14(c). Unless and until the Facility's discharges are subject to such phosphorus treatment to eliminate cyanobacteria blooms, the proliferation of nuisance algae and invasive milfoil, and unnatural color, Defendants are violating state water quality standards and, thus, the Permit.

***iii. Defendants' Discharges Cause Violations of New Hampshire's Dissolved Oxygen Standard.***

New Hampshire's state water quality standards include dissolved oxygen criteria under which, with limited exception, Class B waters "shall have a dissolved oxygen content of: (1) [a]t least 75% of saturation, as specified in N.H. Rev. Stat. § 485-A:8,II, based on a daily average; and (2) [a]n instantaneous minimum dissolved oxygen concentration of at least 5 mg/L." N.H. Code Admin. R. Env-Wq § 1703.07(b). Defendants are violating these standards.

One of the consequences of Defendants' direct and indirect discharges of phosphorus and phosphorus-bearing solids to the Merrymeeting River is eutrophic blooms. *Supra* at 10–12. After a bloom ends, its component organisms decompose in a process that depletes the water column's dissolved oxygen supply, lowering oxygen levels below 5 mg/L in Marsh, Jones, and Downing Ponds. *Supra* at 11. At times, Marsh and Jones Ponds experience "[e]xtremely low dissolved oxygen" or "anoxia" at levels below 1 mg/L, which triggers internal loading from phosphorus-bearing sediments and perpetuates phosphorus loading, eutrophication, and oxygen depletion. *Supra* at 7, 11. Defendants' discharges initiate and continue this vicious cycle of phosphorus loading and oxygen depletion, causing violations of the New Hampshire dissolved oxygen standard and, thus, the Permit.

***iv. Defendants' Discharges Cause Violations of New Hampshire's Aquatic Community Integrity and Nuisance Species Standards.***

New Hampshire water quality standards include criteria designed to protect biological integrity and prevent aquatic habitats from being dominated by nuisance species:

> [a]ll surface waters shall support and maintain a balanced, integrated, and adaptive community of organisms having a species composition, diversity, and functional organization comparable to that of similar natural habitats of a region . . . [and] [d]ifferences from naturally-occurring conditions shall be limited to nondetrimental differences in community structure and function.

N.H. Code Admin. R. Env-Wq § 1703.19. In addition, New Hampshire's General Water Quality Criteria include the requirement that all surface waters "be free from substances in kind or quantity that . . . [r]esult in the dominance of nuisance species." *Id.* § 1703.03(c)(1)(d). Defendants' discharges are causing violations of these standards.

Defendants' substantial discharges of phosphorus and phosphorus-bearing solids have caused cultural eutrophication in the Merrymeeting River. *Supra* at 10–12. Due to that eutrophication, filamentous green algae and variable milfoil, an invasive, nuisance aquatic plant species, dominate segments of the River. *Id*. The green algae and invasive milfoil create a detrimental and unnatural composition, diversity, and functional organization of plant species at the expense of biological diversity in the River. *Id.* In addition, the algal blooms described above exhaust the dissolved oxygen needed by native species of plants and fish. *Id.* Blooms also generate turbidity, preventing sunlight from reaching photosynthesizing organisms in the River. *Supra* at 10–11. Defendants' discharges of phosphorus trigger a radical—and environmentally detrimental—change in the River's species composition, thus violating the aquatic community integrity and nuisance species water quality criteria and, thus, the Permit.

***v. Defendants' Discharges Cause Violations of New Hampshire's Color Standard.***

New Hampshire's state water quality standards require that "Class B waters shall contain no color in such concentrations that would impair any existing or designated uses, unless naturally occurring." N.H. Code Admin. R. Env-Wq § 1703.10(b); *see also id.* § 1703.03(c)(1)(c) (requiring that all surface water be free from substances that "[p]roduce . . .

color . . . that is not naturally occurring and would render the surface water unsuitable for its designated uses.”). Defendants’ discharges are causing violations of this standard.

Defendants’ substantial discharges of phosphorus and phosphorus-bearing solids have caused cultural eutrophication in the River. *Supra* at 10–12. Algae and dissolved particles significantly reduce water clarity, *id.* at 11, and eutrophic conditions cause green filamentous algae to produce greenish-clouded water, *id*. This change in color accompanies impairments to existing and designated uses of the River for recreation. *Supra* at 11–12. Defendants’ discharges are causing or contributing to these changes in color, violating these water quality standards and, thus, the Permit.

***vi. Defendants’ Discharges Cause Violations of New Hampshire’s Benthic Deposit Standard.***

New Hampshire’s state water quality standards require that all surface waters be free from substances in kind or quantity that “[s]ettle to form harmful benthic deposits.” N.H. Code Admin. R. Env-Wq § 1703.03(c)(1)(a). In addition, “Class B waters shall contain no benthic deposits that have a detrimental impact on the benthic community, unless naturally occurring.” *Id*. § 1703.08(b). Defendants’ discharges are causing violations of these standards.

Defendants’ discharges of phosphorus and phosphorus-bearing solids settle on the bottom of the River, where they form non-naturally occurring benthic deposits of phosphorus-bearing sediments. *Supra* at 6–8. These sediments store phosphorus until physically disturbed or exposed to low-oxygen conditions, at which point the phosphorus is rereleased—itself an indirect discharge of phosphorus—entering the water column in dissolved form. This indirect discharge of sediment-bound phosphorus in turn contributes to further eutrophication and associated oxygen depletion, which leads to mobilization of more sediment-bound phosphorus on the riverbed. *Id*. at 6–8, 10–12. The vicious cycle of phosphorus loading imposes significant harms

on the riverine ecosystem. By creating preconditions for toxic cyanobacteria blooms, the cycle also imposes harms for those who would otherwise enjoy the River. *Supra* at 12. Defendants' discharges create harmful benthic deposits in violation of water quality standards and, thus, the Permit.

### C. There Is No Genuine Dispute Regarding the Causal Nexus Between Defendants' Conduct and Violations of Water Quality Standards.

The Facility's Permit prohibits Defendants from discharging effluent and wastes that "cause a violation of the water quality standards of the receiving water." ECF No. 47-5 (Permit) at 7 of 46. While the record does not enable the Court to identify and trace the specific phosphorus molecule discharged by Defendants that pushes the Merrymeeting River over the eutrophication threshold to violate the relevant state water-quality standards discussed above, the law does not require so searching a task. In evaluating causality in the Clean Water Act context, courts do not require a plaintiff to "show to a scientific certainty that defendant's effluent, and defendant's effluent alone, caused the precise harm." *Pub. Interest Research Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990) (holding, in the context of determining standing, that a sufficient causal nexus is established "by showing that a defendant has 1) discharged some pollutant in concentrations greater than allowed by its permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs").

The plain meaning of the Permit's reference to "cause" contemplates the possibility that an effect may have multiple causal origins—each of which is a "cause" of that effect. *See Cause*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1999) ("[T]o serve as *a* cause or occasion of" (emphasis added)). The Permit's language is drafted against a background of

causation doctrine. Where multiple actors are at fault but it is indeterminable which of them brought about a harm, the court may attribute liability to any of the wrongdoers whose behavior was sufficient to bring about the harm, even without determining which of the actors' conduct was the necessary cause. W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 41, at 270-71 (5th ed. 1984) (explaining the "special type of situation" of "clearly established double fault and alternative liability").

As Defendants have previously conceded, the Powder Mill Facility is "the largest contributor of phosphorus to the receiving waters," with Defendants' direct and indirect discharges accounting for more than half of total phosphorus in the River. ECF No. 44-1 (Defs. Opp. Mem.) at 6-7; ECF No. 47-3 (Watershed Management Plan) at 4, 40 of 97. There is no genuine dispute that phosphorus concentrations rise dramatically—a twelve-fold increase—as River waters pass through the Facility. *Supra* at 5. There is no genuine dispute that the River experiences high concentrations of phosphorus—concentrations that range from two- to twenty-fold of the environmentally acceptable level. *Supra* at 13–14. As a result of the high concentration of phosphorus, the River experiences eutrophication and cyanobacterial blooms, thereby resulting in violations of state water-quality standards. *Supra* at 10–12; *see also* ECF No. 44-1 (Defs. Opp. Mem.) at 6.

There is no genuine dispute that Defendants' discharges are a substantial factor, indeed the *primary* factor, in triggering the River's eutrophication, its cyanobacterial blooms, and its noncompliance with state water-quality standards. Whether there are other sources of phosphorus

that reach the Merrymeeting River is immaterial to this case.[12] Accordingly, Defendants have "cause[d]" these violations within the plain meaning of the Permit.

**D. A New Permit Is Immaterial to Defendants' Current Liability for Violating State Water Quality Standards.**

Pending the conclusion of EPA's permitting process, the new permit's substance (as well as its finalization) is unknowable; however, to the extent the Court draws inferences from EPA's draft permit, *see* ECF No. 65 (Memorandum & Order) at 4, there is no genuine dispute that Defendants' liability for direct and indirect discharges of phosphorus will continue under the new permit.[13] EPA's draft permit proposes numeric limits for phosphorus discharges at the Powder Mill Facility's outfalls that need not be met for five years. ECF No. 53-4 (Draft New Permit) at 2, 4, 6, 18. But importantly, the proposed numeric limits do not replace or supersede the narrative permit conditions under which CLF brings its claims. *See id*. at 10 (retaining prohibition on causing violations of state water quality standards). The draft permit's compliance schedule applies only to the total phosphorus numeric limits and anticipates that the Facility will achieve compliance with those limits through engineered "improvements." *Id.* at 18, 28. In contrast, narrative criteria retained in the draft permit would continue in effect—that is, regardless of whether improvements have been built. The compliance schedule for numeric limitations as proposed in the draft permit cannot function as a shield for Defendants' violations of narrative criteria.

---

[12] Nor is it material that Defendants have allegedly reduced the magnitude of their phosphorus discharges during the pendency of this suit.

[13] The new permit is also immaterial to Defendants' liability on each of the other counts that CLF brings against Defendants (including Counts IV and V, *see* ECF No. 73 (Defs. Partial Cross Motion) at 2 n.1). CLF reserves its rights also to dispute and rebut Defendants to the extent they invoke the new permit with regard to other counts in Defendants consolidated memorandum of law.

Nor will the new permit constrain the Court's remedial powers. Where "it is still possible for the district court to award effective injunctive relief to the Plaintiffs," the claim is not mooted. *NRDC v. County of Los Angeles*, 840 F.3d 1098, 1105 (9th Cir. 2016); *see also id*. at 1103 ("A new permit, in and of itself, does not moot a case for injunctive relief."). In *U.S. Public Interest Research Group v. Atlantic Salmon of Maine, LLC*, the First Circuit addressed a potential conflict between an injunction and NPDES permit conditions that became effective after that injunction had been entered. 339 F.3d 23, 27 (1st Cir. 2003). The plaintiffs sued fish farms, alleging they were unlawfully discharging pollutants to navigable waters in the absence of a NPDES permit. *Id.* During the district court's deliberations, the State of Maine proposed a draft permit applicable to the farms. *Id.* Before a final permit became effective, however, the district court ruled for the plaintiffs and entered an order enjoining the farms' discharges. *Id*. When a final permit later became effective, the fish farms appealed, challenging the injunction on the grounds that it was stricter than the final permit. *Id.* at 28. The First Circuit affirmed the injunction, observing that "[t]he district court order [was] issued before a permit and [was] designed to remedy *pre-permit* violations." *Id*. at 31 (emphasis added). Although the injunction was stricter than later-imposed permit conditions, this was permissible because "the court may grant additional injunctive relief governing the post-permit operations of the companies insofar as the court is remedying harm caused by their past violations." *Id.*

Here, there will be no problem if the Court enjoins Defendants' ongoing violations of the current permit's narrative standards, even after the Facility's new permit comes into effect. This is because, as described above, the same narrative standards will be retained in the new permit. *Compare* ECF No. 47-5 (Permit) at 7 of 46 ("The discharge shall not cause a violation of the water quality standards of the receiving water.") *with* ECF No. 53-4 (Draft New Permit) at 10

("The discharge shall not cause a violation of the water quality standards of the receiving water."). In other words, an injunction enforcing the Permit's extant protection of New Hampshire water quality standards would impose relief *no stricter than* the new permit's terms. In these circumstances, under *Atlantic Salmon*, the new permit imposes no constraint on the Court's injunctive powers.

## III. DEFENDANTS VIOLATE THE PERMIT'S DESIGNATED USE, AQUATIC LIFE, AND BENTHIC DEPOSIT PROHIBITIONS (COUNT II).

In addition to incorporating, and prohibiting violations of, state water quality standards, the Permit directly prohibits discharges that would interfere with the River's designated uses, aquatic life, and create harmful benthic deposits. Specifically, the Permit requires that:

(1) Discharges from the Facility "shall be adequately treated to ensure that the receiving water remains free from pollutants which produce odor, color, taste, or turbidity which is not naturally occurring and would render it unsuitable for its designated uses";

(2) "No components of the effluent shall result in any demonstrable harm to aquatic life";

(3) The River "remains free from pollutants in concentrations or combinations that settle to form harmful deposits [or] float as. . . scum."

ECF No. 47-5 (Permit) at 7 of 46.

### A. Defendants' Discharges Cause Non-Naturally Occurring Color, Odor, and Turbidity That Impair Designated Uses.

There is no genuine dispute that Defendants' discharges of dissolved and solid-bound phosphorus, as well as of algae, cause non-naturally occurring color, odor and turbidity that impair recreational use of the River.[14] Each day, Defendants discharge approximately 6.5 million gallons of effluent from the Facility to the River containing dissolved and solid-bound

[14] To the extent there is a genuine dispute of material fact relevant to this claim, the Court should deny Defendants' cross motion for summary judgment on this claim and advance the dispute to trial. CLF reserves the right to dispute characterizations of the summary judgment record Defendants make in their forthcoming consolidated memorandum due on June 30, 2020.

phosphorus. *Supra* at 3, 5–6. Under the Clean Water Act, Defendants' additions of phosphorus (a chemical in its dissolved form and a biological material) and the solid wastes of phosphorus-laden fish feces or feed (the former also a biological material) are discharges of pollutants. 33 U.S.C. § 1362(6); *see also* 40 C.F.R. § 122.2. Defendants' discharges are the primary contributors of phosphorus to the River, accounting for 67 percent of the total phosphorus in the River. *Supra* at 14. The high phosphorus level causes eutrophication, invasive species, and cyanobacterial blooms.[15] *Id.* at 10–12. Eutrophication is manifested in:

- **Non-naturally occurring color**: the resulting proliferation of vegetation and algae, lead to high levels of chlorophyll-a, "a measurement of the green pigment found in all plants, including microscopic plants such as algae." ECF No. 47-3 (Watershed Management Plan) at 11 of 97.[16]
- **Non-naturally occurring turbidity**: discharges of solid-bound phosphorus directly produce turbidity when they cloud River water with particles of feces and unconsumed feed. ECF No. 47-3 (Watershed Management Plan) at 30 of 97. Defendants' phosphorus discharges generally lead to turbidity via the proliferation of vegetation and algae which cloud River waters—at times blocking the penetration of sunlight to the River floor. *Supra* at 11.
- **Non-naturally occurring odor**: resulting algal blooms decompose, generating unpleasant odors. *Id*.

The unnatural green color and cloudiness caused by excessive phosphorus renders waters unpleasant and foul, thus unsuitable for the River's designated recreational uses. *Supra* at 12–13. The foul odor has a similar effect. *Id*. Additionally, the non-naturally occurring color, turbidity and odor accompany outbreaks of harmful cyanobacteria, which also render the River unsuitable for designated recreational uses. *Id*. Outbreaks expose recreational users to cyanotoxins, which

---

[15] It is immaterial that Defendants' phosphorus pollution does not directly cause all the harmful conditions that render the waters unsuitable for their designated uses. By its plain language, the relevant Permit language applies to any pollutants that "produce" unnatural color or turbidity in the receiving waters. ECF No. 47-5 (Permit) at 7 of 46. Produce means "to give . . . rise to: YIELD" or "cause to . . . happen: BRING ABOUT." *Produce*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1999). The causation need not be direct under this definition.

[16] Figure 3-1 in the Watershed Management Plan shows the linear relationship between total phosphorus and chlorophyll-a (green color) in Marsh Pond, Jones Pond, and Downing Pond. ECF No. 47-3 (Watershed Management Plan) at 31 of 97.

can cause effects from mild skin rash to serious illness (e.g. pneumonia, fever, vomiting, diarrhea) and, in rare circumstances, respiratory paralysis leading to death. *Supra* at 12. As a result of cyanobacteria outbreaks, the River has been rendered unsuitable for recreation uses. The State of New Hampshire was forced to close segments of the River due to cyanobacterial outbreaks and has also listed the River as "impaired" as to its designated uses. *Supra* at 13.

Defendants' discharges of algae—a visible pollutant—also contribute to non-naturally occurring color and turbidity in the Merrymeeting River. Discharged algae turn the River's water greenish and clouded, and impair the River's designated uses, including swimming and other forms of recreation and use by wildlife. ECF No. 47-17 (Rensel Report) at 4; ECF No. 47-3 (Watershed Management Plan) at 30 of 97; ECF No. 47-15 (Gelinas Decl.) at 4-5; ECF No. 47-25 (Quimby Decl.) at 4-6; ECF No. 47-24 (Hoover Decl.) at 2-4.

### B. Defendants' Discharges Cause "Demonstrable Harm to Aquatic Life."

There is no genuine dispute that Defendants' direct and indirect discharges of dissolved and solid bound phosphorus cause "demonstrable harm to aquatic life."[17] Defendants' phosphorus discharges trigger a radical—and environmentally detrimental—change in the River's species composition, causing eutrophication and cyanobacteria blooms. *Supra* at 10–12. Cyanobacteria produce a variety of toxins that can cause death or injury for exposed wildlife, including animals, birds, and fish. *Supra* at 12. Eutrophication has also resulted in filamentous green algae and variable milfoil, an invasive, nuisance aquatic plant species, dominating segments of the River and harming the wildlife that use it. *Supra* at 11. Proliferating algae and milfoil exhaust supplies of dissolved oxygen needed by native species of plants and fish. *Supra*

---

[17] To the extent there is a genuine dispute of material fact relevant to this claim, the Court should deny Defendants' cross motion for summary judgment on this claim and advance the dispute to trial. CLF reserves the right to dispute factual allegations that Defendants may make in their forthcoming consolidated memorandum due on June 30, 2020.

at 11. Where oxygen levels are low enough, they can result in fish kills. *Id*. Anaerobic organisms that thrive in the absence of oxygen produce waste products including sulfides and methane, which are toxic to aquatic animals. *Id*. The over-abundance of algae and cyanobacteria denies sunlight to photosynthesizing organisms in the River, steadily eliminating these native plant species. *Id*. Defendants' discharges trigger an ecological crisis with a cascade of demonstrable harms to aquatic life.

### C. Defendants' Discharges Settle as Harmful Deposits and Float as Scum.

There is no genuine dispute that Defendants discharge dissolved and solid-bound phosphorus from their outfalls that settle to form harmful deposits and float as scum.[18] Defendants discharge large quantities of phosphorus-bearing solids to the River. *Supra* at 6. These solids sink to the floor where they settle and form sediment deposits. *Supra* at 6–7. The benthic deposits are "harmful": when disturbed or exposed to low oxygen conditions they re-release phosphorus to the River, perpetuating a vicious cycle of eutrophication and cyanobacteria blooms. *Supra* at 7–8, 10–12.

In addition, Defendants discharge pollutants that float as scum on the Merrymeeting River. Photographs by Mr. Gelinas, a citizen scientist trained by the University of New Hampshire's Lay Lakes program, show a visible layer of scum on the surface of the Facility's settling ponds. ECF No. 54-2 (Gelinas photographs). When released from Facility outfalls, that scum constitutes a discharge of pollutants that also float as scum in the River, in violation of the Permit. *Supra* at 6 n.3. Although Defendants are currently not discharging floating solids from

---

[18] To the extent there is a genuine dispute of material fact relevant to this claim, the Court should deny Defendants' cross motion for summary judgment on this claim and advance the dispute to trial. CLF reserves the right to dispute factual allegations that Defendants may make in their forthcoming consolidated memorandum due on June 30, 2020.

the settling ponds, under the doctrine of voluntary cessation, this pause in action does not moot Plaintiff's claim. *See infra* at 38–40.

## IV. DEFENDANTS VIOLATE THE PERMIT'S FORMALDEHYDE LIMITS (COUNT III).

There is no genuine dispute that Defendants have violated the Permit's formaldehyde limitations. In response to parasites, such as Gyrodactylus worms, Defendants treat fish at the Facility with formalin, a liquid form of formaldehyde. *Supra* at 14. When Defendants add formalin to the Facility's waters, it is discharged to the Merrymeeting River as formaldehyde in effluent. *Id*. Defendants are authorized to discharge formaldehyde at a daily maximum concentration of 4.6 milligrams per liter (mg/L) and a maximum monthly average concentration of 1.6 mg/L. ECF No. 47-5 (Permit) at 3, 30 of 46. Defendants have repeatedly violated these numeric limitations. ECF No. 47-9 (DMRs) at 1, 2. On previous occasion Defendants discharged wastewater with 1500 percent of the Permit's maximum formaldehyde concentration (4.6 mg/L daily average) and later 200 percent of the Permit limit (1.6 mg/L monthly average). *Supra* at 15.

There is no genuine dispute that Defendants are highly likely to continue to violate the Permit's formaldehyde limits in the future.[19] *Nat. Res. Def. Council, Inc. v. Gould, Inc.*, 733 F. Supp. 8, 9 (D. Mass. 1990) ("Intermittent . . . violations do not cease to be ongoing until the date when there is no real likelihood of repetition…" (internal quotation marks and citation omitted)). Defendants stockpile formalin on the Facility's premises. *Supra* at 15. The Gyrodactylus parasite, which Defendants treat with formalin, seasonally recurs at the Facility. *Supra* at 14–15. When Defendants use formalin again, they will do so as before—on an "as needed basis," in

[19] To the extent there is a genuine dispute of material fact relevant to this claim, the Court should deny Defendants' cross motion for summary judgment on this claim and advance the dispute to trial. CLF reserves the right to dispute characterizations of the summary judgment record Defendants make in their forthcoming consolidated memorandum due on June 30, 2020.

whatever amounts are necessary to eliminate the parasitic infestation. *Supra* at 15. The record indicates no measures undertaken to treat wastewater for formaldehyde or otherwise remediate formaldehyde violations. Defendants' recurring formalin use at the Facility has resulted in Permit violations in the past; it is highly likely to do so in the future.

The summary judgment record provides no support for any alternative attribution of Defendants' recurring formaldehyde violations. For example, speculation about whether some of Defendants' past formaldehyde violations may have been attributable to sampling error would be insufficient to establish a genuine dispute of fact. As the First Circuit has stated, "improbable inferences[] and unsupported speculation[] are insufficient to establish a genuine dispute of fact." *Velazquez-Perez v. Developers Diversified Realty Corp*., 753 F.3d 265, 270 (1st Cir. 2014) (internal quotation marks and citation omitted).

## V. DEFENDANTS VIOLATE THE PERMIT'S PH LIMITS (COUNTS IV & V).

The Permit mandates that Defendants may not discharge effluent from the Facility with a pH lower than 6.5 standard units, unless the effluent's pH is within half a standard unit of the ambient upstream river water. ECF No. 47-5 (Permit) at 2, 27 of 46. The Permit's State Certification requirement also prohibits the discharge of effluent with a pH below 6.5 standard units unless the pH level is no more than 0.5 standard units lower than upstream river water. *Id*. at 16 of 46. These pH limits are violated only where effluent pH is significantly more acidic than water flowing into the Facility from Merrymeeting Lake. *Id.* at 16 of 46. For this reason, a phenomenon such as acid rain cannot account for a violation (i.e. acid rain is unlikely to deposit only on the Facility, and not on the Lake that feeds it). *Cf.* ECF No. 47-10 (Pehrson 2nd Dep.) at 34:4-10. Liability attaches wherever Defendants violate the Permit condition: "Enforcement of the permit is based on strict liability." *Sierra Club v. C.G. Mfg., Inc.*, 638 F. Supp. 492, 495 (D. Mass. 1985).

There is no genuine dispute that Defendants discharge and will continue to discharge acidic wastewater in violation of the Permit limits.[20] To quote Defendants, "[i]t is undisputed that the Hatchery has violated the pH limit at various times in the past and continues to have intermittent violations." ECF No. 44-1 (Defs. Opp. Mem.) at 13. Defendants have violated this Permit limit at least 24 times since 2013—including 6 violations in 2019. *See* ECF No. 47-27 (pH Noncompliance Letters); *see also* ECF No. 47-11 (Smith Dep.) at 45:20-22, 46:8-13, 47:11-13. Despite these repeated violations, Defendants "don't do anything to manipulate the pH" at the Facility prior to discharging the wastewater into the Merrymeeting River. ECF No. 47-10 (Pehrson 2nd Dep.) at 34:1-2. Facility staff attribute the acidification of effluent to the Facility's fish. *Supra* at 15. As Defendants have made no attempts to treat their effluent for low pH despite years of repeated pH violations, these ongoing violations will continue. *Supra* at 16.

## VI. DEFENDANTS DISCHARGE CLEANING WATER TO THE RIVER IN VIOLATION OF THE PERMIT (COUNT VI).

The Permit prohibits Defendants from discharging cleaning water "directly to the receiving water during periodic cleaning operations." ECF No. 47-5 (Permit) at 8. Cleaning water consists of a slurry of solid wastes (feces, uneaten feed) and wastewater that accumulates in the raceways and is periodically vacuumed by Defendants. *Supra* at 8. Under the Permit, only clarified "decant water" that remains after solids have settled may be discharged from the settling ponds directly to the Merrymeeting River. ECF No. 47-5 (Permit) at 8.

There is no genuine dispute that Defendants discharge cleaning water to the River in violation of the Permit.[21] Prior to August 2019, Defendants deposited cleaning water, vacuumed

---

[20] CLF reserves the right to dispute characterizations of the summary judgment record that Defendants make in their forthcoming consolidated memorandum due on June 30, 2020.

[21] To the extent there is a genuine dispute of material fact relevant to this claim, the Court should deny Defendants' cross motion for summary judgment on this claim and advance the dispute to trial. CLF reserves the right to dispute

out of raceways, to settling ponds, a practice allowed by the Permit only "for the purpose of settling solids." *Supra* at 8. Defendants repeatedly discharged solids-laden cleaning water directly from their settling ponds into the Merrymeeting River either before the solids had settled or while turbulent fast-moving water was flowing through the ponds, stirring up sediment. *Supra* at 8–9. Defendants discharged cleaning water in this manner during the summers of 2017, 2018, and 2019, for example, discharging up to 3,000 gallons of cleaning water on July 11, 2018 alone. *Id*.

Defendants' post-complaint "Interim Project" does not moot this claim. "A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (quoting *Already, LLC v. Nike, Inc*., 568 U.S. 85, 91 (2013)); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 174 (2000) (emphasis added). "Absent such an exception, defendants might be tempted to engage in a game of legal 'cat and mouse' by voluntarily ceasing illegal activities in the face of pending litigation only to resume that conduct when the claims against them have been declared moot." *Dubois v. U.S. Dep't of Agric*., 20 F. Supp. 2d 263, 269 (D.N.H. 1998); *see also Friends of the Earth, Inc.*, 528 U.S. at 189. Where a party asserts mootness on the basis of its cessation of unlawful conduct, it bears the "heavy burden of persuading the court" that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc*., 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)).

---

characterizations of the summary judgment record Defendants make in their forthcoming consolidated memorandum due on June 30, 2020.

Here, the record presents nothing to indicate, let alone "ma[ke] . . . absolutely clear," that Defendants cannot reasonably be expected to return to flushing cleaning water into the Merrymeeting River from the settling ponds. *Id.* Defendants' creation of the Interim Project was, by Defendants' admission, voluntary. *Supra* at 9. As the Project's name indicates, it is for "interim" use. Defendants have not and cannot commit to its future, not least because its long-term efficacy in containing and treating the wastewater component of the cleaning-water slurry is yet unknown.

Moreover, sampling by NHDES in Fall 2019 revealed that the Interim Project was designed poorly and is not treating phosphorus as planned. According to engineer and wastewater-system specialist Dr. Wane Schneiter, the Interim Project's "intended biological treatment is not occurring in the circular tanks due to poor design." ECF No. 47-26 (Schneiter Decl.) at 2. The record allows for no genuine dispute that the Interim Project is an experiment, potentially terminating at any time. Nor does the record provide a basis to rule out that Defendants will resume use of the old settling ponds. Defendants concede that the settling ponds have only been "taken out of service," in so far as they are no longer in active use—no physical changes have been made. *Supra* at 10; ECF No. 44-1 (Defs. MSJ Mem.) at 14. The settling ponds remain available on the Facility's premises, ready to return to service. *Supra* at 10. If the Interim Project experiences any failures or problems, as it is likely to do, Defendants could easily return the settling ponds to service, reverting to their unlawful flushing of cleaning water into the Merrymeeting River.

Defendants can be expected to continue violations of the Permit's cleaning water provision. Defendants' stop-gap use of the experimental Interim Project cannot moot CLF's cleaning water claim, because Defendants fail to make "absolutely clear" they cannot be

reasonably expected to revert to unlawful discharges of cleaning water. *Friends of the Earth, Inc.*, 528 U.S. at 189.

## VII. DEFENDANTS FAIL TO IMPLEMENT A BEST MANAGEMENT PRACTICES PLAN (COUNT VII).

The Permit requires Defendants to "implement and maintain a BMP Plan." ECF No. 47-5 (Permit) at 10 of 46. Defendants' Plan "must address, at a minimum" solids control, and must "identify and implement procedures for routine cleaning of rearing units and settling tanks." *Id.* at 11 of 46. The Permit's mandate that Defendants "implement" a Plan is not precatory: once Defendants have developed a Plan, they must carry out and accomplish it. *See Implement*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1999) ("CARRY OUT, ACCOMPLISH; *esp*: to give practical effect to and ensure of actual fulfillment by concrete measures").

There is no genuine dispute that Defendants have not implemented the October 2016 BMP Plan nor its September 2019 revised version.[22] The October 2016 BMP Plan and the revised September 2019 Plan require Defendants to clean Facility raceways "approximately once per week, or once every two weeks in winter, when in use by vacuum pumping" and to clean the round tanks "about once every two weeks." ECF No. 47-6 (Sept. 2019 BMP Plan) at 4; ECF No. 56-8 (Oct. 2016 BMP Plan) at 4 ("[E]ach [raceway] is cleaned once a week, or once every two weeks in winter"). The Facility's "Loads Hauled Log" evidences that Defendants routinely fail to comply with this requirement: in 2019, at least 26 times in the spring, summer, and fall, Defendants failed to clean weekly, and during the winter, biweekly cleanings were missed at least 8 times. *Supra* at 17. At times, raceways are cleaned as infrequently as once per month. *Id.*

---

[22] To the extent there is a genuine dispute of material fact relevant to this claim, the Court should deny Defendants' cross motion for summary judgment on this claim and advance the dispute to trial. CLF reserves the right to dispute characterizations of the summary judgment record that Defendants make in their forthcoming consolidated memorandum due on June 30, 2020.

Charts produced by Defendants confirm that the uncleaned raceways were in use, accumulating fish wastes during the periods when Defendants skipped cleanings. *Id*. According to Jason Smith, the chief of inland fisheries for Fish and Game, the Facility does not have a set cleaning schedule. *Id*. Without a set cleaning schedule that meets the BMP Plan requirements, nor an intention to implement one, Defendants will continue to violate their BMP Plan.

Defendants' promulgation of a revised BMP Plan in September 2019 cannot moot CLF's BMP claim for two reasons. First, as just described, Defendants fail to implement the BMP Plan even as revised in September 2019: they fail to clean Facility raceways "approximately once per week, or once every two weeks in winter, when in use by vacuum pumping" and to clean the round tanks "about once every two weeks." ECF No. 47-6 (Sept. 2019 BMP Plan) at 4. Second, the Court can reasonably expect Defendants to revert to—and continue to violate—their pre-revision October 2016 Plan. *Friends of the Earth, Inc.*, 528 U.S. at 189. The validity of the September 2019 revised BMP Plan is premised on the Defendants' use of the Interim Project. As the use of the Interim Project is a voluntary and potentially temporary change to Defendants' conduct, *see supra* at 9–10, so too is Defendants' reliance on the September 2019 revised BMP Plan. If and when Defendants revert to the use of the settling ponds to flush vacuumed cleaning water to the River, it is reasonably likely they will revert from the September 2019 revisions to the previous October 2016 BMP Plan. Defendants therefore cannot satisfy their "heavy burden of persuading the court" that "subsequent events made it absolutely clear" their wrongful violation of the pre-September BMP Plan "could not reasonably be expected to recur." *Friends of the Earth, Inc.*, 528 U.S. at 189.

**CONCLUSION**

For the foregoing reasons, there is no genuine dispute of material fact as to Counts I-VII, nor as to the proper remedy for these Counts. Defendants' Partial Cross Motion for Summary Judgment should be denied, and CLF is entitled to judgment as a matter of law.

DATED: June 16, 2020

Respectfully submitted,

CONSERVATION LAW FOUNDATION, INC.,

*/s/ Heather A. Govern*
Heather A. Govern, *Admitted Pro Hac Vice*
Chelsea E. Kendall, *Admitted Pro Hac Vice*
Kenta Tsuda, *Admitted Pro Hac Vice*
Conservation Law Foundation
62 Summer St.
Boston, MA 02110
(617) 850-1765
hgovern@clf.org

*/s/ Thomas F. Irwin*
Thomas F. Irwin
N.H. Bar No. 11302
Conservation Law Foundation
27 North Main Street
Concord, NH 03301
(603) 225-3060
tirwin@clf.org

**CERTIFICATE OF SERVICE**

I hereby certify that on June 16, 2020, the foregoing document was filed through the ECF system, by which means a copy of the filing will be sent electronically to all parties registered with the ECF system.

*/s/ Kenta Tsuda*
Kenta Tsuda