**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Conservation Law Foundation, Inc.</u>

                                          Case No. 18-cv-996-PB
  v.                                      Opinion No. 2020 DNH 150

<u>New Hampshire Fish and Game Department, et al.</u>

<u>MEMORANDUM AND ORDER</u>

The Conservation Law Foundation ("CLF"), a non-profit environmental advocacy organization, brought this citizen suit for injunctive and declaratory relief under Section 505 of the Clean Water Act ("CWA") against the Executive Director of the New Hampshire Fish and Game Department ("NHF&G") and the eleven individual officers who serve as commissioners of the New Hampshire Fish and Game Commission (collectively "defendants").[1] CLF alleges that the Powder Mill State Fish Hatchery ("the Facility"), which is owned by the state and operated by the defendants, has for several years been discharging pollutants into the Merrymeeting River in violation of the Facility's National Pollutant Discharge Elimination System ("NPDES") permit. CLF bases its claims on two types of what it alleges are

---

[1] CLF stipulated earlier to a dismissal of the New Hampshire Fish & Game Department ("NHF&G") and the New Hampshire Fish & Game Commission as defendants. Joint Stipulation & Notice of Dismissal of NHF&G, the Comm'n, Barry Carr, & Todd Baldwin with Prejudice, Doc. No. 29 at 1-2.

ongoing CWA violations. The first — "Outfall Discharge" claims — are based on current and anticipated releases of phosphorus and other pollutants directly from the Facility's two outfalls. The remaining claims — "Sediment Discharge" claims — stem from past releases of phosphorus by the Facility that have settled into sediments at the bottom of the river and continue to leach into the river.

The parties have filed cross-motions for summary judgment (Doc. Nos. 72, 73) addressing both types of claims. For the reasons that follow, I grant defendants' motion with respect to the Sediment Discharge claims and grant in part and deny in part each side's motion with respect to the Outfall Discharge claims.

## I.  STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, a "material fact" is one that "ha[s] the 'potential to affect the outcome of the suit under the applicable law.'" Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if "a reasonable jury could resolve the" disputed fact in the nonmovant's favor.

Ellis v. Fidelity Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018) (quoting Cherkaoui, 877 F.3d at 23–24).

The movant bears the initial burden of presenting evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); accord Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016). Once the movant has properly presented such evidence, the burden shifts to the nonmoving party to "designate 'specific facts showing that there is a genuine issue for trial,'" Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in its favor," Flovac, 817 F.3d at 853 (brackets omitted) (internal quotation marks omitted) (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). If the nonmovant fails to produce this evidence, then the motion must be granted. Id.

When the parties file cross-motions for summary judgment, I "view each motion separately, drawing all inferences in favor of the nonmoving party." Giguere v. Port Res. Inc., 927 F.3d 43, 47 (1st Cir. 2019) (internal quotation marks omitted) (quoting Fadili v. Deutsche Bank Nat. Tr. Co., 772 F.3d 951, 953 (1st Cir. 2014)).

## II.    BACKGROUND

### A.    The Facility

NHF&G established the Facility in 1947. Fact Sheet at 3, Ex. 3 to Decl. of Heather A. Govern in Supp. of Pl. CLF's Mot. for Summ. J. ("Govern Decl."), Doc. No. 47-5. It has since been expanded twice and — as of the issuance of its most recent NPDES permit — raises "[e]astern brook trout, rainbow trout, . . . brown trout[,]" and "landlocked salmon[.]" Fact Sheet at 3, Doc. No. 47-5. The Facility complex includes "a [h]atchery [h]ouse, seven series of raceways, three [s]how [p]onds, four [w]oods [p]onds, four [b]ass [p]onds, and [twenty-seven] [c]ircular [t]anks . . . ." Fact Sheet at 3, Doc. No. 47-5. It is capable of producing up to 265,000 harvestable pounds of fish annually. Fact Sheet at 3, Doc. No. 47-5.

As part of its operation, the Facility draws water from the Merrymeeting River, a "Class B waterbody pursuant to [New Hampshire Revised Statutes Annotated Section] 485-A:8 . . . ." Fact Sheet at 6, Doc. No. 47-5.[2] The Facility then discharges water back into the Merrymeeting River through two outfalls, Outfall 001 and Outfall 002. Fact Sheet at 10, Doc. No. 47-5. Downstream of these outfalls, the Merrymeeting River flows into

---

[2] "Class B waterbodies are considered suitable for fishing, swimming[,] and other recreational purposes, and for use as a water supply after adequate treatment." Fact Sheet at 6, Doc. No. 47-5.

4

Marsh Pond, James Pond, Downing Pond, and, eventually, Lake Winnipesaukee. FB Envtl. Assocs., Merrymeeting River & Lake Watershed Management Plan iv (Sept. 2019), Ex. 1 to Govern Decl., Doc. No. 47-3.

**B.   <u>The 2011 Permit</u>**

The U.S. Environmental Protection Agency ("EPA") has designated the Facility "as a concentrated aquatic animal production . . . facility . . . ." Fact Sheet at 3, Doc. No. 47-5. Based upon this designation, the EPA issued the Authorization to Discharge under the NPDES ("2011 Permit"), which imposes limitations and standards on the Facility's discharges, as well as institutes monitoring and reporting requirements. 2011 Permit at 2-16, Doc. No. 47-5. The 2011 Permit expired in December 2016, 2011 Permit at 1, Doc. No. 47-5, and has since been administratively continued, Aff. of Jason Smith ("2019 Smith Aff."), Ex. A to State's Partial Mot. for Summ. J., Doc. No. 44-2 at 2 ¶ 5, Nov. 26, 2019. In December 2019, the EPA issued a draft NPDES permit to replace the expired permit ("2019 Draft Permit"). N.H. Dep't of Envtl. Servs. & EPA Joint Pub. Re-Notice of Pub. Cmt. Period & Notice of a Pub. Hr'g, Pub. Notice No. NH-12-19, Ex. A-1 to Aff. of Jason Smith, Jan. 3, 2020 ("2020 Smith Aff."), Doc. No. 53-3 at 1. The public comment period for the 2019 Draft Permit ended on February 14, 2020. Doc. No. 53-3 at 1. The EPA has yet to issue a final renewed permit. The language

in the 2011 permit relevant to each count alleged in CLF's amended complaint is as follows.

1.    State Water Quality Standards - Phosphorous (Count I)

Under the 2011 Permit, the Facility's "discharge shall not cause a violation of the [state] water quality standards of the receiving water." 2011 Permit, pt. I.A.3, at 7, Doc. No. 47-5. New Hampshire water quality standards require that "[a]ll surface waters . . . be restored to meet the water quality criteria for their designated classification[,] including existing and designated uses, and to maintain the chemical, physical, and biological integrity of surface waters," N.H. Code Admin. R. Env-Wq § 1703.01(b), and that "[a]ll surface waters . . . provide, wherever attainable, for the protection and propagation of fish, shellfish[,] and wildlife, and for recreation in and on the surface waters," id. § 1703.01(c). The standards further state that "[u]nless otherwise specifically allowed by a statute, rule, order, or permit," N.H. Code Admin. R. Env-Wq § 1703.03(c), "[a]ll surface waters shall be free from substances in kind or quantity that," id. § 1703.03(c)(1),

> [s]ettle to form harmful benthic deposits; . . . [f]loat as foam, debris, scum[,] or other visible substances; . . . [p]roduce odor, color, taste or turbidity that is not naturally occurring and would render the surface water unsuitable for its designated uses; . . . [r]esult in the dominance of nuisance species; or . . . [i]nterfere with recreational activities,

id. § 1703.03(c)(1)(a)-(e).

6

Class B waters, such as the Merrymeeting River, "shall have a dissolved oxygen content of . . . (1) [a]t least [seventy-five percent] of saturation, . . . based on a daily average; and (2) [a]n instantaneous minimum dissolved oxygen concentration of at least [five milligrams per liter]." N.H. Code Admin. R. Env-Wq § 1703.07(b). Class B waters cannot "contain . . . benthic deposits that have a detrimental impact on the benthic community, unless naturally occurring." N.H. Code Admin. R. Env-Wq § 1703.08(b). Class B waters also cannot "contain . . . color in such concentrations that would impair any existing or designated uses, unless naturally occurring." N.H. Code Admin. R. Env-Wq § 1703.10(b).

Finally, the regulations prohibit Class B waters from containing "phosphorus . . . in such concentrations that would impair any existing or designated uses, unless naturally occurring." N.H. Code Admin. R. Env-Wq § 1703.14(b). Any "[e]xisting discharges containing phosphorus[,]" therefore, that "encourage cultural eutrophication shall be treated to remove the nutrient(s) to ensure attainment and maintenance of water quality standards," id. § 1703.14(c), and "[t]here shall be no new or increased discharge containing phosphorus . . . to tributaries of lakes or ponds that would contribute to cultural eutrophication or growth of weeds or algae in such lakes or ponds," id. § 1703.14(e).

7

2.    Narrative Requirements - Phosphorous (Count II)

The 2011 Permit requires that the Facility's

> discharge . . . be adequately treated to ensure that the receiving water remains free from pollutants in concentrations or combinations that settle to form harmful deposits, float as foam, debris, scum or other visible pollutants. It shall be adequately treated to ensure that the receiving water remain free from pollutants which produce odor, color, taste[,] or turbidity [that] is not naturally occurring and would render it unsuitable for its designated uses.

2011 Permit, pt. I.A.4, at 7, Doc. No. 47-5. It further requires

that "[n]o components of the effluent . . . result in any

demonstrable harm to aquatic life . . . ." 2011 Permit, pt.

I.A.5.a, at 7, Doc. No. 47-5.

3.    Formaldehyde Discharge Limits (Count III)

The 2011 Permit contemplates that defendants will use

formalin, a mixture of formaldehyde gas in water with methanol.

Fact Sheet at 4, Doc. No. 47-5. Formalin is "[a]dded as needed

to culture water to control external parasites on fish and

eggs." Fact Sheet at 4, Doc. No. 47-5. The Facility's use of

formalin is subject to two limits on the milligram-per-liter

("mg/l") concentration of formaldehyde in the Facility's

outfalls: a maximum daily concentration of 4.6 mg/l and a

maximum monthly average concentration of 1.6 mg/l. 2011 Permit,

pt. I.A.1, at 3; pt. I.A.2, at 5, Doc. No. 47-5.

8

### 4.   pH Limits (Counts IV & V)

The 2011 Permit requires that

> [t]he pH of the [Facility's] discharge shall be in the range of 6.5 to 8.0 standard units (["]S.U.["])[,] unless the upstream ambient pH in the receiving water is outside of this range, and is not altered by the [F]acility's discharge or activities. If the permittee's discharge pH is lower than 6.5 S.U., the permittee may demonstrate compliance by showing that the discharge pH is either higher than, or no more than 0.5 S.U. lower than, the ambient upstream river water pH.

2011 Permit, pt. I.D.1.a, at 16, Doc. No. 47-5; accord 2011 Permit, pt. I.A.1, at 2; pt. I.A.2, at 4, Doc. No. 47-5 (providing charts of discharge limitations for each outfall).[3]

### 5.   Cleaning Water (Count VI)

The 2011 Permit requires that

> [t]here . . . be no direct discharge of "cleaning water." Cleaning water is defined as any water from the [F]acility's hatchery house, raceways, ponds, canals, circular tanks, etc. [that] contains settled solids that have accumulated on the bottom of such structures that is discharged, absent some form of solids removal, directly to the receiving water during periodic cleaning operations. The discharge of water from the hatchery house, or any raceway, pond, canal, circular tank, etc. to a settling tank, empty raceway and/or clarifier for

---

[3] Although CLF has styled Count IV as a violation of the 2011 permit based on Part I.A., and Count V as a violation of identical "state certification requirements" based on Part I.D., a close inspection of the permit reveals that they are one and the same. A footnote to Parts I.A.1 and 2 reads, "Limit is a State Certification Requirement." 2011 Permit, pt. I.A.1 & 2, at 6 n.4, Doc. No. 47-5. In any event, this distinction is immaterial because, as I explained at the October 8, 2019 hearing on defendants' motion to dismiss, there is no potential for improper duplicative relief based on these two pH-related counts.

9

the purposes of settling solids, including the temporary storage of those solids, is allowed. The discharges of any decant water that accumulates above those solids and/or any water that flows slowly over those solids is allowed.

2011 Permit, pt. I.A.9, at 8, Doc. No. 47-5.

### 6.    The Best Management Practices ("BMP") Plan (Count VII)

The 2011 Permit states that the Facility "must continue to implement and maintain a BMP Plan . . . ." 2011 Permit, pt. I.B.4, at 10, Doc. No. 47-5. The BMP Plan "must address, at a minimum, . . . [s]olids [c]ontrol . . . ." 2011 Permit, pt. I.B.4—4.a, at 11, Doc. No. 47-5. Specifically, "[i]n order to minimize the discharge of accumulated solids from settling tanks, basins[,] and production systems," the BMP Plan must "identify and implement procedures for routine cleaning of rearing units and settling tanks . . . ." 2011 Permit, pt. I.B.4.a.ii, at 11, Doc. No. 47-5. Defendants' most recent BMP Plan, adopted pursuant to the 2011 Permit, prescribes a process by which each pool of the seven raceways "is cleaned approximately once per week, or once every two weeks in winter, when in use . . . ." NNF&G, BMP Plan (Sept. 2019), Ex. 4 to Govern Decl., Doc. No. 47-6 at 4. "The [twenty-four] round tanks are cleaned about once every two weeks." Doc. No. 47-6 at 4.

### C.    Alleged Violations of the 2011 Permit

CLF alleges that the following conduct by defendants constitute violations of the 2011 Permit.

10

1.   State Water Quality Standards and 2011 Permit Narrative Requirements - Phosphorous (Counts I & II)

CLF alleges that defendants are violating the 2011 Permit because, although the permit contains no numerical limit for the discharge of phosphorus,[4] defendants' phosphorus discharges cause violations of the state water quality standards and the 2011 Permit narrative requirements that I have outlined above. The primary mechanism by which CLF alleges that the phosphorus discharges impact the waterbody is by "trigger[ing] the growth of invasive aquatic plants, algae, and cyanobacteria (a blue-green, algae-like bacteria)." Pl. CLF's Consol. Mem. of Law in Supp. of Its Mot. for Summ. J. & Its Obj. to Defs.' Partial Cross[-]Mot. for Summ. J., Doc. No. 75 at 10. This growth contributes to hypoxia, which kills fish and results in the

---

[4] Defendants point out repeatedly that the permit includes no numerical limit on phosphorus discharge. See, e.g., Defs.' Consol. Mem. of Law in Supp. of State's Partial Mot. for Summ. J. & in Obj. to Pl.'s Mot. for Summ. J. ("Defs.' Consol. Mem."), Doc. No. 78 at 2, 16, 17, 36 n.4. They made clear at the July 29, 2020 hearing on the cross-motions for summary judgment, however, that they do not argue that the absence of a numeric limit on phosphorus precludes plaintiff's phosphorus-based claims. I agree that the law would not support such a contention. See PUD No. 1 v. Wash. Dep't of Ecology, 511 U.S. 700, 714–15, 114 S. Ct. 1900, 128 L. Ed. 2d 716 (1994) (rejecting the argument that only specific numerical criteria can give rise to CWA liability); Paolino v. JF Realty, LLC, 710 F.3d 31, 39 & n.7, 42 (1st Cir. 2013) (reversing district court's dismissal and permitting suit to go forward based on alleged violations of state water quality standards incorporated into NPDES permit).

"dominance of nuisance species[,] like variable milfoil and filamentous green algae[,] at the expense of biological diversity." Doc. No. 75 at 11. The cyanobacteria also release cyanotoxins, which "are among the most powerful natural poisons known." Cyanobacteria Blooms FAQs, Ex. 17 to Govern Decl., Doc. No. 47-19 at 1.[5]

CLF identifies two processes by which defendants allegedly discharge phosphorus into the Merrymeeting River. First, the Facility's own data from its reports to the EPA show that the Facility directly discharges hundreds of pounds of phosphorus per year from its two outfalls. E.g., 2019 Pollutant Loading Report at 1, Ex. 7 to Govern Decl., Doc. No. 47-9 (showing 431 pounds of phosphorus discharge in 2019 reported as of November 26, 2019); 2018 Pollutant Loading Report at 1, Doc. No. 47-9 at 6 (showing 1,354 pounds of phosphorus discharge in 2018); 2017 Pollutant Loading Report at 1, Doc. No. 47-9 (showing 983 pounds of phosphorus discharge in 2017). One of CLF's experts identifies the Facility as "the single largest point source of

---

[5] At times, defendants have appeared to argue that their phosphorus discharges do not violate the water quality standards or narrative standards because the algae and cyanobacteria, and not the phosphorus, cause these violations. See, e.g., Doc. No. 78 at 21-22. At the hearing on these cross-motions, however, defendants made clear that they do not, in fact, argue that there can be no CWA liability for violations caused by cyanobacteria and algae blooms that are, in turn, directly caused by phosphorus discharges.

[phosphorus] to the watershed." Report of J.E. Jack Rensel M.Sc., Ph.D., Ex. 15 to Govern Decl., Doc. No. 47-17 at 3. These alleged violations stemming from the Facility's current and anticipated discharges from its outfalls are what I have referred to as "Direct Discharges" in earlier orders and what I refer to as "Outfall Discharges" in this order.

Second, according the same expert, discharged phosphorus settles into sediments at the bottom of the ponds downstream from the Facility. Doc. No. 47-17 at 11. Then, through a process called "internal loading," phosphorus from these deposits is re-released into the water column "after hypoxia or physical disturbance breaks the chemical bonds holding it in place." Doc. No. 47-17 at 3. These internal loading discharges of phosphorus are what I have referred to as "Indirect Discharges" in earlier orders and what I refer to as "Sediment Discharges" in this order.

2.    Formaldehyde Discharge Limits (Count III)

CLF identifies two past formalin treatments that resulted in reported formaldehyde concentrations at the Facility's outfalls in excess of permit limits. See Doc. No. 75 at 14-15. First, following a September 2016 sampling analysis, defendants reported a daily maximum formaldehyde concentration of 75 mg/l (far above the permitted daily maximum concentration of 4.6 mg/l). NPDES Discharge Monitoring Report ("DMR") (Sept. 30,

13

2016) at 2, Ex. 7 to Govern Decl., Doc. No. 47-9; accord Doc. No. 75 at 15. Then, in November 2017, defendants reported a daily maximum formaldehyde concentration of 8.8 mg/l and a monthly average formaldehyde concentration of 3.26 mg/l (above the permitted monthly average concentration of 1.6 mg/l). NPDES DMR (Nov. 30, 2017) at 2, Doc. No. 47-9; accord Doc. No. 75 at 15. CLF further argues that, because the parasite infestations that defendants treat with formalin "are seasonally recurring," Doc. No. 75 at 14, and because defendants "maintain supplies of formalin on[-]site at the Facility," Doc. No. 75 at 15, the formaldehyde concentration violations are likely to recur, Doc. No. 75 at 35-36.

### 3.   pH Limits (Counts IV & V)

Plaintiff alleges — and defendants do not dispute — that the Facility's Outfall Discharges have, on occasion, been more acidic than is allowed under the 2011 Permit. Doc. No. 75 at 36-37; Defs.' Consol. Mem., Doc. No. 78 at 10. Defendants provided data showing numerous samples taken over the past four years that were both "below 6.5 S.U. and more than 0.5 S.U. below the pH measured at the inflow." Doc. No. 78 at 10; accord pH Data, Ex. A-3 to 2020 Smith Aff., Doc. No. 53-5 at 1. Most recently, in 2019 (the year after CLF commenced this suit), the Facility took 104 pH measurements (once per week at each of the two

14

outfalls), nine of which were more acidic than permitted. Doc.
No. 78 at 10; accord Doc. No. 53-5 at 1.

   4.    Cleaning Water (Count VI)

Defendants periodically vacuum waste from the Facility's
rearing units, generating "a slurry of water and fish waste"
referred to as "cleaning water." Doc. No. 44-2 at 4 ¶ 14. Prior
to the commencement of this suit, defendants disposed of this
cleaning water by depositing it into settling ponds. Doc. No.
44-2 at 4 ¶ 14. Solids in the waste settled to the bottom of
these ponds while the excess decant water flowed "over dam
boards" and out one of the outfalls. Doc. No. 44-2 at 4 ¶ 14.
The settled solids were then removed from the settling ponds
approximately once a year and applied to "local agricultural
fields." Doc. No. 44-2 at 4 ¶ 14. Plaintiffs allege that the
decant water releases violate the 2011 Permit.

In the summer of 2019, the Facility ceased using the
settling ponds for cleaning water. See Doc. No. 44-2 at 4 ¶ 15.
Instead, defendants devised "a new . . . waste treatment system"
that uses a series of circular tanks to collect settled waste in
cleaning water. Doc. No. 44-2 at 4 ¶ 15. Vegetation in the tanks
is intended to remove excess phosphorus from the cleaning water.
Doc. No. 44-2 at 4 ¶ 16. The resulting effluent then passes
through a sand filter, filter bags, and wood chips and is
discharged into the ground. Doc. No. 44-2 at 4-5 ¶ 16.

Defendants contend that this new waste treatment system moots plaintiffs' cleaning water claim.

5.   The Best Management Practices ("BMP") Plan (Count VII)

Defendants maintain a log "documenting when the loads of vacuumed solids" are transported from rearing units to settling ponds or tanks for regular cleaning. Doc. No. 75 at 16; accord Loads Hauled Log, Ex. 30 to Govern Decl., Doc. No. 47-32. For the purposes of its claim, CLF considers "[d]efendants to have cleaned 'approximately weekly'" when cleanings occurred "no more than [eleven] days apart." Doc. No. 75 at 17 n.8. Based on this definition, CLF identifies "[twenty-six] times in the spring, summer, and fall" of 2019 when defendants did not clean the rearing units "approximately weekly." Doc. No. 75 at 17; accord Summ. Chart: Frequency of Raceway Cleaning at the Facility in 2019, Ex. 32 to Govern Decl., Doc. No. 47-34. CLF further identifies "[eight] times in the winter" of 2019, Doc. No. 75 at 17, when defendants did not clean the rearing units "about once every two weeks," Doc. No. 75 at 16, although CLF does not specify the number of days it used to judge this metric. Plaintiffs' argue that defendants' failure to keep up with the cleaning schedule required by the BMP violates the 2011 Permit.

16

D.     **Remedies Sought**

The remedies CLF seeks include "a declaratory judgment, pursuant to 28 U.S.C. § 2201, that [d]efendants have violated and remain in violation of the [2011] Permit, Section 301(a) of the [CWA], 33 U.S.C § 1311(a), and applicable regulations[;]" an injunction preventing defendants "from violating the requirements of the [2011] Permit, Section 301(a) of the [CWA], 33 U.S.C. § 1311(a), applicable [CWA] regulations, and the State Certification requirement; . . . an injunction requiring [d]efendants to remove sediments from the receiving water; . . . [and] reasonable attorney and expert witness fees . . . ." First Am. Compl. for Declaratory & Injunctive Relief & Civil Penalties, Doc. No. 20 at 28–29.[6]

## III. ANALYSIS

My analysis of CLF's claims is governed by the CWA and the Eleventh Amendment. I outline each relevant area of law before applying both to the facts of this case.

---

[6] At the hearing on defendants' motion to dismiss, CLF abandoned any claim to civil penalties, as barred by the Eleventh Amendment.

A.    **Relevant Law**

1.    The CWA

The CWA aims "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, the CWA "makes unlawful the discharge of any pollutant into navigable waters except as authorized by specified sections of the Act." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 52, 108 S. Ct. 376, 98 L. Ed. 2d 306 (1987) (citing 33 U.S.C. § 1311(a)). For purposes of the CWA, a "discharge of a pollutant" and the "discharge of pollutants" mean "any addition of any pollutant to navigable waters from any point source . . . ." 33 U.S.C. § 1362(12). "Point source," in turn, means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." Id. § 1362(14).[7]

---

[7] By contrast, "Congress intended to leave substantial responsibility and autonomy to the States" for the regulation of nonpoint source pollution. Cnty. of Maui v. Haw. Wildlife Fund, ___ U.S. ___, 140 S. Ct. 1462, 1471, 206 L. Ed. 2d 640 (2020) (citing CWA § 101(b), 86 Stat. 816, 816 (1972) (codified as amended at 33 U.S.C. § 1251(b))).

One exception to the CWA's ban on point source discharges is the National Pollutant Discharge Elimination System (NPDES), which allows the Administrator of the EPA to "issue a permit for the discharge of any pollutant, or combination of pollutants" under certain conditions. 33 U.S.C. § 1342(a)(1). Thus, "all discharges from a 'point source' . . . must obtain an [NPDES] permit." Conservation L. Found., Inc. v. Pruitt, 881 F.3d 24, 26 (1st Cir. 2018) (citing §§ 1362(14), 1342(a)).

State and federal authorities may enforce the terms of an NPDES permit through suits. See generally 33 U.S.C. §§ 1319, 1342(b)(7). Congress intended "[t]he great volume of enforcement actions [to] be brought by the [s]tate." N. & S. Rivers Watershed Ass'n v. Town of Scituate, 949 F.2d 552, 557 (1st Cir. 1991) (internal quotation marks omitted) (quoting Gwaltney, 484 U.S. at 60). Private citizens also share an enforcement role, albeit a more limited one. A citizen may bring a civil enforcement action "against any person . . . alleged to be in violation of" the conditions of an NPDES permit. 33 U.S.C. § 1365(a)(1). The "in violation of" requirement prohibits citizens — but not state and federal authorities — from bringing suits for "wholly past violations." Gwaltney, 484 U.S. at 58, 64. The citizen suit provision "confers jurisdiction . . . when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation . . . ." Id. at 64. The

19

CWA, therefore, grants a district court subject matter jurisdiction to adjudicate

> only citizen suits alleging that defendants are in violation of the [CWA] at the time suit is brought . . . . But once a citizen suit is brought and establishes a present violation, there is nothing in the statute or in Gwaltney that prevents a court from ordering equitable relief to remedy the harm done in the past.

U.S. Pub. Int. Rsch. Grp. v. Atl. Salmon of Me., LLC, 339 F.3d 23, 33 (1st Cir. 2003). In addition to an injunction, the district court may award attorneys' fees and, when the defendant is a private party, impose civil penalties. § 1365(a), (d).

### 2.    The Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ." U.S. Const. amend XI. "Long interpreted as an affirmation of state sovereign immunity[,]" the Eleventh "[A]mendment (despite its literal text) also bar[s] a citizen from bringing a federal court action against his or her own State." Maysonet-Robles v. Cabrero, 323 F.3d 43, 48 (1st Cir. 2003) (footnote omitted). This immunity "extends to bar suits against state agents and instrumentalities . . . ." Id. (citing Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429, 117 S. Ct. 900, 137 L. Ed. 2d 55 (1997)).

20

The Eleventh Amendment's prohibition is, however, "subject to a well[-]recognized exception" described in Ex parte Young, 209 U.S. 123, 159–60, 28 S. Ct. 441, 52 L. Ed. 714 (1908). Town of Barnstable v. O'Connor, 786 F.3d 130, 138 (1st Cir. 2015) (internal quotation marks omitted) (quoting Rosie D. ex rel. John D. v. Swift, 310 F.3d 230, 234 (1st Cir. 2002)). This exception "permits 'federal courts, notwithstanding the absence of consent, waiver[,] or evidence of congressional assertion of national hegemony, [to] enjoin state officials to conform future conduct to the requirements of federal law.'" Id. (alteration in original) (quoting Rosie D., 310 F.at 234). The Ex parte Young exception is, itself, subject to an exception articulated in Edelman v. Jordan, 415 U.S. 651, 666, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974). "The distinction between that relief permissible under the doctrine of Ex parte Young and that found barred in Edelman [is] the difference between prospective relief on [the] one hand and retrospective relief on the other." Quern v. Jordan, 440 U.S. 332, 337, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979). "The Constitution does not permit relief that 'would have much the same effect as a full-fledged award of damages or restitution by the federal court . . . .'" O'Connor, 786 F. 3d at 138 (quoting Mills v. Maine, 118 F.3d 37, 55 (1st Cir. 1997)). Put differently, "[t]he key question . . . is whether the" relief sought

> requires the payment of funds or grants other relief, "not as a necessary consequence of compliance in the future with a substantive federal question determination, but as a form of compensation" or other relief based on or flowing from violations at a prior time when the defendant "was under no court-imposed obligation to conform to a different standard."

Guardians Ass'n v. Civ. Serv. Comm'n, 463 U.S. 582, 604, 103 S. Ct. 3221, 77 L. Ed. 2d 866 (1983) (quoting Edelman, 415 U.S. at 668). The Eleventh Amendment similarly bars federal courts from granting declaratory relief related solely to past violations of federal law. See Green v. Mansour, 474 U.S. 64, 74, 106 S. Ct. 423, 88 L. Ed. 2d 371 (1985).

**B.     Application**

CLF's most substantial claims allege that defendants are discharging large quantities of phosphorous into the Merrymeeting River in violation of the 2011 Permit. I begin by analyzing CLF's phosphorous claims and then take up each of its remaining claims in turn.

1.     Phosphorous Claims (Counts I and II)

Although CLF's complaint does not separate its Sediment Discharge claims from its Outfall Discharge claims, I view these two types of alleged violations as analytically distinct. Accordingly, I first address CLF's Sediment Discharge claims: the category of claims encompassing the portions of Counts I and II that allege violations of the 2011 Permit due to "internal

22

loading" of phosphorus that left the Facility's outfalls and settled into sediment in the receiving waters before plaintiffs filed their complaint. I then address CLF's Outfall Discharge claims, which include those portions of Counts I and II that allege violations of the 2011 Permit due to the Facility's current and anticipated discharges of phosphorus from its outfalls.

### i.    Sediment Discharge Claims

There can be no doubt that CLF has alleged an ongoing violation of the CWA under Gwaltney. Defendants' present discharges from their outfalls are, perhaps, paradigmatic point source discharges. CLF's good-faith allegations that those discharges continue to violate provisions of defendants' NPDES permit and incorporated state water quality standards are unambiguous allegations of "continuous or intermittent violation[s]." Gwaltney, 484 U.S. at 64. This is plainly sufficient to establish subject matter jurisdiction under the CWA for both plaintiffs' Sediment Discharge claims and their Outfall Discharge claims. See Atl. Salmon of Me., 339 F.3d at 33. Defendants argue, however, that the relief CLF seeks with respect to the Sediment Discharge claims — namely, an injunction requiring defendants to remove or otherwise remediate the phosphorus-laden sediments — is a form of retrospective relief barred by the Eleventh Amendment. See Doc. No. 73 at 8 ¶ 30.

23

CLF counters with two legal theories. First, it argues that the sediments are, themselves, point sources attributable to defendants. Doc. No. 75 at 20. Because the sediments continue to discharge phosphorus, CLF argues, an injunction requiring defendants to eliminate those discharges is necessarily a prospective form of relief not barred by the Eleventh Amendment. Second, CLF argues that, even if the sediments are not point sources, the Sediment Discharges represent the lingering effects of prior Outfall Discharges. According to CLF, an injunction to clean up the contaminated sediments does not violate the Eleventh Amendment under this "continuing violation" theory because it would merely require the defendants to end what CLF argues is an ongoing violation of the CWA. See Doc. No. 75 at 20-21. Neither argument is ultimately persuasive.

a.   Sediments as a Point Source

CLF's argument that the sediments at the bottom of the receiving waters are, themselves, point sources cannot be reconciled with the CWA's definition of "point source." To be sure, there is support for the proposition that "[t]he concept of a point source was designed to . . . embrac[e] the broadest possible definition of any identifiable conveyance from which pollutants might enter waters of the United States." Dague v. City of Burlington, 935 F.2d 1343, 1354-55 (2d Cir. 1991) (quoting United States v. Earth Scis., Inc., 599 F.2d 368, 373

(10th Cir. 1979)), rev'd in part on other grounds, 505 U.S. 557, 112 S. Ct. 2638, 120 L. Ed. 2d 449 (1992). Even reading this statute as broadly as possible, however, I struggle to see how diffuse sediments spread across multiple ponds could qualify as "discernible, confined, and discrete conveyance[s] . . . ." See § 1362(14).

Although the CWA's examples of "conveyances" that qualify as "point sources" are non-exhaustive, I can hardly disregard those examples in my analysis. I may "rely on the principle of noscitur a sociis — a word is known by the company it keeps — to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'" Yates v. United States, 574 U.S. 528, 543, 135 S. Ct. 1074, 191 L. Ed. 2d 64 (2015) (quoting Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 575, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995)). Pollutant-containing sediments — that form at the base of waterbodies and re-release pollutants through natural processes — have little in common with pipes, ditches, channels, tunnels, or any of the other enumerated "point sources." See § 1362(14).

Yet another flaw with CLF's argument is illuminated by one of the numerous cases to which it cites to illustrate the breadth of conveyances that other courts have deemed to be "point sources." In Ohio Valley Environmental Coal, Inc. v.

25

Hernshaw Partners, LLC, 984 F. Supp. 2d 589 (S.D. W. Va. 2013), the court found that water percolating through a valley fill deposit and out of the valley's "toe" into a river was adequately alleged to be a point source. Id. at 599. In doing so, the court distinguished the toe discharge from "uncollected rainfall runoff" — a nonpoint source — because "water discharged from the toe of the valley fill is easily ascribed to a single source: the valley fill." Id. The same cannot be said of the sediments at issue here, even when fully crediting CLF's version of the material facts. See Doc. No. 75 at 32 ("Defendants' discharges are the primary contributors of phosphorus to the [r]iver, accounting for [sixty-seven] percent of the total phosphorus in the [r]iver.").

Furthermore, in every case CLF cites[8] demonstrating the broad array of recognized point sources, the point source is, without exception, the point at which the pollutant first finds its way from the permitted entity to navigable waters. See, e.g., Sierra Club v. Abston Const. Co., Inc., 620 F. 2d 41, 45 (5th Cir. 1980) (holding that overflow from mine spoils pile was

---

[8] At the hearing on these cross-motions, the case CLF cited as providing the greatest support for its contention that the sediments are point sources was Rybachek v. EPA, 904 F. 2d 1276 (9th Cir. 1990). This case discusses the CWA's use of the word "addition" within its definition of "discharge," not within its definition of "point source." Id. at 1285–86.

a point source discharge, where that overflow was carried to navigable waters "by means of ditches, gullies[,] and similar conveyances"); Earth Scis., Inc., 599 F.2d at 374 (holding that sump pit "discharge, whether from a fissure in [its] dirt berm or overflow of [its] wall" is an "escape of liquid from [a] confined system" and, therefore, "from a point source"). I can find no case where a defendant discharged a pollutant from a point source into navigable waters, the pollutant left and reentered navigable waters by natural processes, and the reentry was found to be a point source attributable to the defendant. Such a broad reading would destroy any meaningful distinction between point sources and nonpoint sources and confuse the jurisdiction of the CWA with the enforcement authority Congress left to the states. See Cnty. of Maui v. Haw. Wildlife Fund, ___ U.S. ___, 140 S. Ct. 1462, 1471, 206 L. Ed. 2d 640 (2020) ("[A]s to . . . nonpoint source pollution, Congress intended to leave substantial responsibility and autonomy to the States.").

    b.   Sediment Discharges as Continuing Violations

CLF's fallback argument is that an injunction to clean up the contaminated sediments is a form of prospective relief authorized by the Eleventh Amendment because a person who violates the CWA by improperly discharging pollutants through a point source remains "in violation" until the effects of the violation have dissipated. Under this argument, an order to

clean up the sediments is a permissible form of prospective relief that merely requires defendants to stop an ongoing violation of the CWA.

Plaintiffs draw their argument from cases that consider whether the lingering effects of prior point source discharges can support a citizen suit under Gwaltney. Other courts that have addressed that issue have come to differing conclusions. See Sierra Club v. El Paso Gold Mines, Inc., 421 F.3d 1133, 1139-40 (10th Cir. 2005) (collecting cases), as corrected, (Oct. 21, 2005); Day, LLC v. Plantation Pipe Line Co., 315 F. Supp. 3d 1219, 1236 (N.D. Ala. 2018) (same). As I have explained, however, this case does not present a Gwaltney problem because CLF has credibly alleged that defendants are currently discharging phosphorous through the Facility's Outfalls. Instead, the very different question at issue here, which none of the cases cited by the parties consider, is whether the Eleventh Amendment bars a federal court from issuing an injunction against state officials to eliminate the lingering effects of past point source discharges.

In answering this question, it is important to bear in mind that regardless of whether a citizen suit can be based on the lingering effects of a past point source discharge, it remains the case that the conduct that the CWA prohibits is the "discharge of pollutants . . . ." § 1362(12). Because the

Sediment Discharge claims are based solely on prior discharges through the Facility's Outfalls, an injunction to correct the lingering effects of such discharges is necessarily retrospective. See Edelman, 415 U.S. at 665 ("It is one thing to tell [a state defendant] that he must comply with the federal standards for the future . . . . It is quite another thing to order [a state defendant] to use state funds to make reparation for the past." (internal quotation marks omitted) (quoting Rothstein v. Wyman, 467 F.2d 226, 236–37 (2d Cir. 1972))). If I were to require defendants to remove sediment contaminated by past point source discharges, it would be "relief based on or flowing from violations at a prior time when . . . defendant[s] '[were] under no court-imposed obligation to conform to a different standard.'" Guardians Ass'n, 463 U.S. at 604 (quoting Edelman, 415 U.S. at 668).[9] Applying a continuing violation argument to overcome Gwaltney, therefore, does nothing to address the Eleventh Amendment bar to the injunction CLF seeks.

Because the sediments are not "point sources" within the meaning of the CWA, and because CLF's continuing violation theory cannot overcome the hurdle imposed by the Eleventh

---

[9] A declaratory judgment that defendants have violated their NPDES permit due to past discharges that have resulted in the creation of phosphorus-laden sediments would be similarly barred under Green. See 474 U.S. at 74.

Amendment, the relief it seeks with respect to the Sediment Discharges is barred. Defendants are, therefore, entitled to summary judgment on Counts I and II, to the extent those counts are based on the Sediment Discharges.

### ii.   Outfall Discharge Claims

As I have already noted, the Facility's outfalls are indisputably point sources. Defendants advance no argument that their current and anticipated discharges from those outfalls are outside the jurisdiction of the CWA citizen suit provision under Gwaltney. They, furthermore, do not argue that the Eleventh Amendment prevents me from enjoining them to modify their current and anticipated outfall discharge. Having cleared these two hurdles, I proceed to the merits of each count.

   a.   State Water Quality Standards (Count I)

As I have already noted, state water quality standards incorporated into an NPDES permit can form the basis of CWA liability. See PUD No. 1 v. Wash. Dep't of Ecology, 511 U.S. 700, 714-15, 114 S. Ct. 1900, 128 L. Ed. 2d 716 (1994). CLF asks me to rule, as a matter of law, that defendants' discharges cause algae and cyanobacteria blooms and that those blooms, in turn, violate a litany of state water quality standards incorporated into the 2011 Permit. Defendants do not move for summary judgment on this count and, instead, ask only that I

deny CLF's motion because genuine disputes of material fact remain. Doc. No. 78 at 35-41. I agree with the defendants on this issue.

When, as in this case, "the party moving for summary judgment bears the burden of proof on an issue, he cannot prevail 'unless the evidence he provides on that issue is conclusive.'" EEOC v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados de P.R., 279 F.3d 49, 55 (1st Cir. 2002) (quoting Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35 (1st Cir. 1998)). Here, there are simply too many disputes of material fact that must be resolved before I could rule in CLF's favor on this claim. Most importantly, as both parties recognize, the Facility is not the only source of phosphorus discharges on the Merrymeeting River. See Doc. No. 78 at 38; Doc. No. 75 at 32. The Merrymeeting River & Lake Watershed Management Plan provided by CLF identifies septic systems, fertilizers, abandoned landfills, and climate change as other potential sources of phosphorus. Doc. No. 47-3 at 40-43. It is entirely possible that CLF can prove the necessary chain of causation through evidence introduced at trial. On summary judgement, however, I must "draw[] all inferences in favor of the nonmoving party." Giguere, 927 F.3d at 47 (quoting Fadili, 772 F.3d at 953). Because issues of material fact remain, I deny

the motion for summary judgment on Count I with respect to CLF's Outfall Discharge claims.

b.   NPDES Permit Narrative Requirements (Count II)

My analysis of Count II largely repeats my analysis of Count I with respect to the Outfall Discharge claims. To prove the alleged violations of the 2011 Permit's narrative requirements, CLF must prove that defendants' discharges caused those violations. When I draw all reasonable inferences in defendants' favor, I cannot conclude that CLF has proven causation as a matter of law.

Defendants have also moved for summary judgment on this count. Doc. No. 78 at 20–25. Just as CLF has not proven a link between defendants' discharges and the alleged violations, defendants have not proven the absence of such a link. CLF has provided ample evidence from which a reasonable juror could conclude that defendants' discharges produce unnatural odor, color, taste, or turbidity in the Merrymeeting River by causing cyanobacteria and algae blooms, and that these blooms render the receiving waters unsuitable for their designated uses. See, e.g., Doc. No. 47-17 at 4–5 (expert report articulating causal link between Facility's phosphorus discharge and eutrophication in receiving waters). Defendants have, similarly, failed to meet the summary judgment standard as to the Outfall Discharge claims in Count II.

32

The parties' cross-motions for summary judgment on Count II are, therefore, denied to the extent they are based on Outfall Discharges.

2.    Formaldehyde Discharge Limits (Count III)

Defendants concede that they have "used formalin (formaldehyde) to treat parasitic infections in" the Facility's fish and fish eggs four times in the past five years. See Aff. of Edward J. Malone ("Malone Aff."), Ex. B to State's Partial Mot. for Summ. J., Doc. No. 44-11 at 2 ¶ 5. They also acknowledge that, in two of those instances, the Facility reported formaldehyde discharges that violated the limitations in the 2011 Permit. Doc. No. 44-11 at 2 ¶¶ 7-9; 3 ¶¶ 13-14. Defendants assert, however, that only one of these discharges actually exceeded permitted limitations, as the other was caused by a sampling error. Doc. No. 44-11 at 2-3 ¶ 10; accord Doc. No. 78 at 8-9.

In support of their explanation, defendants have provided a contemporaneous letter sent to the EPA by Edward Malone, the Facility's superintendent, who conducted the sampling. Letter from Edward J. Malone, Hatchery Superintendent, to Joy J. Hilton, EPA, Water Treatment Unit - SEW (Sept. 27, 2016), Ex. B-3 to Malone Aff., Doc. No. 44-14. This letter attributes the reported high formaldehyde concentration to "operational error." Doc. No. 44-14. Malone, in an affidavit accompanying defendants'

33

motion, further explains that he "had mistakenly taken the water samples" for the formaldehyde test

> from the tail end of the B series of raceways where the treatment had been administered, instead of at Outfall 002 as required under the [Facility's] standard operating procedures. Because of the incorrect sampling location, the samples showed inaccurately high results that did not accurately represent the concentration of formaldehyde at Outfall 002, which would have been substantially lower due to dilution within the [Facility] from the other series.

Doc. No. 44-11 at 2–3 ¶ 10. Defendants, therefore, move for summary judgment on Count III, arguing that CLF "has failed to establish an ongoing violation of the formaldehyde effluent limits in the [2011] Permit." Doc. No. 73 at 4 ¶ 11.

CLF offers no evidence to contradict Malone's contemporaneous letter and sworn statements but merely expresses disbelief of his account. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (footnote omitted). However sincere CLF's skepticism may be, it is, without more, insufficient to generate a genuine dispute of material facts.

I am left, therefore, to consider only one instance in the past six years when defendants' formaldehyde discharge exceeded its permitted limits and three subsequent formalin treatments

that did not result in discharges with unpermitted formaldehyde concentrations. "[A] single, past violation" is not sufficient to meet a citizen suit plaintiff's burden of alleging "a continuing likelihood" of future violations. Pawtuxet Cove Marina, Inc. v. Ciba-Geigy Corp., 807 F.2d 1089, 1094 (1st Cir. 1986). Accordingly, defendants' motion is granted with respect to Count III.

### 3.   pH Limits (Counts IV and V)

There is no dispute that the Outfall Discharges have, on numerous occasions, had a pH below 6.5 S.U. and more than 0.5 S.U. lower than the ambient upstream water. E.g., Doc. No. 78 at 41. Defendants acknowledge that there were nine instances in 2019 alone when the Outfall Discharges violated the pH limit. Doc. No. 78 at 41. They merely argue, instead, that CLF has not proven a causal link between the Facility's activities and the low pH, because the Facility's outflow pH is also occasionally higher than the upstream pH. Doc. No. 78 at 41-42. Defendants contend, therefore, that "it is likely that pH [p]ermit violations are the result of external environmental factors." Doc. No. 78 at 41.

It is highly improbable that a decrease in pH between the Facility's inflow and outflow could be attributed to anything other than the Facility itself. Whether the Facility, in fact, is the cause of the low pH is, however, immaterial. Unlike

provisions of the 2011 Permit that require a showing of causation, the pH provision imposes a strict liability standard. Compare, e.g., 2011 Permit, pt. I.A.3, at 7, Doc. No. 47-5 ("The discharge shall not cause a violation of the water quality standards of the receiving water." (emphasis added)) with 2011 Permit, pt. I.D.1.a, at 16, Doc. No. 47-5 ("The pH of the discharge shall be in the range of 6.5 to 8.0 [S.U.] . . . .").

Whatever the cause, it is undisputed that defendants' discharges violated the 2011 Permit. The fact that violations indisputably continued unabated, even after CLF commenced this suit, is proof that those violations are likely to continue. Cf. Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd., 844 F.2d 170, 171 (4th Cir. 1988) (holding that citizen-plaintiff can prove an ongoing violation "by proving violations that continue on or after the date the complaint is filed"); accord Nat. Res. Def. Council v. Sw. Marine, Inc., 236 F.3d 985, 998 (9th Cir. 2000) (citing Chesapeake Bay Found., 844 F.2d at 171). CLF is, therefore, entitled to summary judgment on Counts IV and V.

4.    Cleaning Water (Count VI)

CLF has proffered evidence that defendants frequently discharged cleaning water directly into the Merrymeeting River in the summers of 2017, 2018, and 2019. Decl. of Michael Gelinas, Ex. 13 to Govern Decl., Doc. No. 47-15 at 4 ¶ 26. If

36

true, these discharges would violate the 2011 permit's prohibition on "direct discharge of 'cleaning water.'" 2011 Permit, pt. I.A.9, at 8, Doc. No. 47-5. Defendants have not contradicted this account and argue only that CLF's cleaning water claim is now moot given the Facility's new interim cleaning water system, which discharges cleaning water into the ground. Doc. No. 78 at 27-29.

"The doctrine of mootness enforces the mandate 'that an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed.'" ACLU of Mass. v. U.S. Conf. of Cath. Bishops, 705 F.3d 44, 52 (1st Cir. 2013) (internal quotation marks omitted) (quoting Mangual v. Rotger-Sabat, 317 F.3d 45, 60 (1st Cir. 2003)). "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." United States v. Concentrated Phosphate Exp. Ass'n, 393 U.S. 199, 203, 89 S. Ct. 361, 21 L. Ed. 2d 344 (1968); accord City of Los Angeles v. Lyons, 461 U.S. 95, 101, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983) (noting that temporary moratorium on the use of the challenged policy did not moot the case). One "reason for mootness is that a court cannot provide meaningful relief to the allegedly aggrieved party," especially when "the only relief requested is an injunction," and "there is no ongoing conduct left for the court to enjoin." U.S. Conf. of Cath. Bishops, 705

37

F.3d at 53. Declaratory judgements deeming past conduct illegal are similarly disfavored because "[t]he Supreme Court has admonished that federal courts 'are not in the business of pronouncing that past actions [that] have no demonstrable continuing effect were right or wrong.'" Id. (quoting Spencer v. Kemna, 523 U.S. 1, 18, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998)).

Ordinarily, a defendant may not render a suit moot simply by voluntarily ceasing its challenged conduct once the suit is commenced. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) ("It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982))). As I have written previously, unsupported speculation that temporary cessation will at some point become permanent "cannot provide a sufficient foundation to moot a live controversy." N.H. Lottery Comm'n v. Barr, 386 F. Supp. 3d 132, 143 (D.N.H. 2019), argued, No. 19-1835 (1st Cir. June 18, 2020).

Here, CLF questions the efficacy of defendants' new cleaning water system. See Decl. of R. Wane Schneiter, Ex. 24 to Govern Decl., Doc. No. 47-26 at 4 ¶¶ 8-9 (providing expert's sworn statements). Further, while the settling ponds used in the

Facility's former cleaning system have been "drained, cleaned, and taken out of service," they remain on-site. Doc. No. 78 at 28. There is no practical bar to defendants returning to past practices. Cf. Already, LLC v. Nike, Inc., 568 U.S. 85, 96, 133 S. Ct. 721, 184 L. Ed. 2d 553 (2013) ("[T]he voluntary cessation standard requires the defendant to show that the challenged behavior cannot reasonably be expected to recur . . . ."). Accordingly, I see no way to conclude, as a matter of law, that CLF's cleaning water claim is moot.[10] I am, likewise, unable to find at the summary judgment stage that defendants' settling pond system violated the 2011 Permit's prohibition on the direct discharge of cleaning water because CLF's cleaning water count is based entirely on the observations of a non-expert bystander, which is insufficient evidence for me to rule in CLF's favor at this stage. The parties' motions are, therefore, denied with respect to Count VI.

    5.   The BMP Plan (Count VII)

Defendants' 2011 Permit does not include any specific cleaning requirements. Rather, it requires defendants "to implement and maintain a BMP Plan . . . ." 2011 Permit, pt.

---

[10] Although I am highly likely to credit defendants' representation that it will not revert to a challenged practice once this suit is resolved, I cannot reach that conclusion at the summary judgment stage. Cf. City of Los Angeles v. Lyons, 461 U.S. 95, 101, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983).

I.B.4, at 10, Doc. No. 47-5. This plan "must address, at a minimum, . . . [s]olids [c]ontrol." 2011 Permit, pt. I.B.4.-4.a, at 11, Doc. No. 47-5. Furthermore, "[i]n order to minimize the discharge of accumulated solids from settling tanks, basins[,] and production systems," the BMP Plan must "identify and implement procedures for routine cleaning of rearing units and settling tanks . . . ." 2011 Permit, pt. I.B.4.a.ii., at 11, Doc. No. 47-5. Defendants' BMP Plan prescribes a cleaning schedule of "approximately once per week" for some of its units and "about once every two weeks" for others. Doc. No. 47-6 at 4. CLF argues that it has identified numerous instances — continuing even after it filed this suit — where defendants "routinely fail[ed] to comply with this requirement" by missing cleanings. Doc. No. 75 at 40.

Litigation over the minutiae of BMP Plan implementation is rare. Defendants identify two cases addressing whether provisions of a BMP Plan adopted pursuant to an NPDES permit were adequate. See Doc. No. 78 at 30–31. Neither party, however, has cited a single case where a court found a defendant's failure to follow its BMP Plan to the letter constituted a violation of the CWA. Without the benefit of guiding caselaw, I turn to the text of the 2011 Permit.

The plain text of the 2011 Permit does not require defendants to adhere to a rigid cleaning schedule. Rather, it

requires the BMP Plan to "identify and implement procedures for routine cleaning . . . ." 2011 Permit, pt. I.B.4.a.ii, at 11, Doc. No. 47-5. Thus, even if I were to adopt CLF's definition of "approximately once per week" and determine that defendants' cleaning fell short of that definition, that shortcoming alone would not constitute a violation of the 2011 Permit. To reach the level of a violation, defendants' implementation of their BMP Plan would have to fall so far short that they fail to fulfill the 2011 Permit's mandate to "address, at a minimum . . . [s]olids [c]ontrol . . . [i]n order to minimize the discharge of accumulated solids." 2011 Permit, pt. I.B.4.—4.a.ii, at 11, Doc. No. 47-5.

I am willing to accept the proposition, at least in principle, that a failure to fulfill that mandate could constitute a violation of the 2011 Permit. Determining whether defendants' implementation of their approximated cleaning schedule is inadequate, however, would require a detailed factual inquiry. Neither party has presented evidence showing whether defendants' current implementation of their BMP Plan minimizes the discharge of accumulated solids. At present, I have little more than CLF's inferences drawn from defendants' "Loads Hauled Log," see Doc. No. 75 at 40-41, and an affidavit from an NHF&G employee stating that "[r]igid adherence to a weekly or bi-weekly cleaning schedule for each rearing unit

41

without regard to specific rearing unit conditions would not optimize solids removal," 2020 Smith Aff., Doc. No. 53-2 at 3 ¶ 11. This evidence is insufficient to permit an award of summary judgment to either party. The motions are, therefore, denied with respect to Count VII.

## IV.   CONCLUSION

For the foregoing reasons, defendants' partial cross-motion for summary judgment (Doc. No. 73) is granted with respect to the Sediment Discharge claims in Counts I and II and with respect to Count III in its entirely. CLF's cross-motion for summary judgment (Doc. No. 72) is granted with respect to Counts IV and V.

Pursuant to 28 U.S.C. § 2201, I declare that defendants' discharges have violated the pH limits in their 2011 NPDES Permit. Defendants shall have ninety days to devise and implement a system to cease Outfall Discharges that violate these limits.

The motions are, in all other respects, denied.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

August 27, 2020

42

cc:   Chelsea Elizabeth Kendall, Esq.
      Heather A. Govern, Esq.
      Kenta Tsuda, Esq.
      Thomas F. Irwin, Esq.
      Christopher G. Aslin, Esq.