# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

**Conservation Law Foundation, Inc.**

　　　　v.

　　　　　　　　　　　　　　　　　Case No. 1: 18-cv-00996-PB
　　　　　　　　　　　　　　　　　Opinion No. 2023 DNH 033

**Scott Mason, Executive Director,**
**New Hampshire Fish and Game**
**Department, et al.**


## MEMORANDUM AND ORDER

The Conservation Law Foundation ("CLF"), a non-profit environmental advocacy organization, brought this citizen suit for injunctive and declaratory relief under Section 505 of the Clean Water Act ("CWA") against various state defendants. The complaint alleged that the Powder Mill State Fish Hatchery ("the Facility"), which is owned by the state and operated by the defendants, has been discharging pollutants into the Merrymeeting River in violation of the Facility's National Pollutant Discharge Elimination System ("NPDES") permit. The U.S. Environmental Protection Agency ("EPA") eventually intervened in the action, and the parties agreed to the entry of a consent decree resolving the plaintiffs' claims. After I approved the consent decree, CLF moved for attorney's fees. For the following reasons, the motion is granted in part and denied in part.

# I.   <u>BACKGROUND</u>

CLF filed this citizen suit under Section 505 of the CWA on October 31, 2018, against the New Hampshire Fish & Game Department and its Executive Director, as well as the New Hampshire Fish & Game Commission and its eleven commissioners. CLF alleged that the Facility was discharging various pollutants into the Merrymeeting River, including phosphorus, formaldehyde, and acidic wastewater, in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and the Facility's 2011 NPDES Permit ("2011 Permit"). The complaint asserted two types of ongoing CWA violations: (1) "Outfall Discharges," based on current and anticipated releases of phosphorus and other pollutants directly from the Facility's two outfalls, and (2) "Sediment Discharges," as a result of past releases of phosphorus by the Facility that settled into sediments at the bottom of the river and continue to leach into the river. The complaint requested a declaratory judgment, injunctive relief, civil penalties, and an award of attorney's fees. Following a motion to dismiss, CLF voluntarily dismissed the two state entities from the action and disavowed any request for civil penalties on Eleventh Amendment grounds. The rest of the complaint survived the defendants' attempts at dismissal.

Following extensive fact and expert discovery, the parties filed cross-motions for summary judgment. I granted summary judgment to the

defendants on CLF's Sediment Discharge claims on the ground that they sought retrospective relief barred by the Eleventh Amendment. See CLF, Inc. v. N.H. Fish & Game Dep't, 2020 DNH 150, 2020 WL 5102830, at *11 (D.N.H. Aug. 27, 2020). With respect to the Outfall Discharges, I granted summary judgment to the defendants on CLF's claim that the Facility was exceeding the 2011 Permit's formaldehyde limit, and I granted summary judgment to CLF on the claim that the defendants were violating the Permit's pH limit. Id. at *13-14. I denied both parties' motions with respect to the remaining Outfall Discharge claims, which were principally focused on releases of phosphorus in violation of the 2011 Permit's narrative effluent limits and state water quality standards. Id. at *12, *14-15.

A few months later, the 2011 Permit was superseded by a new NPDES permit that took effect on January 1, 2021 ("2021 Permit"). The 2021 Permit imposed numeric limits on phosphorus discharges and specified that those limits were a "translation" of the 2011 Permit's narrative limits into quantitative terms. See Doc. No. 90-2 at 97. CLF subsequently amended its complaint, restating its claims with reference to the 2021 Permit, and moved for partial summary judgment with respect to violations of the numeric phosphorus effluent limits. Meanwhile, the defendants moved to dismiss those same claims for lack of notice.

In April 2021, I denied the defendants' partial motion to dismiss and scheduled a status conference with the parties and representatives from EPA to discuss EPA's willingness to intervene and establish a transition schedule for the Facility to come into compliance with the 2021 Permit. Thereafter, the defendants, CLF, and EPA engaged in a year-long negotiation. EPA eventually joined the action as a plaintiff and intervenor, and all three parties executed a consent decree and submitted it for court approval. After an opportunity for public comment, I issued final judgment in November 2022, in the form of an order entering the consent decree.

The consent decree requires the defendants to achieve compliance with the 2021 Permit and the CWA, to undertake interim measures until full compliance can be achieved, and to assess options to remediate the pollution caused by Sediment Discharges. See Doc. No. 130. Specifically, the defendants must construct a wastewater treatment system at the Facility by December 31, 2025, to achieve compliance with the 2021 Permit's effluent limitations. Id. at 13-15. In the interim, the defendants must take measures to improve their waste collection and disposal practices and increase cleaning and maintenance. Id. at 8-13. The defendants are also required to address the buildup of phosphorus-loaded sediment by performing a Merrymeeting River Phosphorus Assessment and a Remediation Options Study to assess the impacts of the phosphorus pollution and any remediation options. Id. at 18-

4

24. Violations of the consent decree automatically trigger a stipulated penalty starting at $1,000 per day for violations of its compliance or remediation requirements and $750 per day for violations of its reporting requirements. Id. at 27-31.

After the entry of the consent decree, CLF moved for a full award of attorney's fees and costs. The requested attorney's fees amount to $538,774, reflecting 2,065.3 hours of work performed by ten CLF attorneys and other staff during the four years of litigation. In addition, CLF seeks an award of its expert fees ($33,563.28), deposition costs ($2,821.19), and other litigation costs ($1,081.52). The defendants object to the motion.

## II.   STANDARD OF REVIEW

Under the citizen suit provision of the CWA, a court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d). Because this form of relief is not mandatory, "the trial court's discretion in respect to fee awards is extremely broad." Perez-Sosa v. Garland, 22 F.4th 312, 320 (1st Cir. 2022) (cleaned up).

To be eligible for an award of fees and costs, the movant must be a "prevailing" or "substantially prevailing" party, meaning a party who has "succeed[ed] on any significant issue in litigation which achieves some of the

benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983) (cleaned up); see id. at 433 n.7 (construing "prevailing party" under 42 U.S.C. § 1988 but explaining that "[t]he standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party'"). "The party's success cannot be a hollow victory; it must materially alter the litigants' legal relationship by modifying one party's behavior in a way that directly benefits the other." Maine Sch. Admin. Dist. No. 35 v. Mr. R., 321 F.3d 9, 14 (1st Cir. 2003).

The prevailing party has the burden of proving the reasonableness of the fees it seeks to recover. Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 340 (1st Cir. 2008). In this circuit, fee awards are commonly calculated using the lodestar method. Perez-Sosa, 22 F.4th at 321. "The lodestar amount equals the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Efron v. Mora Dev. Corp., 44 F.4th 72, 76 (1st Cir. 2022) (cleaned up). Calculating the lodestar is a two-step process. Perez-Sosa, 22 F.4th at 321. At step one, "the court must calculate the number of hours reasonably expended by the attorneys for the prevailing party, excluding those hours that are excessive, redundant, or otherwise unnecessary." Id. (cleaned up). Step two involves deriving "a reasonable hourly rate or rates — a determination that is often benchmarked to the prevailing rates in the

community for lawyers of like qualifications, experience, and competence." Id. (cleaned up). The court then multiplies the resulting figures to arrive at the lodestar amount. Id.

After the lodestar is calculated, the court may adjust the fee upward or downward based on the so-called Hensley factors, with the greatest weight assigned to the "results obtained" in litigation. Joyce v. Town of Dennis, 720 F.3d 12, 27 (1st Cir. 2013). This factor takes into account the plaintiff's "claim-by-claim success, the relief obtained, and the societal importance of the right vindicated." Burke v. McDonald, 572 F.3d 51, 65 n.11 (1st Cir. 2009).

## III.   ANALYSIS

CLF argues that it is entitled to a full award of its attorney's fees and costs because (1) it is a prevailing party by virtue of the consent decree and the entry of summary judgment in its favor on the pH claim, (2) the award should not be reduced to account for work on the claims on which the defendants prevailed at summary judgment because the consent decree provided relief for those claims, and those claims are interrelated with CLF's successful claims, and (3) its hours and rates are otherwise reasonable and well-documented. The defendants challenge, to some extent, all three arguments. They first contend that CLF is not a prevailing party because it was EPA's issuance of the 2021 Permit and its intervention in the action, not

CLF's litigation, that resulted in the consent decree. In the alternative, the defendants contend that CLF's fees associated with its unsuccessful claims should be excluded from the award, and that the award should be further reduced for various inadequacies and excessive fees. I address these arguments in turn.

## A.   Prevailing Party

It is well-established that a party can prevail for purposes of a fee-shifting statute by obtaining relief through a consent decree. See Farrar v. Hobby, 506 U.S. 103, 111 (1992); Maher v. Gagne, 448 U.S. 122, 129-30 (1980). "Although a consent decree does not always include an admission of liability by the defendant, it nonetheless is a court-ordered change in the legal relationship between the plaintiff and the defendant." Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res., 532 U.S. 598, 604 (2001) (cleaned up). Here, the consent decree provides relief on at least some of CLF's outstanding claims against the defendants and in ways that have changed the parties' legal relationship. Indeed, the defendants concede that CLF "is arguably technically a prevailing party" as a signatory to the consent decree. See Doc. No. 132-1 at 10. They argue, however, that I should deny CLF prevailing party status because it was EPA's issuance of the 2021 Permit, rather than CLF's efforts in this case, that led to the consent decree. That argument fails to persuade.

While it is true that the 2021 Permit would have issued irrespective of CLF's litigation, I cannot say the same about the consent decree. CLF actively participated in the negotiation of the consent decree and, based on its zealous advocacy throughout this litigation, I have no doubt that CLF meaningfully contributed to the development of the decree. The imprint of CLF's involvement is reflected in the fact that the consent decree creates new rights and obligations beyond those mandated by the 2021 Permit. Most significantly, violations of the consent decree automatically trigger a stipulated penalty starting at $750 or $1,000 per day depending on the type of violation, Doc. No. 130 at 29-30, whereas the 2021 Permit merely allows for the possibility of an enforcement action for "[a]ny permit noncompliance," Doc. No. 90-2 at 24. Other requirements imposed only in the consent decree include: (1) implementation of the Best Management Practices Plan, Doc. No. 130 at 8; (2) additional sampling and monitoring, id. at 11-13; (3) the requirement that the defendants either cease discharge or complete construction on the wastewater treatment system by December 31, 2025, id. at 13-15; (4) fish production targets and pollutant action levels, with exceedance consequences, id. at 10-11, 16-18; (5) study of the impacts of accumulated sediments discharged by the Facility and remediation options, id. at 18-24; and (6) quarterly and semi-annual consent decree compliance reports, id. at 26-27. Therefore, the consent decree affords various forms of

judicially sanctioned relief with respect to CLF's claims that the 2021 Permit alone does not provide. Such relief is sufficient to show that CLF obtained the necessary degree of success to be considered a prevailing party.

The consent decree has also "materially alter[ed] the litigants' legal relationship" in another way that directly benefits CLF. See Mr. R., 321 F.3d at 14. "The parties to a consent decree . . . achieve a continuing basis of jurisdiction to enforce the terms of the resolution of their case in the court entering the order." Aronov v. Napolitano, 562 F.3d 84, 91 (1st Cir. 2009) (cleaned up). As a signatory to the consent decree, CLF can bring the defendants before the court to enforce compliance with any of its provisions without filing a new action. Therefore, I agree with CLF that it is a prevailing party in this suit.

## B.    Reduction for Hours Spent on Unsuccessful Claims

The parties agree that CLF's work performed after the issuance of the 2021 Permit related exclusively to its successful claims and thus should factor into the lodestar calculation. The defendants likewise do not challenge the reasonableness of CLF's claimed hourly rates, and I agree that those rates are reasonable and commensurate with the experience of its attorneys. The parties disagree, however, on the compensability of CLF's services performed prior to the issuance of the 2021 Permit.

CLF maintains that it is entitled to a full award of attorney's fees even though I granted summary judgment to the defendants on a substantial category of claims asserted in the complaint. CLF's principal argument is that the consent decree provides relief even for those claims that I found legally deficient. In other words, CLF contends that all its clams were ultimately successful notwithstanding its loss on summary judgment. Alternatively, CLF maintains that its unsuccessful claims are so intertwined with its successful claims that it would be difficult to segregate the hours on a claim-by-claim basis. Neither argument carries the day.

CLF's various claims for relief fell into two categories: Outfall Discharge claims and Sediment Discharge claims. Except for its formaldehyde claim, which I resolved at summary judgment in the defendants' favor, CLF achieved victory on its Outfall Discharge claims: it prevailed on summary judgment on a lightly litigated claim involving the Facility's failure to comply with the 2011 Permit's pH limit, and it obtained relief for the remaining Outfall Discharge claims through the consent decree. But CLF lost on summary judgment on the entirety of its Sediment Discharge claims, which were a substantial part of the case until that point. I concluded that, as a matter of law, relief for those claims was barred by the Eleventh Amendment. See CLF, 2020 WL 5102830, at *11. My legal conclusion has not been challenged on appeal and thus remains the law of the

case. Cf. United States v. Wallace, 573 F.3d 82, 87-88 (1st Cir. 2009) ("Under the law of the case doctrine, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (cleaned up). That the consent decree includes some measures that potentially may lead to remediation of Sediment Discharges in the future, namely requiring the defendants to assess what could be done to remedy the issue, does not mean that CLF was successful on those claims. Irrespective of the consent decree's measures aimed at potential remediation of Sediment Discharges,[1] those claims remain legally deficient and thus cannot qualify as anything but unsuccessful claims. Thus, I agree with the defendants that CLF is not a prevailing party with respect to its Sediment Discharge claims.

When a prevailing party litigates multiple distinct claims for relief but achieves only a partial victory, fees associated with its unsuccessful claims ordinarily must be excluded from the fee award. See Hensley, 461 U.S. at 435; Burke, 572 F.3d at 63. The rationale for the exclusion is that "work on an unsuccessful claim cannot be deemed to have been expended in pursuit of

---

[1]     The consent decree does not require defendants to remediate Sediment Discharges, which was the relief that CLF sought. Instead, the consent decree leaves that remediation to EPA's enforcement discretion, following an agreed upon study of downstream phosphorus releases and potential remediation options, including a no-action option.

the ultimate result achieved." Hensley, 461 U.S. at 435 (cleaned up). Fees

may be awarded for services on the unsuccessful claims, however, if those

claims are interconnected with the successful claims. Id.; Burke, 572 F.3d at

63. Claims are interconnected when they either rest on "a common core of

facts" or are "based on related legal theories." Lipsett v. Blanco, 975 F.2d 934,

940 (1st Cir. 1992) (cleaned up). In such cases, the "lawsuit cannot be viewed

as a series of discrete claims" because "[m]uch of counsel's time will be

devoted generally to the litigation as a whole, making it difficult to divide the

hours expended on a claim-by-claim basis." Hensley, 461 U.S. at 435. Only

when "the fee-seeker properly documents [its] claim and plausibly asserts

that the time cannot be allocated between successful and unsuccessful

claims" does the burden shift to the fee-target "to show a basis for

segregability." Lipsett, 975 F.2d at 941.

CLF's contention that its successful and unsuccessful claims are

interrelated strains credulity. Apart from conclusory assertions that research

and investigation related to some claims benefited work on other claims, the

basis for CLF's relatedness contention appears to be that all its claims "are

Clean Water Act claims factually connected to discharges from the Facility

and the conditions of the Merrymeeting River." Doc. No. 135 at 9. As the

defendants point out, if that were sufficient, then all CWA claims that stem

from releases from the same facility would be interrelated for fee award
purposes. But that is not the law.

Contrary to CLF's assertion, the Sediment Discharge claims and the
Outfall Discharge claims were based on different facts and legal theories. The
Outfall Discharge claims challenged the defendants' present and anticipated
discharges from their outfalls. The evidence for those claims was relatively
straightforward: the Facility's own data from its reports to EPA showed that
the Facility directly discharged hundreds of pounds of phosphorus per year
from its two outfalls. CLF, 2020 WL 5102830, at *5. By contrast, the
Sediment Discharge claims were premised on the evidence that discharged
phosphorus settles into sediments at the bottom of the ponds downstream
from the Facility and is then rereleased into the water column through a
process called "internal loading" once "hypoxia or physical disturbance breaks
the chemical bonds holding it in place." Id. at *6 (cleaned up). To prove those
claims, CLF retained an expert, Dr. Jack Rensel, to explain the science
behind the process of internal loading and to opine on the resulting impact on
the Merrymeeting River. See Doc. No. 75 at 11-13; Doc. No. 47-17. The
evidence for the two categories of claims, then, was not common.

Nor were CLF's successful and unsuccessful claims based on similar
legal theories. The Outfall Discharge claims were based on "paradigmatic
point source discharges" prohibited by the CWA. CLF, 2020 WL 5102830, at

*9. The relief sought under those claims was undoubtedly prospective and therefore permissible under the Eleventh Amendment. See id. at *11. By contrast, the relief CLF sought with respect to the Sediment Discharge claims was an injunction requiring the defendants to remove or otherwise remediate the phosphorus-laden sediments. Id. at *9. Because the Eleventh Amendment bars retrospective relief against state defendants, CLF had the burden to show that such an injunction would constitute prospective relief. See id. At summary judgment, CLF responded with two novel legal arguments to address that issue. They first argued that the sediments were themselves "point sources" within the meaning of the CWA. I rejected that argument as inconsistent with the plain language of the statute. See id. at *10. Alternatively, CLF maintained that lingering effects of prior point source discharges constitute a "continuing violation" until the effects of the discharges have dissipated. Id. at *11. That theory likewise failed to clear the Eleventh Amendment hurdle. Because the Sediment Discharge claims were based solely on prior discharges through the Facility's outfalls, I concluded that an injunction to correct the lingering effects of such discharges is necessarily retrospective. See id. Considering that there was no question that the Outfall Discharge claims sought prospective relief, those successful claims did not benefit from the substantial efforts CLF expended on

developing the legal theories that underpinned their unsuccessful Sediment Discharge claims.

Because CLF has not persuaded me that the Sediment Discharge claims were either "intertwined with, and contributed materially to, the eventual success of" the Outfall Discharge claims, or that CLF has achieved such "a smashing success" that it "should recover a fully compensatory fee," CLF is not entitled to a full award of attorney's fees. See Trainor v. HEI Hosp., LLC, 699 F.3d 19, 35-36 (1st Cir. 2012) (cleaned up).

Unfortunately, CLF's fee petition does not adequately allocate time between its successful and unsuccessful claims. Ordinarily, a fee seeker should provide "an affidavit explaining with sufficient detail how the line item entries—or even categories of line item entries—were related to the meritorious claim." Burke, 572 F.3d at 64. As was the case in Burke, CLF's time records provide "little, if any, basis for determining what work reflected in them was done to develop what claims." See id. The vast majority of the time entries are ambiguous about the exact scope of the work performed, with typical entries such as "case strategy emails," "drafting" and "editing" pleadings or discovery requests, and "document review" making it impossible to determine the time expended on a claim-by-claim basis. See Doc. No. 131-8. Indeed, the word "sediment" appears only seven times and "Eleventh

Amendment" only three times in the 38 pages of billing records, which surely underestimates the time spent on the Sediment Discharge claims.[2]

Since CLF has not adequately allocated time between its successful and unsuccessful claims, the defendants argue that "an obvious demarcation point" is the filing of the second amended complaint ("SAC") that came on the heels of the 2021 Permit. See Doc. No. 132-1 at 12. According to the defendants, with a limited exception for the pH claim, CLF should not be compensated for any work performed before the 2021 Permit issued. That work, the argument goes, did not contribute to CLF's ultimate success because its pre-SAC claims that survived summary judgment were based on the narrative provisions of the 2011 Permit, which were displaced by the numeric phosphorus effluent limits in the 2021 Permit.

Although attractive in its simplicity, the defendants' proposal fails to appreciate the interrelatedness of CLF's Outfall Discharge claims under the two permits. CLF defended the core of its Outfall Discharge claims through summary judgment, which at that time focused on the narrative limits and

---

[2]     CLF's only attempt at a time allocation involves an "estimate[]" of "the time spent briefing and developing legal arguments for each claim based on the number of pages devoted to each issue" in its pleadings. See Doc. 135 at 10; Doc. No. 135-10. Based on that estimate, 18.4% of CLF's pleadings concerned the unsuccessful claims. See Doc. No. 135-10. Setting aside the adequacy of this method of allocation, CLF has not proposed a time allocation for other tasks, which consumed more time than the briefing.

state water quality standards. When EPA imposed a numeric effluent limit in the 2021 Permit, it described that limit as a "translation" into quantitative terms of the prior permit's phosphorus-related narrative standards. See Doc. No. 90-2 at 97. Thus, while differing in form, the 2021 Permit's numeric limit for phosphorus is substantively similar to the 2011 Permit's phosphorus-related narrative conditions. Stated differently, the pre-SAC and post-SAC claims were based on a common core of facts and related legal theories. As such, I cannot say that CLF's pre-SAC efforts expended on the surviving Outfall Discharge claims should be excluded from the fee award.

Because CLF has not delineated its pre-SAC attorney's fees on a claim-by-claim basis, I must resort to a less exacting approach. The First Circuit's guidance when addressing analogous circumstances in Burke is instructive. Faced with a similarly difficult task where the fee seeker did not adequately meet his burden to segregate his hours between successful and unsuccessful claims, the First Circuit agreed that the district judge acted within the bounds of his discretion in applying a "global reduction" based on the district judge's "proportionate estimate of the time spent on the meritorious claim." See Burke, 572 F.3d at 64. The First Circuit noted that both the Supreme Court and its own precedent were consistent with the district court's approach. See id. Specifically, the Supreme Court in Hensley acknowledged that "no precise rule or formula" existed and that it was up to the district

18

court to either "attempt to identify specific hours that should be eliminated" or else "simply reduce the award to account for the limited success." 461 U.S. at 436-37. The court in Burke also cited precedent "permitting district courts, when computing the lodestar amount, to 'discount or disallow' hours when time records are 'too generic and, thus, insufficient as a practical matter to permit a court to answer questions about excessiveness, redundancy, and the like.'" 572 F.3d at 64 (quoting Torres-Rivera, 524 F.3d at 336).

Like the district court in Burke, I conclude that the best approach available to me in these circumstances is to apply a global reduction. Having presided over this case for over four years and ruled on multiple rounds of substantive motions, I estimate that 30% of the pre-SAC work was of little to no benefit to CLF's ability to succeed on its surviving Outfall Discharge claims. As I noted earlier, CLF expended significant work on the novel theories and the evidence that supported only its unsuccessful Sediment Discharge claims. In addition to the substantial effort that went into legal research, CLF needed an expert witness to explain the science underlying those claims. Indeed, much of Dr. Rensel's expert report focused on evidence that benefited only the Sediment Discharge claims and ultimately proved fruitless. See Doc. No. 47-17. Accordingly, based on my estimate of the hours spent on the unsuccessful claims, I will recognize only 70% of the pre-SAC hours in the lodestar calculation.

**C.    Other Reductions in Hours**

The defendants argue that there should be a further reduction in hours when calculating the lodestar to exclude certain hours as not adequately documented or unreasonably expended.

First, the defendants request a global 10% reduction of the hours to address non-contemporaneous recordkeeping. The defendants point out that CLF attorneys' affidavits show that they used a combination of contemporaneous time records and post-event reconstruction based on their subsequent review of emails and docket entries. The First Circuit requires fee petitions to be based on contemporaneous time records and has instructed lower courts that, absent extraordinary circumstances, failure to keep contemporaneous time records should result in a "substantial reduction in any award." Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 952 (1st Cir. 1984). Because some unidentified time records were retrospectively generated and CLF has not identified exceptional circumstances for its failure to prepare only contemporaneous records, I agree with the defendants that the appropriate resolution is to reduce the hours globally by 10%.

Relatedly, the defendants argue that a reduction for excessive billing is necessary because CLF attorneys spent too much time preparing the fee petition. CLF attorneys spent more time preparing the fee petition (nearly 160 hours) than they did negotiating settlement and the consent decree

(nearly 95 hours). Especially considering that a significant amount of the time billed for the fee petition was likely wasted on reconstructing timekeeping records that should have been contemporaneously maintained, I conclude that the hours worked on the fee petition were excessive. As such, I will grant the defendants' request for a 50% reduction of the hours spent on preparing the fee petition.[3]

The defendants next seek a reduction to the hours billed by Attorney Kendall while she was a law student intern. The bulk of her 111 hours was spent on researching and preparing the notice of intent letter that began this case. CLF counters that it excluded hours spent by several other interns but included then-Intern Kendall's hours because she had prior relevant experience and made significant contributions. Although I do not doubt that that is the case, I agree with the defendants that a trained attorney would have completed the task in substantially less time. Accordingly, Intern Kendall's hours will be reduced by 50%.

---

[3]     The defendants also argue that excessive billing occurred because too many CLF attorneys attended hearings and conferences or spent too much time conferencing amongst themselves. Having examined the records in question, I disagree that they show excessive billing. Further, I take CLF attorneys on their word as officers of the court that they made efforts to exclude conferencing hours and included only those that were reasonable. The defendants' request for a reduction for purported administrative and clerical tasks fares no better. Having reviewed those entries, I disagree that they necessarily reflect purely administrative work that should be excluded.

Lastly, the defendants seek a reduction for CLF attorneys' travel time. Several CLF attorneys billed for travel time without indicating that the travel time was spent working on the case. "If the attorney is merely traveling and not working on the case, however, courts in this circuit normally reduce the rate charged by fifty percent." Conservation L. Found., Inc. v. Patrick, 767 F. Supp. 2d 244, 255 (D. Mass. 2011). Thus, I will reduce by 50% the rate charged for traveling.

As summarized in the table below, the various reductions I have allowed in calculating the lodestar yield a lodestar figure of $333,176.79. Because neither party has argued that an upward or a downward adjustment to the lodestar is warranted in this case based on the Hensley factors, I conclude that CLF is entitled to the lodestar amount.[4]

| Description | Fee Amount |
|---|---|
| Pre-SAC attorney's fees | $429,578.00 |
| Pre-SAC attorney's fees after 30% reduction for unsuccessful claims | $300,704.60 |
| Post-SAC attorney's fees | $109,196.00 |
| Combined pre- and post-SAC lodestar | $409,900.60 |
| Combined lodestar after 10% reduction for non-contemporaneous recordkeeping | $368,910.54 |
| Combined lodestar after reductions for excessive hours | $333,176.79 |

[4]     The defendants recite the Hensley factors in their surreply brief in support of their argument that all pre-SAC claims should be deemed unsuccessful, but they do not present a developed argument on how I should evaluate those factors as a distinct basis for a downward fee adjustment.

**D.     Expert Fees and Other Costs**

In addition to its attorney's fees, CLF seeks an award of expert costs ($33,563.28), deposition costs ($2,821.19), and other litigation cost ($1,081.52). The defendants argue that those costs should be disallowed because they are all associated with CLF's pre-SAC claims. Because I rejected the defendants' argument that all pre-SAC claims are not compensable, I likewise reject their argument that those costs should be excluded altogether. However, because issues related solely to the Sediment Discharge claims predominated Dr. Rensel's expert report, I will deduct 70% of his expert fees to account for the unsuccessful claims. The total amount for expert and other costs owed to CLF is $23,195.93.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, I grant CLF's motion for attorney's fees and costs (Doc. No. 131) in part and deny it in part. CLF is entitled to $333,176.79 in attorney's fees and $23,195.93 in costs.

SO ORDERED.

<u>/s/ Paul J. Barbadoro</u>
Paul J. Barbadoro
United States District Judge

April 26, 2023

cc:     Counsel of record